ELIZABETH KERRIGAN ET AL. *v.* COMMISSIONER OF PUBLIC HEALTH ET AL.
(SC 17716)

Borden, Norcott, Katz, Palmer, Vertefeuille, Zarella and Harper, Js.*

---

* The listing of justices reflects their seniority status at the time of oral argument.

Argued May 14, 2007—officially released October 28, 2008

*Bennett C. Klein*, pro hac vice, with whom were *Kenneth J. Bartschi* and *Mary L. Bonauto*, pro hac vice, and, on the brief, *Karen L. Loewy*, pro hac vice, *Jennifer L. Levi*, pro hac vice, and *Karen L. Dowd*, *Maureen Murphy* and *Renee Redman*, for the appellants (plaintiffs).

*Jane R. Rosenberg*, assistant attorney general, with whom were *Robert W. Clark* and *Susan Quinn Cobb*, assistant attorneys general, and, on the brief, *Richard Blumenthal*, attorney general, for the appellees (named defendant).

*Judith Ravel*, for the appellee (defendant Dorothy Bean, acting town clerk of the town of Madison).

*Jennifer A. Osowiecki* filed a brief for Connecticut Clergy for Marriage Equality et al. as amici curiae.

*Daniel J. Klau* filed a brief for Carlos Ball et al. as amici curiae.

*Sheila A. Huddleston, Christopher R. Drury, Lee Anne Duval* and *Kevin M. Roy* filed a brief for Ian Ayres et al. as amici curiae.

*Noah B. Novogrodsky, Ben A. Solnit* and *Paul Guggina* filed a brief for the International Human Rights Clinic of the University of Toronto Faculty of Law et al. as amici curiae.

*Stuart D. Rosen, William C. Heuer, Meghan Freed Pelletier, Stuart F. Delery, Nora Freeman Engstrom* and *Benjamin C. Mizer* filed a brief for the Human Rights Campaign et al. as amici curiae.

*Sheila Horvitz* filed a brief for the Connecticut chapter of the American Academy of Matrimonial Lawyers as amicus curiae.

*Linda L. Morkan* and *Kori Termine Wisneski* filed a brief for the Lambda Legal Defense and Education Fund, Inc., as amicus curiae.

*Timothy S. Fisher, Charles D. Ray* and *Brian P. Rice* filed a brief for Peter W. Bardaglio et al. as amici curiae.

*Leslie I. Jennings-Lax* filed a brief for Barbara Aaron et al. as amici curiae.

*Martin B. Margulies, Emanuel Margolis, Mary-Kate Smith, Jennifer Gerarda Brown* and *Suzanne B. Goldberg* filed a brief for the American Association of University Women in Connecticut et al. as amici curiae.

*Paul M. Smith, William M. Hohengarten, Eric Berger, Nathalie F.P. Gilfoyle* and *Sandra Rachel Baker* filed a brief for the American Psychological Association et al. as amici curiae.

*Joseph Niglio, Paul R. Devin, Thomas Brejcha* and *Paul Benjamin Linton* filed a brief for the Knights of Columbus as amicus curiae.

*Dwight G. Duncan* and *William T. Barrante* filed a brief for the Alliance for Marriage as amicus curiae.

*Peter Wolfgang* filed a brief for John Coverdale et al. as amici curiae.

*Michael K. Conway* filed a brief for James Q. Wilson et al. as amici curiae.

*Anthony R. Picarello, Jr., Roger T. Severino* and *Howard M. Wood III* filed a brief for the Becket Fund for Religious Liberty as amicus curiae.

*Gregg Hannan* and *Monte N. Stewart* filed a brief for United Families Connecticut as amicus curiae.

*Howard M. Wood III* filed a brief for Paul McHugh et al. as amici curiae.

*Vincent P. McCarthy, Laura Hernandez* and *Kristina J. Wenberg* filed a brief for the Family Institute of Connecticut as amicus curiae.

*Mark W. Dost* filed a brief for the Connecticut Catholic Conference, Inc., as amicus curiae.

*Hugh D. Hughes, Benjamin W. Bull, Glen Lavy, Christopher R. Stovall* and *Dale Schowengerdt* filed a brief for the Family Research Council as amicus curiae.

*Opinion*

PALMER, J. The issue presented by this case is whether the state statutory prohibition against same sex marriage violates the constitution of Connecticut. The plaintiffs, eight same sex couples, commenced this action, claiming that the state statutory prohibition against same sex marriage violates their rights to substantive due process and equal protection under the state constitution. The trial court rendered summary judgment in favor of the defendant state and local officials upon determining that, because this state's statutes afford same sex couples the right to enter into a civil union, which affords them the same legal rights as marriage, the plaintiffs had not established a constitutionally cognizable harm. We conclude that, in light of the history of pernicious discrimination faced by

gay men and lesbians,[1] and because the institution of marriage carries with it a status and significance that the newly created classification of civil unions does not embody, the segregation of heterosexual and homosexual couples into separate institutions constitutes a cognizable harm. We also conclude that (1) our state scheme discriminates on the basis of sexual orientation, (2) for the same reasons that classifications predicated on gender are considered quasi-suspect for purposes of the equal protection provisions of the United States constitution, sexual orientation constitutes a quasi-suspect classification for purposes of the equal protection provisions of the state constitution, and, therefore, our statutes discriminating against gay persons are subject to heightened or intermediate judicial scrutiny, and (3) the state has failed to provide sufficient justification for excluding same sex couples from the institution of marriage. In light of our determination that the state's disparate treatment of same sex couples is constitutionally deficient under an intermediate level of scrutiny, we do not reach the plaintiffs' claims implicating a stricter standard of review, namely, that sexual orientation is a suspect classification, and that the state's bar against same sex marriage infringes on a fundamental right in violation of due process and discriminates on the basis of sex in violation of equal protection. In accordance with our conclusion that the statutory scheme impermissibly discriminates against gay persons on account of their sexual orientation, we reverse the trial court's judgment and remand the case with direction to grant the plaintiffs' motion for summary judgment.

The record reveals the following undisputed facts and procedural history. On August 24, 2004, the plain-

---

[1] For convenience and economy of language, we hereinafter refer to gay men and lesbians as gay persons.

tiffs,[2] eight same sex couples who applied for and were denied marriage licenses by the town of Madison, commenced this action, seeking a declaratory judgment and injunctive relief against the defendants, J. Robert Galvin, in his official capacity as commissioner of the state department of public health, and Dorothy Bean, in her official capacity as acting town clerk and deputy registrar of vital statistics of the town of Madison. The plaintiffs sought, inter alia, a judgment declaring that, to the extent that any statute, regulation or common-law rule precludes otherwise qualified individuals from marrying someone of the same sex, or because they are gay or lesbian couples, such statutes, regulations and common-law rules violate various provisions of the state constitution, including the due process provisions of article first, §§ 8[3] and 10,[4] and the equal protection provisions of article first, §§ 1[5] and 20, as amended.[6]

[2] The plaintiffs, each of whom has identified himself or herself as a partner in a long-term, committed, same sex relationship with another plaintiff, are Elizabeth Kerrigan and Joanne Mock, Janet Peck and Carol Conklin, Geraldine Artis and Suzanne Artis, Jeffrey Busch and Stephen Davis, J.E. Martin and Denise Howard, John Anderson and Garrett Stack, Barbara Levine-Ritterman and Robin Levine-Ritterman, and Damaris Navarro and Gloria Searson. Several of the couples have been together for more than twenty years, and many of them have raised or are raising children together. Although we recognize each of the plaintiffs as a member of a same sex couple, for purposes of their state constitutional claims, we treat them as individuals seeking the right to marry the same sex partner of their choice.

[3] Article first, § 8, of the constitution of Connecticut provides in relevant part: "No person shall . . . be deprived of life, liberty or property without due process of law . . . ."

[4] Article first, § 10, of the constitution of Connecticut provides: "All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay."

[5] Article first, § 1, of the constitution of Connecticut provides: "All men when they form a social compact, are equal in rights; and no man or set of men are entitled to exclusive public emoluments or privileges from the community."

[6] Article first, § 20, of the constitution of Connecticut, as amended by articles five and twenty-one of the amendments, provides: "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political

The plaintiffs did not raise any claims under the United States constitution. The plaintiffs also sought an order directing Bean to issue a marriage license to each couple and the department of public health to register the plaintiffs' marriages once they were performed.[7]

While the plaintiffs' action was pending in the trial court, the legislature passed Public Acts 2005, No. 05-10, now codified at General Statutes § 46b-38aa et seq. (civil union law), which established the right of same sex partners to enter into civil unions and conferred on such unions all the rights and privileges that are granted to spouses in a marriage. See General Statutes § 46b-38nn;[8] see also General Statutes (Sup. 2008) § 46b-38oo.[9] Under the civil union law, however, "marriage" is defined as "the union of one man and one woman." General Statutes § 46b-38nn. In light of this intervening statutory development, the parties narrowed the issue posed by this action to whether the civil union law and

rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability."

[7] The plaintiffs also claimed that state laws limiting marriage to opposite sex couples violated the right of free expression and association protected by article first, §§ 4, 5 and 14, of the constitution of Connecticut. On appeal, however, the plaintiffs expressly have abandoned that claim.

[8] General Statutes § 46b-38nn provides: "Parties to a civil union shall have all the same benefits, protections and responsibilities under law, whether derived from the general statutes, administrative regulations or court rules, policy, common law or any other source of civil law, as are granted to spouses in a marriage, which is defined as the union of one man and one woman."

[9] General Statutes (Sup. 2008) § 46b-38oo provides: "Wherever in the general statutes the terms 'spouse', 'family', 'immediate family', 'dependent', 'next of kin' or any other term that denotes the spousal relationship are used or defined, a party to a civil union shall be included in such use or definition, and wherever in the general statutes, except sections 7-45 and 17b-137a, subdivision (4) of section 45a-727a, and sections 46b-20 to 46b-34, inclusive, 46b-38nn and 46b-150d, the term 'marriage' is used or defined, a civil union shall be included in such use or definition. Wherever in the general statutes, except sections 46a-60, 46a-64, 46a-64c and 46a-66, the term 'marital status' is used or defined, civil union status shall be included in such use or definition."

its prohibition against same sex marriage pass muster under the state constitution.

Thereafter, the parties filed cross motions for summary judgment. In support of the plaintiffs' motion, they claimed, inter alia, that this state's statutes governing marriage and civil unions violate the due process and equal protection provisions of the state constitution because they deprive gay persons of the fundamental right to marry the person of their choice, and because they discriminate on the basis of both sex and sexual orientation. With respect to their due process claim, the plaintiffs maintained that, because marriage is a fundamental right, the state bears the burden of demonstrating that any abridgement of the right has been narrowly tailored to effectuate a compelling state interest, a burden which, the plaintiffs contended, the state cannot meet.

With respect to their equal protection claims, the plaintiffs maintained that, by limiting marriage to the union of a man and a woman, our statutory scheme impermissibly segregates on the basis of sex in violation of the express prohibition against such treatment contained in article first, § 20, of the state constitution, as amended by article five of the amendments. The plaintiffs contended that this state's statutes contravene the state constitutional prohibition against sex discrimination because those statutes preclude a woman from doing what a man may do, namely, marry a woman, and preclude a man from doing what a woman may do, namely, marry a man. The plaintiffs also maintained that our laws barring same sex marriage impermissibly discriminate against gay persons, who, the plaintiffs claimed, constitute a suspect class or, at the least, a quasi-suspect class, under constitutional principles of

equal protection.[10] In particular, the plaintiffs maintained that, because they are members of a suspect or quasi-suspect class, the state cannot discriminate against them in the absence of an exceptionally strong justification for doing so, a justification that the plaintiffs contended does not exist.

In support of the defendants' motion for summary judgment, they asserted that the plaintiffs had failed to demonstrate that they have suffered any harm as a result of the statutory bar against same sex marriage because, under the civil union law, gay persons are entitled to all of the rights that married couples enjoy. The defendants also maintained that this state's ban on same sex marriage does not deprive the plaintiffs of a fundamental right because, since ancient times, marriage has been understood to be the union of a man and a woman, and only such rights that are "deeply rooted in this [n]ation's history and tradition . . . and implicit in the concept of ordered liberty" are deemed to be fundamental. (Citations omitted; internal quotation marks omitted.) *Washington* v. *Glucksberg*, 521 U.S. 702, 721, 117 S. Ct. 2258, 138 L. Ed. 2d 772 (1997). The defendants contended that, in light of the universally understood definition of marriage as the union of a man and a woman, the right that the plaintiffs were asserting, namely, the right to marry "any person of one's choosing," is not a fundamental right.

The defendants also asserted that our statutory scheme does not discriminate on the basis of sex because, inter alia, it does not single out men or women as a class for disparate treatment, the touchstone of any sex discrimination claim. Those laws also do not discriminate on the basis of sexual orientation, the

---

[10] For equal protection purposes, the classification at issue is sexual orientation. For ease of reference, we sometimes refer to gay persons as members of that class.

defendants maintained, because gay persons are not prohibited from marrying. According to the defendants, our laws are facially neutral because they treat homosexual and heterosexual persons alike by providing that anyone who wishes to marry may do so with a person of the opposite sex.

Finally, the defendants asserted that, even if the statutory definition of marriage as an opposite sex union does discriminate on the basis of sexual orientation, nothing in the text or history of article first, § 1, and article first, § 20, as amended by articles five and twenty-one of the amendments, supports the conclusion that the drafters of those provisions intended to extend special protection to gay persons as a suspect or quasi-suspect class. On the contrary, the defendants maintained that, because sexual orientation is not one of the eight categories enumerated in article first, § 20, of the state constitution, as amended, namely, religion, race, color, ancestry, national origin, sex, and physical or mental disability, it must be presumed that that provision does not afford enhanced protection to persons on the basis of their sexual orientation. The defendants finally maintained that our statutory scheme does not run afoul of the state constitution's equal protection provisions because it bears a rational relationship to a legitimate state purpose, the test that the defendants asserted is applicable to the determination of whether that scheme passes muster under the equal protection provisions of the state constitution.

The trial court granted the defendants' motion for summary judgment and denied the plaintiffs' motion for summary judgment. *Kerrigan* v. *Commissioner of Public Health*, 49 Conn. Sup. 644, 667, 909 A.2d 89 (2006). The trial court concluded that the plaintiffs could not establish "that they have suffered any legal harm that rises to constitutional magnitude"; id., 646; because "[t]he effect of [the civil union law] has been

to create an identical set of legal rights in Connecticut for same sex couples and opposite sex couples." Id., 655. The trial court further observed that, if the legislature had not passed the civil union law while the plaintiffs' case was pending before it, the court then would have been required to undertake a traditional constitutional analysis of their claims. Id., 654. The court reasoned, however, that the passage of the civil union law had rendered that analysis unnecessary because the plaintiffs no longer could establish that the laws of the state, either on their face or as applied, treat same sex couples differently than opposite sex couples. See id., 655, 658–59. In so concluding, the trial court expressly rejected the plaintiffs' claim that the legislature's "creation of the civil union for same sex couples, while retaining the status of marriage for opposite sex couples, has the effect of creating for them a legal institution of lesser status." Id., 658. The court explained: "[Although] the plaintiffs may feel themselves to be relegated to a second class status, there is nothing in the text of the Connecticut statutes that can be read to place the plaintiffs there." Id.

On appeal,[11] the plaintiffs challenge the trial court's determination that Connecticut's civil union law does not discriminate against gay persons because same sex couples who have entered into a civil union are entitled to the same legal rights under state law as married couples. The plaintiffs also renew the various state constitutional claims that they raised in the trial court. We conclude, first, that the trial court improperly determined that the distinction between civil unions and marriage is constitutionally insignificant merely because a same sex couple who enters into a civil union enjoys the same legal rights as an opposite sex couple

---

[11] The plaintiffs appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

who enters into a marriage. We also conclude that our statutory scheme governing marriage impermissibly discriminates against gay persons on the basis of their sexual orientation.

## I

## DECISION OF THE TRIAL COURT

We first address the plaintiffs' contention that the trial court improperly granted the defendants' motion for summary judgment on the ground that the plaintiffs had failed to demonstrate any legally cognizable or actionable harm by virtue of the fact that the legislature had established two separate and distinct classifications for couples who wish to be recognized by the law, one limited to same sex couples and one limited to opposite sex couples. The trial court predicated its determination on the fact that a couple who enters into a civil union has the same legal rights under state law as a couple who enters into a marriage. The court reasoned that the difference in labels afforded marriage and civil unions is not, in itself, sufficient to trigger an analysis of the constitutionality of that statutory scheme as applied to same sex couples.

The plaintiffs challenge the trial court's conclusion that the distinction between marriage and civil unions is merely one of nomenclature. They contend that marriage is not simply a term denominating a bundle of legal rights. Rather, they contend that it is an institution of unique and enduring importance in our society, one that carries with it a special status. The plaintiffs therefore contend that their claim of unequal treatment cannot be dismissed solely because same sex couples who enter into a civil union enjoy the same rights under state law as married couples. The plaintiffs also claim that we must consider the legislature's decision to create civil unions for same sex couples in the context of the historical condemnation and discrimination that gay

persons have suffered.[12] We agree with the plaintiffs that, despite the legislature's recent establishment of civil unions, the restriction of marriage to opposite sex couples implicates the constitutional rights of gay persons who wish to marry a person of the same sex.[13]

A cognizable constitutional claim arises whenever the government singles out a group for differential treatment. The legislature has subjected gay persons to precisely that kind of differential treatment by creating a separate legal classification for same sex couples who, like opposite sex couples, wish to have their relationship recognized under the law. Put differently, the civil union law entitles same sex couples to all of the same rights as married couples except one, that is, the freedom to marry, a right that "has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men [and women]" and "fundamental to our very existence and survival." *Loving* v. *Virginia*, 388 U.S. 1, 12, 87 S. Ct. 1817, 18 L. Ed. 2d 1010 (1967). Indeed, marriage has been characterized as "intimate to the degree of being sacred"; *Griswold* v. *Connecticut*, 381 U.S. 479, 486, 85 S. Ct. 1678, 14 L. Ed. 2d 510 (1965); see also *Turner* v. *Safley*, 482 U.S. 78, 96, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987) ("many religions recognize marriage as having spiritual significance"); and "an institution more basic in our civilization than any other." *Williams* v. *North Carolina*, 317 U.S. 287, 303, 63 S. Ct. 207, 87 L. Ed. 279 (1942). Marriage, therefore, is not merely shorthand for a discrete set of legal rights and responsibilities but is "one of the most fundamental of human relationships . . . ." *Davis* v.

---

[12] As we discuss more fully in part V A of this opinion, the parties do not dispute that gay persons historically have been the object of invidious discrimination.

[13] We note, preliminarily, that no party has suggested that the test for determining whether our statutory scheme pertaining to marriage and civil unions gives rise to a cognizable claim under the state constitution is any different from that under the federal constitution.

*Davis*, 119 Conn. 194, 203, 175 A. 574 (1934). "Marriage . . . bestows enormous private and social advantages on those who choose to marry. Civil marriage is at once a deeply personal commitment to another human being and a highly public celebration of the ideals of mutuality, companionship, intimacy, fidelity, and family. . . . Because it fulfills yearnings for security, safe haven, and connection that express our common humanity, civil marriage is an esteemed institution . . . ." (Citation omitted; internal quotation marks omitted.) *Goodridge* v. *Dept. of Public Health*, 440 Mass. 309, 322, 798 N.E.2d 941 (2003).

Especially in light of the long and undisputed history of invidious discrimination that gay persons have suffered; see part V A of this opinion; we cannot discount the plaintiffs' assertion that the legislature, in establishing a statutory scheme consigning same sex couples to civil unions, has relegated them to an inferior status, in essence, declaring them to be unworthy of the institution of marriage. In other words, "[b]y excluding same-sex couples from civil marriage, the [s]tate declares that it is legitimate to differentiate between their commitments and the commitments of heterosexual couples. Ultimately, the message is that what same-sex couples have is not as important or as significant as 'real' marriage, that such lesser relationships cannot have the name of marriage."[14] *Lewis* v. *Harris*, 188 N.J.

---

[14] We agree with the following point made by the Lambda Legal Defense and Education Fund, Inc., in its amicus brief: "Any married couple [reasonably] would feel that they had lost something precious and irreplaceable if the government were to tell them that they no longer were 'married' and instead were in a 'civil union.' The sense of being 'married'—what this conveys to a couple and their community, and the security of having others clearly understand the fact of their marriage and all it signifies—would be taken from them. These losses are part of what same sex couples are denied when government assigns them a 'civil union' status. If the tables were turned, very few heterosexuals would countenance being told that they could enter only civil unions and that marriage is reserved for lesbian and gay couples. Surely there is [a] constitutional injury when the majority imposes on the minority that which it would not accept for itself."

415, 467, 908 A.2d 196 (2006) (Poritz, C. J., concurring and dissenting); see also *In re Marriage Cases*, 43 Cal. 4th 757, 830–31, 183 P.3d 384, 76 Cal. Rptr. 3d 683 (2008) ("[t]he current statutes—by drawing a distinction between the name assigned to the family relationship available to opposite-sex couples and the name assigned to the family relationship available to same-sex couples, and by reserving the historic and highly respected designation of marriage exclusively to opposite-sex couples while offering same-sex couples only the new and unfamiliar designation of domestic partnership—pose a serious risk of denying the official family relationship of same-sex couples the equal dignity and respect that is a core element of the constitutional right to marry"); *Opinions of the Justices to the Senate*, 440 Mass. 1201, 1207, 802 N.E.2d 565 (2004) ("[t]he dissimilitude between the terms 'civil marriage' and 'civil union' is not innocuous; it is a considered choice of language that reflects a demonstrable assigning of same-sex, largely homosexual, couples to second-class status"). Although the legislature has determined that same sex couples are entitled to "all the same benefits, protections and responsibilities . . . [that] are granted to spouses in a marriage"; General Statutes § 46b-38nn; the legislature nonetheless created an entirely separate and distinct legal entity for same sex couples even though it readily could have made those same rights available to same sex couples by permitting them to marry. In view of the exalted status of marriage in our society, it is hardly surprising that civil unions are perceived to be inferior to marriage. We therefore agree with the plaintiffs that "[m]aintaining a second-class citizen status for same-sex couples by excluding them from the institution of civil marriage *is* the constitutional infirmity at issue."[15] (Emphasis in original.) *Opinions of the Justices to the Senate*, supra, 1209.

---

[15] As one prominent legal commentator has explained in discussing the establishment of civil unions: "Such a step reduces the discrimination, but falls far short of eliminating it. The institution of marriage is unique: it is a

Accordingly, we reject the trial court's conclusion that marriage and civil unions are "separate" but "equal" legal entities; *Kerrigan* v. *Commissioner of Public Health*, supra, 49 Conn. Sup. 664; and that it therefore "would be the elevation of form over substance"; id., 667; to conclude that the constitutional rights of same sex couples are implicated by a statutory scheme that restricts them to civil unions. Although marriage and civil unions do embody the same legal rights under our law, they are by no means "equal." As we have explained, the former is an institution of transcendent historical, cultural and social significance, whereas the latter most surely is not. Even though the classifications created under our statutory scheme result in a type of differential treatment that generally may be character- ized as symbolic or intangible, this court correctly has stated that such treatment nevertheless "is every bit as restrictive as naked exclusions"; *Evening Sentinel* v. *National Organization for Women*, 168 Conn. 26, 35, 357 A.2d 498 (1975); because it is no less real than more tangible forms of discrimination, at least when, as in the present case, the statute singles out a group that

distinct mode of association and commitment with long traditions of histori- cal, social, and personal meaning. It means something slightly different to each couple, no doubt. For some it is primarily a union that sanctifies sex, for others a social status, for still others a confirmation of the most profound possible commitment. But each of these meanings depends on associations that have been attached to the institution by centuries of experience. We can no more now create an alternate mode of commitment carrying a parallel intensity of meaning than we can now create a substitute for poetry or for love. The status of marriage is therefore a social resource of irreplaceable value to those to whom it is offered: it enables two people together to create value in their lives that they could not create if that institution had never existed. We know that people of the same sex often love one another with the same passion as people of different sexes do and that they want as much as heterosexuals to have the benefits and experience of the married state. If we allow a heterosexual couple access to that wonderful resource but deny it to a homosexual couple, we make it possible for one pair but not the other to realize what they both believe to be an important value in their lives." R. Dworkin, "Three Questions for America," N.Y. Review of Books, September 21, 2006, pp. 24, 30.

historically has been the object of scorn, intolerance, ridicule or worse.

We do not doubt that the civil union law was designed to benefit same sex couples by providing them with legal rights that they previously did not have. If, however, the intended effect of a law is to treat politically unpopular or historically disfavored minorities differently from persons in the majority or favored class, that law cannot evade constitutional review under the separate but equal doctrine. See, e.g., *Brown* v. *Board of Education*, 347 U.S. 483, 495, 74 S. Ct. 686, 98 L. Ed. 873 (1954); cf. *In re Marriage Cases*, supra, 43 Cal. 4th 830–31; *Opinions of the Justices to the Senate*, supra, 440 Mass. 1209. In such circumstances, the very existence of the classification gives credence to the perception that separate treatment is warranted for the same illegitimate reasons that gave rise to the past discrimination in the first place. Despite the truly laudable effort of the legislature in equalizing the legal rights afforded same sex and opposite sex couples, there is no doubt that civil unions enjoy a lesser status in our society than marriage.[16] We therefore conclude that the plain-

---

[16] We are confused by the position that Justice Borden takes in his dissenting opinion with respect to the plaintiffs' contention that they have alleged a cognizable constitutional claim. Justice Borden first expresses the view that the plaintiffs have set forth a claim sufficient to "trigger equal protection analysis" because of the "uncertainty" as to whether civil unions "now or soon will be viewed by the citizens of our state as the social equivalent of marriage." Before engaging in this analysis, however, Justice Borden states that "our experience with civil unions is simply too new and the views of the people of our state about it as a social institution are too much in flux to say with any certitude that the marriage statute must be struck down in order to vindicate the plaintiffs' constitutional rights." This latter assertion is inconsistent with Justice Borden's earlier acknowledgment that, contrary to the decision of the trial court, the plaintiffs have set forth a claim that implicates the equal protection provisions of the state constitution.

Nevertheless, with respect to Justice Borden's assertion that the plaintiffs have failed to demonstrate, to any reasonable degree of certainty, that the institution of marriage enjoys a greater status in our society than civil unions, for the reasons set forth by the trial court, we question whether, under that view, the plaintiffs have satisfied their burden of demonstrating actual harm.

tiffs have alleged a constitutionally cognizable injury, that is, the denial of the right to marry a same sex partner. We next must determine whether the state's differential treatment of same sex and opposite sex couples nevertheless satisfies state constitutional requirements.

Moreover, Justice Borden's contention that there is insufficient reason to conclude that civil unions are not viewed as the "social equivalent" of marriage cannot be reconciled with his own acknowledgment that, in stark contrast to civil unions, marriage "is a fundamental and ancient social institution that has existed in our state from before its founding and throughout the world for millennia." Part I C 2 of Justice Borden's dissenting opinion; see also *Mendillo* v. *Board of Education*, 246 Conn. 456, 493, 717 A.2d 1177 (1998) (*Borden, J.*) (characterizing marriage as "unique human relationship" and "the closest entity recognized by society" [internal quotation marks omitted]). We do not see how the recently created legal entity of civil union possibly can embody the same status as an institution of such long-standing and overriding societal importance as marriage. If proof of this obvious fact were necessary, it would suffice to point out that the vast majority of heterosexual couples would be unwilling to give up their constitutionally protected right to marry in exchange for the bundle of legal rights that the legislature has denominated a civil union. In addition, Justice Borden's assertion that the issue is irretrievably fact-bound and, therefore, falls outside this court's authority, is surprising in view of his willingness to marshal evidence from hearsay sources not in the record of this case and to draw conclusive inferences from those sources with respect to the relative political power of gay persons. See part I C of Justice Borden's dissenting opinion. In sum, Justice Borden's refusal to concede the obvious hardly reflects the wisdom to which Judge Learned Hand was referring when he reminded us that judges should never be too certain that they are right; rather, it brings to mind the admonition of former United States Supreme Court Justice Felix Frankfurter that we "should not be ignorant as judges of what we know as men [and women]." *Watts* v. *Indiana*, 338 U.S. 49, 52, 69 S. Ct. 1347, 93 L. Ed. 1801 (1949).

Finally, we also are not persuaded by Justice Zarella's rationale for concluding that the plaintiffs have raised a cognizable constitutional claim, namely, that the statutory right to marry has constitutional underpinnings whereas the statutory right to enter into a civil union does not. According to Justice Zarella, this difference has "specific legal consequences for the plaintiffs," and thus gives rise to "a legally cognizable or actionable harm," because the legislature "presumably could not abolish the institution [of marriage] altogether" even though it could repeal the civil union law. The difference that Justice Zarella identifies, however, is irrelevant for purposes of the present case because the plaintiffs have not alleged, and there is nothing in the record to suggest, that the legislature intends to repeal the

## II

## GENERAL PRINCIPLES

Certain general principles govern our review of the plaintiffs' state constitutional claim. First, "[t]he constitutionality of a statute presents a question of law over which our review is plenary. . . . It [also] is well established that a validly enacted statute carries with it a strong presumption of constitutionality, [and that] those who challenge its constitutionality must sustain the heavy burden of proving its unconstitutionality beyond a reasonable doubt. . . . The court will indulge in every presumption in favor of the statute's constitutionality . . . . Therefore, [w]hen a question of constitutionality is raised, courts must approach it with caution, examine it with care, and sustain the legislation unless its invalidity is clear." (Citation omitted; internal quotation marks omitted.) *State* v. *McKenzie-Adams*, 281 Conn. 486, 500, 915 A.2d 822, cert. denied, 522 U.S. 888, 128 S. Ct. 248, 169 L. Ed. 2d 148 (2007).

Moreover, "[i]t is beyond debate that federal constitutional and statutory law establishes a *minimum* national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights." (Emphasis in original; internal quotation marks omitted.) *State* v. *Morales*, 232 Conn. 707, 716, 657 A.2d 585 (1995), quoting *State* v. *Barton*, 219 Conn. 529, 546, 594 A.2d 917 (1991). In determining that our state constitution in some instances provides greater protection than that provided by the federal constitution, "we have recognized that [i]n the area of fundamental civil liberties—which includes all protections of the declaration of rights contained in article first of the Connecticut con-

civil union law. Consequently, the harm that Justice Zarella has identified is purely hypothetical. We do not believe that such a speculative injury is sufficient to support a constitutional claim.

stitution—we sit as a court of last resort, subject only to the qualification that our interpretations may not restrict the guarantees accorded the national citizenry under the federal charter." (Internal quotation marks omitted.) *State* v. *Morales*, supra, 717; see also *Ramos* v. *Vernon*, 254 Conn. 799, 827, 761 A.2d 705 (2000) ("depending [on] the facts and circumstances, the state constitution may afford greater protection than the federal constitution with regard to equal protection claims"). Therefore, although we may follow the analytical approach taken by courts construing the federal constitution, our use of that approach for purposes of the state constitution will not necessarily lead to the same result as that arrived at under the federal constitution. See, e.g., *State* v. *Marsala*, 216 Conn. 150, 151, 159–61, 579 A.2d 58 (1990) (rejecting "good faith" exception to search warrant requirement for purposes of state constitution despite United States Supreme Court's adoption of that exception for purposes of federal constitution).

Furthermore, we are mindful that state "[c]onstitutional provisions must be interpreted within the context of the times. . . . 'We must *interpret* the constitution in accordance with the demands of modern society or it will be in constant danger of becoming atrophied and, in fact, may even lose its original meaning.' . . . [A] constitution is, in [former United States Supreme Court] Chief Justice John Marshall's words, 'intended to endure for ages to come . . . and, consequently, to be adapted to the various *crises* of human affairs.' . . . [*McCulloch*] v. *Maryland*, 17 U.S. (4 Wheat.) 316, 415, 4 L. Ed. 579 (1819). . . . 'In short, the [state] constitution was not intended to be a static document incapable of coping with changing times. It was meant to be, and is, a living document with current effectiveness.' . . . The Connecticut constitution is an instrument of progress, it is intended to stand for a great length of time and

should not be interpreted too narrowly or too literally so that it fails to have contemporary effectiveness for all of our citizens." (Citations omitted; emphasis in original.) *State* v. *Dukes*, 209 Conn. 98, 114–15, 547 A.2d 10 (1988).

Finally, in *State* v. *Geisler*, 222 Conn. 672, 685, 610 A.2d 1225 (1992), we set forth six factors that, to the extent applicable, are to be considered in construing the contours of our state constitution so that we may reach reasoned and principled results as to its meaning. These factors are: (1) the text of the operative constitutional provision; (2) holdings and dicta of this court and the Appellate Court; (3) persuasive and relevant federal precedent; (4) persuasive sister state decisions; (5) the history of the operative constitutional provision, including the historical constitutional setting and the debates of the framers; and (6) contemporary economic and sociological considerations, including relevant public policies. Id. Although, in *Geisler*, "we compartmentalized the factors that should be considered in order to stress that a systematic analysis is required, we recognize that they may be inextricably interwoven. . . . [Moreover], not every *Geisler* factor is relevant in all cases." (Citation omitted.) *State* v. *Morales*, supra, 232 Conn. 716 n.10. Accordingly, our equal protection analysis is informed by any of those *Geisler* factors that may be relevant to that analysis.[17]

### III

### EQUAL PROTECTION ANALYSIS GENERALLY

"[T]he concept of equal protection [under both the state and federal constitutions] has been traditionally

---

[17] As we explain more fully hereinafter, claims brought under the equal protection provisions of the state constitution are analyzed on the basis of certain well established criteria or considerations. Although those criteria and the *Geisler* factors are in some respects interrelated, we first address the various criteria that are unique to the equal protection analysis; see parts III, IV and V of this opinion; and thereafter review the relevant *Geisler* factors. See part VI of this opinion.

viewed as requiring the uniform treatment of persons standing in the same relation to the governmental action questioned or challenged." (Internal quotation marks omitted.) *State* v. *Matos*, 240 Conn. 743, 760, 694 A.2d 775 (1997); see also *Stuart* v. *Commissioner of Correction*, 266 Conn. 596, 601, 834 A.2d 52 (2003) (constitutional right of equal protection "is essentially a direction that all persons similarly situated should be treated alike" [internal quotation marks omitted]). "Conversely, the equal protection clause places no restrictions on the state's authority to treat dissimilar persons in a dissimilar manner. . . . Thus, [t]o implicate the equal protection [clause] . . . it is necessary that the state statute . . . in question, either on its face or in practice, treat persons standing in the same relation to it differently. . . . [Accordingly], the analytical predicate [of an equal protection claim] is a determination of who are the persons [purporting to be] similarly situated. . . . The similarly situated inquiry focuses on whether the [plaintiff is] similarly situated to another group for purposes of the challenged government action. . . . Thus, [t]his initial inquiry is not whether persons are similarly situated for all purposes, but whether they are similarly situated for purposes of the law challenged." (Citations omitted; internal quotation marks omitted.) *Stuart* v. *Commissioner of Correction*, supra, 601–602; see also *City Recycling, Inc.* v. *State*, 257 Conn. 429, 448, 778 A.2d 77 (2001).

"This court has held, in accordance with the federal constitutional framework of analysis, that 'in areas of social and economic policy that neither proceed along suspect lines nor infringe fundamental constitutional rights, the [e]qual [p]rotection [c]lause is satisfied [as] long as there is a plausible policy reason for the classification, see *United States Railroad Retirement [Board]* v. *Fritz*, 449 U.S. 166, 174, 179 [101 S. Ct. 453, 66 L. Ed. 2d 368] (1980), the legislative facts on which the

classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, see *Minnesota* v. *Clover Leaf Creamery Co.*, 449 U.S. 456, 464 [101 S. Ct. 715, 66 L. Ed. 2d 659] (1981), and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational, see *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U.S. [432, 446, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985)].' . . . *Hammond* v. *Commissioner of Correction*, 259 Conn. 855, 885, 792 A.2d 774 (2002); accord *Luce* v. *United Technologies Corp.*, 247 Conn. 126, 144, 717 A.2d 747 (1998). 'If, however, state action invidiously discriminates against a suspect class or affects a fundamental right, the action passes constitutional muster . . . only if it survives strict scrutiny.' *Daly* v. *DelPonte*, 225 Conn. 499, 513, 624 A.2d 876 (1993). Under that heightened standard, 'the state must demonstrate that the challenged statute is necessary to the achievement of a compelling state interest.' " *Rayhall* v. *Akim Co.*, 263 Conn. 328, 342–43, 819 A.2d 803 (2003).

Although the federal constitution does not expressly enumerate any suspect classes, the United States Supreme Court has identified three such classifications, namely, race, alienage and national origin. *Cleburne* v. *Cleburne Living Center, Inc.*, supra, 473 U.S. 440. In contrast to the federal constitution, the state constitution identifies certain inherently suspect classifications. See, e.g., *Daly* v. *DelPonte*, supra, 225 Conn. 513–14. These classifications, which are set forth in article first, § 20, of the Connecticut constitution, as amended by articles five and twenty-one of the amendments, include religion, race, color, ancestry, national origin, sex, physical disability and mental disability. Because the members of those classes have been deemed to be "especially subject to discrimination"; id., 515; their "rights are protected by requiring encroachments on [those] rights to pass a strict scrutiny test." Id., 514.

Additionally, for purposes of federal equal protection analysis, the United States Supreme Court also "has developed an intermediate level of scrutiny that lies [b]etween [the] extremes of rational basis review and strict scrutiny. *Clark* v. *Jeter*, 486 U.S. 456, 461, 108 S. Ct. 1910, 100 L. Ed. 2d 465 (1988). Intermediate scrutiny typically is used to review laws that employ quasi-suspect classifications . . . such as gender, *Craig* v. *Boren*, 429 U.S. 190, 197, 97 S. Ct. 451, 50 L. Ed. 2d 397 (1976), or [il]legitimacy, *Mills* v. *Habluetzel*, 456 U.S. 91, 98–99, 102 S. Ct. 1549, 71 L. Ed. 2d 770 (1982). On occasion intermediate scrutiny has been applied to review of a law that affects an important, though not constitutional, right. [*United States* v. *Coleman*, 166 F.3d 428, 431 (2d Cir.), cert. denied, 526 U.S. 1138, 119 S. Ct. 1794, 143 L. Ed. 2d 1201 (1999)]; cf. *Plyler* [v. *Doe*, 457 U.S. 202, 223, 102 S. Ct. 2382, 72 L. Ed. 2d 786 (1982)] (applying, without labeling it as such, an intermediate form of scrutiny to review a law that implicated right to education). Under intermediate scrutiny, the government must show that the challenged legislative enactment is substantially related to an important governmental interest."[18] (Citation omitted; internal quotation marks omitted.) *Ramos* v. *Vernon*, 353 F.3d 171, 175 (2d Cir. 2003).

This court also has determined that, for purposes of the state constitution, "[the] two-tier analysis of the law of equal protection . . . that distinguishes only between legislation requiring strict scrutiny, which typically fails to pass constitutional muster, and legislation requiring a rational basis, which typically does pass, is not sufficiently precise to resolve all cases. Legislation that involves rights that may be significant, though not

---

[18] As we have indicated, the plaintiffs make no claim under the federal constitution. We note, however, that the United States Supreme Court never has decided, for purposes of the federal constitution, any of the issues raised by the plaintiffs' claims.

fundamental, or classifications that are sensitive, though not suspect, may demand some form of intermediate review." *Eielson* v. *Parker*, 179 Conn. 552, 564, 427 A.2d 814 (1980); see also *Daly* v. *DelPonte*, supra, 225 Conn. 513 (identifying three levels of scrutiny for equal protection purposes); cf. *Contractor's Supply of Waterbury, LLC* v. *Commissioner of Environmental Protection*, 283 Conn. 86, 103, 925 A.2d 1071 (2007) ("our own case law and precedent . . . support the conclusion that, when [legislation] does not impact a fundamental right, a suspect class or a [quasi-suspect] class, our state constitution generally mandates [a rational basis] level of scrutiny"). In *Carofano* v. *Bridgeport*, 196 Conn. 623, 495 A.2d 1011 (1985), which, like the present case, involved a claim under the equal protection provisions of the state constitution, we further explained: "Courts have tended to depart from the minimal standard [when] the interests affected by the governmental restriction are sufficiently elevated in the hierarchy of social values and to devise various formulae less rigid than the compelling state interest criterion that essentially necessitate balancing private against governmental concerns with varying degrees of deference to legislative judgment. . . .

"Situations triggering . . . intermediate review, other than sensitive classifications relating to stereotypes or disadvantaged minorities, have usually involved a significant interference with liberty or the denial of benefits considered to be vital to the individual." (Citations omitted.) Id., 641–42. We therefore apply the same three-tiered equal protection methodology that is applied under the federal equal protection clause for purposes of our state constitution.

The defendants contend that the plaintiffs' equal protection claim does not satisfy two threshold equal protection principles. Specifically, the defendants contend, first, that same sex couples are not similarly situated

to opposite sex couples and, second, that the classes enumerated in article first, § 20, of the state constitution, as amended, constitute an exclusive list of protected groups. We reject each of these claims.

With respect to their first claim, the defendants assert that the plaintiffs are not similarly situated to opposite sex couples, thereby obviating the need for this court to engage in an equal protection analysis, "because the conduct that they seek to engage in—marrying someone of the same sex—is fundamentally different from the conduct in which opposite sex couples seek to engage." We disagree. It is true, of course, that the plaintiffs differ from persons who choose to marry a person of the opposite sex insofar as each of the plaintiffs seeks to marry a person of the same sex. Otherwise, however, the plaintiffs can meet the same statutory eligibility requirements applicable to persons who seek to marry, including restrictions related to public safety, such as age; see General Statutes § 46b-30; and consanguinity. See General Statutes § 46b-21. The plaintiffs also share the same interest in a committed and loving relationship as heterosexual persons who wish to marry, and they share the same interest in having a family and raising their children in a loving and supportive environment. Indeed, the legislature itself recognized the overriding similarities between same sex and opposite sex couples when, upon passage of the civil union law, it granted same sex couples the same legal rights that married couples enjoy. We therefore agree with the California Supreme Court and conclude that the defendants' contention that same sex and opposite sex couples are not similarly situated clearly lacks merit. "[B]oth [same sex and opposite sex couples] consist of pairs of individuals who wish to enter into a formal, legally binding and officially recognized, long-term family relationship that affords the same rights and privileges and imposes the same obligations and responsibilities. Under these cir-

cumstances, there is no question but that these two categories of individuals are sufficiently similar to bring into play equal protection principles that require a court to determine whether distinctions between the two groups justify the unequal treatment." (Internal quotation marks omitted.) *In re Marriage Cases*, supra, 43 Cal. 4th 831 n.54; see also *Lewis* v. *Harris*, supra, 188 N.J. 448, 451 (same sex couples are similarly situated to their heterosexual counterparts); *Baker* v. *State*, 170 Vt. 194, 218–19, 744 A.2d 864 (1999) (statute prohibiting marriage of same sex couples treats them differently from similarly situated opposite sex couples). In light of the multitude of characteristics that same sex and opposite sex couples have in common, we conclude that the two groups are similarly situated for purposes of the plaintiffs' equal protection challenge to the state statutory scheme governing marriage.[19]

[19] In his dissent, Justice Zarella alone asserts that same sex and opposite sex couples who wish to marry are not similarly situated because the former cannot engage in procreative sexual conduct. In view of the myriad and important similarities between same sex and opposite sex couples, including their shared interest in having and raising a family, we disagree that the inability of the former to conceive children together defeats the plaintiffs' equal protection challenge. Although it may be argued that the state's interest in regulating procreative conduct constitutes a rational basis for limiting marriage to opposite sex couples—an argument that, notably, the state itself expressly has disavowed—that rationale does not answer the entirely different question of whether same sex and opposite sex couples are similarly situated for present purposes. Because same sex and opposite sex couples have the same interest in having a family and the same right to do so, the mere fact that children of the former may be conceived in a different manner than children of the latter is insufficient, standing alone, to negate the fundamental and overriding similarities that they share, both with regard to matters relating to family and in all other respects. Thus, even though procreative conduct plays an important role in many marriages, we do not believe that such conduct so defines the institution of marriage that the inability to engage in that conduct is determinative of whether same sex and opposite sex couples are similarly situated for equal protection purposes, especially in view of the fact that some opposite sex couples also are unable to procreate, and others choose not to do so. Indeed, Justice Zarella has identified no case, and we are aware of none, that has rejected an equal protection claim on the ground that same sex couples are not similarly situated to opposite sex couples, either because the former cannot engage

The defendants also assert that, because article first, § 20, of the state constitution, as amended by articles five and twenty-one of the amendments, expressly prohibits discrimination against eight enumerated classes, no other group is entitled to any form of heightened protection under our state constitutional equal protection provisions. We also reject this assertion, first, because it is inconsistent with previous cases of this court in which we have expressed our approval of the three-tiered methodology for purposes of the equal protection provisions of the state constitution. See, e.g., *Carofano* v. *Bridgeport*, supra, 196 Conn. 641–42; *Keogh* v. *Bridgeport*, 187 Conn. 53, 66–67, 444 A.2d 225 (1982); *Eielson* v. *Parker*, supra, 179 Conn. 563–64. Indeed, we previously have observed that, although the framers' failure expressly to include a particular group within the ambit of article first, § 20, as amended, is a relevant consideration in determining whether that group is entitled to special protection, it is not dispositive of the issue. See *Moore* v. *Ganim*, 233 Conn. 557, 597, 660 A.2d 742 (1995). Furthermore, the history surrounding the adoption of article first, § 20, of the state constitution indicates that its drafters intended that provision to embody "the very strongest human rights principle that this convention can put forth to the people of Connecticut"; 2 Proceedings of the Connecticut Constitutional Convention (1965) p. 692, remarks of Representative James J. Kennelly; and, in accordance with that purpose, that the provision should be read expansively. See id., p. 691, remarks of former United States Representative Chase Going Woodhouse ("[w]e all realize that rights of individuals in this country have developed and have changed from time to time, and we certainly would not want to have in our [c]onstitution any language that

in procreative conduct or for any other reason. In fact, many courts have reached a contrary conclusion. See, e.g., *In re Marriage Cases*, supra, 43 Cal. 4th 831 n.54; *Lewis* v. *Harris*, supra, 188 N.J. 448, 451; *Baker* v. *State*, supra, 170 Vt. 218–19.

would in the future perhaps limit new rights"). Finally, even if we were to assume, arguendo, that the groups enumerated in article first, § 20, as amended, were intended to constitute an exhaustive list of *suspect* classes, the plaintiffs are not barred from recognition as a *quasi-suspect* class—the claim that we resolve in their favor—because the two classes are separate and distinct from one another. Indeed, under the defendants' view, heightened protection would be available only to those classes that had marshaled the political will and popular support to secure a constitutional amendment in their favor, a result inconsistent with the rationale underlying the state constitutional equal protection provisions. We conclude, therefore, that the plaintiffs' equal protection claim is not foreclosed merely because sexual orientation is not an enumerated classification in article first, § 20, as amended.

IV

### QUASI-SUSPECT CLASSIFICATIONS UNDER THE STATE CONSTITUTION

Although this court has indicated that a group may be entitled to heightened protection under the state constitution because of its status as a quasi-suspect class, we previously have not articulated the specific criteria to be considered in determining whether recognition as a quasi-suspect class is warranted. The United States Supreme Court, however, consistently has identified two factors that must be met, for purposes of the federal constitution, if a group is to be accorded such status. These two required factors are: (1) the group has suffered a history of invidious discrimination; see *United States* v. *Virginia*, 518 U.S. 515, 531–32, 116 S. Ct. 2264, 135 L. Ed. 2d 735 (1996); *Massachusetts Board of Retirement* v. *Murgia*, 427 U.S. 307, 313, 96 S. Ct. 2562, 49 L. Ed. 2d 520 (1976); and (2) the characteristics that distinguish the group's members bear "no relation

to [their] ability to perform or contribute to society." *Frontiero* v. *Richardson*, 411 U.S. 677, 686, 93 S. Ct. 1764, 36 L. Ed. 2d 583 (1973) (plurality opinion); accord *Cleburne* v. *Cleburne Living Center, Inc.*, supra, 473 U.S. 441; see also *Massachusetts Board of Retirement* v. *Murgia*, supra, 313 (heightened scrutiny required when group has "been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of [the] abilities [of the group's members]"). The United States Supreme Court also has cited two other considerations that, in a given case, may be relevant in determining whether statutory provisions pertaining to a particular group are subject to heightened scrutiny. These two additional considerations are: (1) the characteristic that defines the members of the class as a discrete group is immutable or otherwise not within their control; see, e.g., *Lyng* v. *Castillo*, 477 U.S. 635, 638, 106 S. Ct. 2727, 91 L. Ed. 2d 527 (1986) (for purposes of suspectness inquiry, relevant consideration is whether members of class "exhibit obvious, immutable, or distinguishing characteristics that define them as a discrete group"); and (2) the group is "a minority or politically powerless." (Internal quotation marks omitted.) *Bowen* v. *Gilliard*, 483 U.S. 587, 602, 107 S. Ct. 3008, 97 L. Ed. 2d 485 (1987); accord *Lyng* v. *Castillo*, supra, 638; see also *San Antonio Independent School District* v. *Rodriguez*, 411 U.S. 1, 28, 93 S. Ct. 1278, 36 L. Ed. 2d 16 (1973) (concluding that class comprised of poor families exhibits none of "traditional indicia of suspectness" because class is "not saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process").

To date, the United States Supreme Court has recognized two quasi-suspect classes, namely, sex; see, e.g., *Frontiero* v. *Richardson*, supra, 411 U.S. 686 (plurality

opinion) (what "differentiates sex from such nonsuspect statuses as intelligence or physical disability . . . is that the sex characteristic frequently bears no relation to ability to perform or contribute to society"); and illegitimacy. See, e.g., *Mathews* v. *Lucas*, 427 U.S. 495, 505–506, 96 S. Ct. 2755, 49 L. Ed. 2d 651 (1976) (applying heightened scrutiny because, inter alia, illegitimacy "bears no relation to the individual's ability to participate in and contribute to society"). The court, however, has rejected claims that the aged and the mentally disadvantaged are quasi-suspect classes, principally because the defining characteristic of each group does in fact bear a substantial relationship to the group's ability to participate in and contribute to society. See *Cleburne* v. *Cleburne Living Center, Inc.*, supra, 473 U.S. 442 (mentally disadvantaged are not suspect class because, inter alia, "those who are mentally retarded have a reduced ability to cope with and function in the everyday world"); *Massachusetts Board of Retirement* v. *Murgia*, supra, 427 U.S. 314–15 (upholding law requiring mandatory retirement of uniformed police officers at age fifty "[s]ince physical ability generally declines with age [and] mandatory retirement at [fifty] serves to remove from police service those whose fitness for uniformed work presumptively has diminished with age").

Because of the evident correlation between the indicia of suspectness identified by the United States Supreme Court and the issue of whether a class that has been singled out by the state for unequal treatment is entitled to heightened protection under the federal constitution, we conclude that those factors also are pertinent to the determination of whether a group comprises a quasi-suspect class for purposes of the state constitution. It bears emphasis, however, that the United States Supreme Court has placed far greater weight—indeed, it invariably has placed dispositive

weight—on the first two factors, that is, whether the group has been the subject of long-standing and invidious discrimination and whether the group's distinguishing characteristic bears no relation to the ability of the group members to perform or function in society. In circumstances in which a group has been subject to such discrimination and its distinguishing characteristic does not bear any relation to such ability, the court inevitably has employed heightened scrutiny in reviewing statutory classifications targeting those groups. Thus, in *Cleburne* v. *Cleburne Living Center, Inc.,* supra, 473 U.S. 440, the court explained that statutory classifications based on race, alienage and national origin are reviewed with great skepticism because such statutes are likely to be motivated by prejudice and antipathy rather than by any legitimate differences between members of those suspect groups and all other persons. The court in *Cleburne* expressed the same rationale in explaining why classifications based on gender are subject to a heightened standard of review: "[W]hat differentiates sex from such nonsuspect statuses as intelligence or physical disability . . . is that the sex characteristic frequently bears no relation to ability to perform or contribute to society. . . . Rather than resting on meaningful considerations, statutes distributing benefits and burdens between the sexes in different ways very likely reflect outmoded notions of the relative capabilities or men and women." (Citation omitted; internal quotation marks omitted.) Id., 440–41. In contrast, with respect to the elderly and mentally disadvantaged, the court explained that "[when] individuals in the group affected by a law have distinguishing characteristics relevant to interests the [s]tate has the authority to implement, the courts have been very reluctant, as they should be in our federal system, to closely scrutinize legislative choices as to whether, how, and to what extent those interests should be pur-

sued. In such cases, the [e]qual [p]rotection [c]lause requires only a rational means to serve a legitimate end." Id., 441–42.

It is evident, moreover, that immutability and minority status or political powerlessness are subsidiary to the first two primary factors because, as we explain more fully hereinafter, the United States Supreme Court has granted suspect class status to a group whose distinguishing characteristic is not immutable;[20] see *Nyquist*

---

[20] Indeed, not infrequently, the United States Supreme Court has omitted any reference to immutability in discussing the identifying or distinguishing characteristic of a particular class. See, e.g., *Massachusetts Board of Retirement* v. *Murgia*, supra, 427 U.S. 313–14 (age); *San Antonio Independent School District* v. *Rodriguez*, supra, 411 U.S. 20, 25 (poverty); *Graham* v. *Richardson*, 403 U.S. 365, 371–72, 91 S. Ct. 1848, 29 L. Ed. 2d 534 (1971) (alienage). Thus, for purposes of determining whether a group is entitled to suspect or quasi-suspect class status—and, in contrast to the considerations of historical discrimination and whether the group's distinguishing characteristic bears on the ability of its members to participate in and contribute to society—"immutability is not a *requirement,* but a *factor.*" (Emphasis in original.) J. Halley, "Sexual Orientation and the Politics of Biology: A Critique of the Argument from Immutability," 46 Stan. L. Rev. 503, 507 (1994); see also *Olagues* v. *Russoniello*, 797 F.2d 1511, 1520 (9th Cir. 1986) ("Whether the classification is based on an immutable characteristic is sometimes an indication of a suspect class. . . . But immutability is not the sole determining factor." [Citation omitted.]), vacated on other grounds, 484 U.S. 806, 108 S. Ct. 52, 98 L. Ed. 2d 17 (1987); *Able* v. *United States*, 968 F. Sup. 850, 863 (E.D.N.Y. 1997) ("[i]mmutability is merely one of several possible indications that a classification is likely to reflect prejudice"), rev'd on other grounds, 155 F.3d 628 (2d Cir. 1998); *In re Marriage Cases*, supra, 43 Cal. 4th 841 ("immutability is not invariably required in order for a characteristic to be considered a suspect classification for equal protection purposes"); *Tanner* v. *Oregon Health Sciences University*, 157 Or. App. 502, 522, 971 P.2d 435 (1998) ("immutability—in the sense of inability to alter or change—is not necessary" for determining that class is suspect under Oregon constitution), review denied, 329 Or. 528, 994 P.2d 129 (1999). Moreover, because one's status as illegitimate also may be changed; see, e.g., *Miller* v. *Albright*, 523 U.S. 420, 431, 118 S. Ct. 1428, 140 L. Ed. 2d 575 (1998) (recognizing that child born out of wedlock may be "legitimated" by father [internal quotation marks omitted]); strictly speaking, illegitimacy also is not an immutable characteristic. Classifications based on illegitimacy nevertheless are subject to heightened scrutiny; see *Mathews* v. *Lucas*, supra, 427 U.S. 505–506; primarily because the status of illegitimacy is not within the child's control and because the status bears no relation to the individual's ability to participate in and contribute to society. Id., 505.

v. *Mauclet*, 432 U.S. 1, 9 n.11, 97 S. Ct. 2120, 53 L. Ed. 2d 63 (1977) (rejecting immutability requirement in treating group of resident aliens as suspect class despite their ability to opt out of class voluntarily); and has accorded quasi-suspect status to a group that had not been a minority or truly politically powerless.[21] See

---

[21] With respect to the relative importance of this fourth and final factor, notably, in every case involving a group that has been subjected to a history of purposeful discrimination based on an innate characteristic unrelated to its members' ability to participate in or contribute to society, the group has been accorded status as a suspect or quasi-suspect class irrespective of its political power or lack thereof. See, e.g., *Palmore* v. *Sidoti*, 466 U.S. 429, 433–34, 104 S. Ct. 1879, 80 L. Ed. 2d 421 (1984) (race); *Mathews* v. *Lucas*, supra, 427 U.S. 505–506 (illegitimacy); *Frontiero* v. *Richardson*, supra, 411 U.S. 686–88 (plurality opinion) (sex). Conversely, when a group has failed either of the first two prongs of the inquiry to determine whether it is entitled to heightened protection, its claim to suspect or quasi-suspect class status invariably has been rejected without regard to the extent of its political power. See, e.g., *Lyng* v. *Castillo*, supra, 477 U.S. 638 ("close relatives"); *Cleburne* v. *Cleburne Living Center, Inc.*, supra, 473 U.S. 441–42 (mentally disadvantaged); *Massachusetts Board of Retirement* v. *Murgia*, supra, 427 U.S. 313–14 (age). Thus, as one court has stated, "[t]he significance of the [political powerlessness] test pales in comparison to the question[s] of whether . . . the characteristic bears any relationship to the individual's ability to function in society, whether the group has suffered a history of discrimination based on misconceptions of that factor and whether that factor is the product of the group's own volition." *Equality Foundation of Greater Cincinnati, Inc.* v. *Cincinnati*, 860 F. Sup. 417, 437–38 n.17 (S.D. Ohio 1994), rev'd, 54 F.3d 261 (6th Cir. 1995), vacated and remanded, 518 U.S. 1001, 116 S. Ct. 2519, 135 L. Ed. 2d 1044 (1996); see also id. (Whether a particular group is entitled to recognition as a suspect or quasi-suspect class "should not be controlled by . . . a group's ability to pass or fail [the] . . . political power test. . . . [R]elative political power cannot even be a particularly weighty factor, let alone a controlling one. For example, it cannot be said that males, as a group, have been relegated to such a position of political powerlessness as to require special judicial protection. Nonetheless, laws differentiating between the sexes which disadvantage males as well as females . . . must be subjected to heightened scrutiny. See *Mississippi [University] for Women* v. *Hogan*, 458 U.S. 718, 723, 102 S. Ct. [3331], 73 L. Ed. 2d 1090 (1982); *Craig* v. *Boren*, [supra, 429 U.S. 204]."). In fact, as the California Supreme Court recently has observed, current political powerlessness cannot be a requirement for recognition as a protected class because other groups, including African-Americans and women, continue to be accorded such protection even though they are not lacking in political power. See *In re Marriage Cases*, supra, 43 Cal. 4th 843.

*Frontiero* v. *Richardson*, supra, 411 U.S. 686 n.17 (plurality opinion) (according women heightened protection despite court's acknowledgment that women "do not constitute a small and powerless minority"). We do not doubt, moreover, that the court has accorded little weight to a group's political power because that factor, in contrast to the other criteria, frequently is not readily discernible by reference to objective standards. Thus, an attempt to quantify a group's political influence often will involve a myriad of complex and interrelated considerations of a kind not readily susceptible to judicial fact-finding. Nevertheless, because the court has identified the immutability of the group's distinguishing characteristic and the group's minority status or relative lack of political power as potentially relevant factors to the determination of whether heightened judicial protection is appropriate, we, too, shall consider those factors for purposes of our inquiry under the state constitution.[22]

---

[22] Our application of the test for determining whether a group is entitled to heightened protection under the state constitution, and, in particular, our consideration of the two subsidiary criteria of immutability and status as a minority or politically powerless group, is informed by the following observations of former United States Supreme Court Justice Thurgood Marshall about that test in his concurring and dissenting opinion in *Cleburne* v. *Cleburne Living Center, Inc.*, supra, 473 U.S. 432. "No single talisman can define those groups likely to be the target of classifications offensive to the [f]ourteenth [a]mendment and therefore warranting heightened or strict scrutiny; experience, not abstract logic, must be the primary guide. The 'political powerlessness' of a group may be relevant . . . but that factor is neither necessary, as the gender cases demonstrate, nor sufficient, as the example of minors illustrates. Minors cannot vote and thus might be considered politically powerless to an extreme degree. Nonetheless, we see few statutes reflecting prejudice or indifference to minors, and I am not aware of any suggestion that legislation affecting them be viewed with the suspicion of heightened scrutiny. Similarly, immutability of the trait at issue may be relevant, but many immutable characteristics, such as height or blindness, are valid bases of governmental action and classifications under a variety of circumstances. . . .

"The political powerlessness of a group and the immutability of its defining trait are relevant insofar as they point to a social and cultural isolation that gives the majority little reason to respect or be concerned with that group's

Finally, we note that courts generally have applied the same criteria to determine whether a classification is suspect, quasi-suspect or neither. See, e.g., *Cleburne* v. *Cleburne Living Center, Inc.*, supra, 473 U.S. 440–42 (applying factors in concluding that mentally disadvantaged persons do not constitute suspect or quasi-suspect class); *Massachusetts Board of Retirement* v. *Murgia*, supra, 427 U.S. 313–14 (applying factors in concluding that age is not suspect classification). Just as there is no uniformly applied formula for determining whether a group is entitled to heightened protection under the constitution, there also is no clear test for determining whether a group that deserves such protection is entitled to designation as a suspect class or as a quasi-suspect class.[23] Nevertheless, we agree with the

interests and needs. Statutes discriminating against the young have not been common [and] need [not] be feared because those who do vote and legislate were once themselves young, typically have children of their own, and certainly interact regularly with minors. Their social integration means that minors, unlike discrete and insular minorities, tend to be treated in legislative arenas with full concern and respect, despite their formal and complete exclusion from the electoral process.

"The discreteness and insularity warranting a 'more searching judicial inquiry' . . . must therefore be viewed from a social and cultural perspective as well as a political one. To this task judges are well suited, for the lessons of history and experience are surely the best guide as to when, and with respect to what interests, society is likely to stigmatize individuals as members of an inferior caste or view them as not belonging to the community. Because prejudice spawns prejudice, and stereotypes produce limitations that confirm the stereotype on which they are based, a history of unequal treatment requires sensitivity to the prospect that its vestiges endure. In separating those groups that are discrete and insular from those that are not, as in many important legal distinctions, 'a page of history is worth a volume of logic.' *New York Trust Co.* v. *Eisner*, 256 U.S. 345, 349 [41 S. Ct. 506, 65 L. Ed. 963] (1921) (Holmes, J.)." (Citations omitted.) *Cleburne* v. *Cleburne Learning Center, Inc.*, supra, 473 U.S. 472–73 n.24 (Marshall, J., concurring in the judgment in part and dissenting in part).

[23] In this regard, we note that the Sixth Circuit Court of Appeals has suggested that suspect class status is appropriate for race, alienage and national origin because those classifications are "seldom relevant to any legitimate state interest"; *Equality Foundation of Greater Cincinnati, Inc.* v. *Cincinnati*, 54 F.3d 261, 266 (6th Cir. 1995), vacated on other grounds and remanded, 518 U.S. 1001, 116 S. Ct. 2519, 135 L. Ed. 2d 1044 (1996);

New Mexico Supreme Court that, although "the definition of a suspect class for the purposes of justifying strict scrutiny is instructive for a determination of whether a group of people qualifies as a [quasi-suspect] class justifying intermediate scrutiny, it is too exacting." *Breen* v. *Carlsbad Municipal Schools*, 138 N.M. 331, 337, 120 P.3d 413 (2005) (holding that mentally disadvantaged persons constitute quasi-suspect class under equal protection clause of New Mexico constitution). Indeed, it stands to reason that "the level of protection needed from the majoritarian political process does not have to be as extraordinary as necessary for strict scrutiny because the level of scrutiny is less in intermediate scrutiny." Id., 338. In other words, although the same factors are relevant for the purpose of identifying both suspect and quasi-suspect classes, we apply those factors less stringently with respect to groups claiming quasi-suspect class status because the intermediate scrutiny applicable to a statutory classification that discriminates on the basis of quasi-suspect status is less rigorous or demanding than the strict scrutiny to which laws burdening a suspect class are subject. With these principles in mind, we consider the plaintiffs' contention that they are entitled to recognition as a quasi-suspect class.[24]

whereas gender and illegitimacy have been accorded quasi-suspect status because statutes that classify along those lines are somewhat more likely to "create a sensible legislative distinction . . . ." Id. Professor Erwin Chemerinsky has posited that gender has been deemed a quasi-suspect class and not a suspect class because (1) "[t]he framers of the [f]ourteenth [a]mendment meant only to outlaw race discrimination," (2) "biological differences between men and women make it more likely that gender classifications will be justified, and thus less than strict scrutiny is appropriate to increase the chances that desirable laws will be upheld," and (3) "women are a political majority who are not isolated from men and thus cannot be considered a discrete and insular minority." E. Chemerinsky, Constitutional Law: Principles and Policies (3d Ed. 2006) § 9.4.1, p. 756.

[24] The defendants raise the threshold claim that this state's marriage laws do not discriminate on the basis of sexual orientation because gay persons have the same right to marry that heterosexuals enjoy. Although the laws governing marriage do not discriminate expressly against gay persons inas-

V

## STATUS OF GAY PERSONS AS A
## QUASI-SUSPECT CLASS

For the reasons that follow, we agree with the plaintiffs' claim that sexual orientation meets all of the

much as such persons are no less free than heterosexuals to marry a person of the opposite sex, there can be no doubt that our statutes do "differentiate implicitly on the basis of sexual preference." *Conaway* v. *Deane*, 401 Md. 219, 277, 932 A.2d 571 (2007). "Those who prefer relationships with people of the opposite sex and those who prefer relationships with people of the same sex are not treated alike, since only opposite-sex relationships may gain the status and benefits associated with marriage." *Hernandez* v. *Robles*, 7 N.Y.3d 338, 364, 855 N.E.2d 1, 821 N.Y.S.2d 770 (2006); accord *Conaway* v. *Deane*, supra, 277; see also *Lawrence* v. *Texas*, 539 U.S. 558, 583, 123 S. Ct. 2472, 156 L. Ed. 2d 508 (2003) (O'Connor, J., concurring in the judgment) ("While it is true that the [Texas] law [criminalizing homosexual sodomy by two consenting adults in the privacy of their own home] applies only to conduct, the conduct targeted by [the] law is conduct that is closely correlated with being homosexual. Under such circumstances, Texas' sodomy law is targeted at more than conduct. It is instead directed toward gay persons as a class.").

We therefore disagree with Justice Zarella's contention that the most that can be said about the state statutory prohibition against same sex marriage is that it impacts gay persons disparately. First, the civil union law, which expressly provides for the union of same sex couples; see General Statutes § 46b-38bb; also expressly defines marriage "as the union of one man and one woman." General Statutes § 46b-38nn. It is readily apparent, therefore, that the statutory scheme at issue purposefully and intentionally distinguishes between same sex and opposite sex couples. Moreover, as a general matter, "the statutory provisions restricting marriage to a man and a woman cannot be understood as having merely a disparate impact on gay persons, but instead properly must be viewed as directly classifying and prescribing distinct treatment on the basis of sexual orientation. By limiting marriage to opposite-sex couples, the marriage statutes, realistically viewed, operate clearly and directly to impose different treatment on gay individuals because of their sexual orientation. . . . A statute that limits marriage to a union of persons of opposite sexes, thereby placing marriage outside the reach of couples of the same sex, unquestionably imposes different treatment on the basis of sexual orientation. . . . [I]t is sophistic to suggest that this conclusion is avoidable by reason of the circumstance that the marriage statutes permit a gay man or a lesbian to marry someone of the opposite sex, because making such a choice would require the negation of the person's sexual orientation. Just as a statute that restrict[s] marriage only to couples of the same sex would discriminate against heterosexual persons on the

requirements of a quasi-suspect classification. Gay persons have been subjected to and stigmatized by a long history of purposeful and invidious discrimination that continues to manifest itself in society. The characteristic that defines the members of this group—attraction to persons of the same sex—bears no logical relationship to their ability to perform in society, either in familial relations or otherwise as productive citizens. Because sexual orientation is such an essential component of personhood, even if there is some possibility that a person's sexual preference can be altered, it would be wholly unacceptable for the state to require anyone to do so. Gay persons also represent a distinct minority of the population. It is true, of course, that gay persons recently have made significant advances in obtaining equal treatment under the law. Nonetheless, we conclude that, as a minority group that continues to suffer the enduring effects of centuries of legally sanctioned discrimination, laws singling them out for disparate treatment are subject to heightened judicial scrutiny to ensure that those laws are not the product of such historical prejudice and stereotyping.

## A

### History of Discrimination

The defendants do not dispute that gay persons historically have been, and continue to be, the target of

basis of their heterosexual orientation, the . . . statutes [being challenged] realistically must be viewed as discriminating against gay persons on the basis of their homosexual orientation." *In re Marriage Cases*, supra, 43 Cal. 4th 839–40. In other words, this state's bar against same sex marriage *effectively* precludes gay persons from marrying; to conclude otherwise would be to blink at reality. See *State* v. *Long*, 268 Conn. 508, 534, 847 A.2d 862 ("[t]o implicate the equal protection [clause] . . . it is necessary that the state statute [or statutory scheme] in question, *either on its face or in practice*, treat persons standing in the same relation to it differently" [emphasis added; internal quotation marks omitted]), cert. denied, 543 U.S. 969, 125 S. Ct. 424, 160 L. Ed. 2d 340 (2004). Accordingly, we reject the assertion that our laws governing marriage do not discriminate on the basis of sexual orientation.

purposeful and pernicious discrimination due solely to their sexual orientation. For centuries, the prevailing attitude toward gay persons has been "one of strong disapproval, frequent ostracism, social and legal discrimination, and at times ferocious punishment." R. Posner, Sex and Reason (Harvard University Press 1992) c. 11, p. 291; see also note, "The Constitutional Status of Sexual Orientation: Homosexuality as a Suspect Classification," 98 Harv. L. Rev. 1285, 1302 (1985) ("It is . . . uncontroversial that gays as a group suffer from stigmatization in all spheres of life. The stigma has persisted throughout history, across cultures, and in the United States."). "The American Psychiatric Association [has noted that] . . . when compared to other social groups, homosexuals are still among the most stigmatized groups in the nation. Hate crimes are prevalent. Gay persons are still banned from serving openly in the [United States] military service.[25] . . . Gay and

---

[25] In 1993, Congress enacted legislation embodying the so-called "don't ask, don't tell" policy; see National Defense Authorization Act for Fiscal Year 1994, Pub. L. No. 103-160, § 571 (a) (1), 107 Stat. 1547, 1670 (1993) (codified as amended at 10 U.S.C. § 654); pursuant to which a service member who has engaged in, intends to engage in or is likely to engage in homosexual conduct will be ordered separated from the armed services. See 10 U.S.C. § 654 (b) (1) through (3) (2006) (providing that service member shall be separated from armed services if he or she has "engaged in, attempted to engage in, or solicited another to engage in a homosexual act," or has "stated that he or she is a homosexual or bisexual . . . unless . . . the member has demonstrated that he or she is not a person who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts," or "has married or attempted to marry a person known to be of the same biological sex").

We note that, in the past, overt discrimination against gay persons by the United States government was significantly more pervasive. "Fifty years ago, no openly gay people worked for the federal government. In fact, shortly after . . . Dwight Eisenhower [became the president in 1953, he] issued an executive order that banned homosexuals from government employment, civilian as well as military, and required companies with government contracts to ferret out and fire their gay employees. At the height of the McCarthy witch-hunt, the [Department of State] fired more homosexuals than communists. In the 1950s and 1960s literally thousands of men and women were discharged or forced to resign from civilian positions in the federal govern-

lesbian adolescents are often taunted and humiliated in their school settings. Many professional persons and employees in all occupations are still fearful of identifying as gay or lesbians in their work settings. . . . In fact, gay persons share a history of persecution comparable to that of blacks and women." (Citation omitted; internal quotation marks omitted.) *Snetsinger* v. *Montana University System*, 325 Mont. 148, 163–64, 104 P.3d 445 (2004) (Nelson, J., concurring); see also *In re Marriage Cases*, supra, 43 Cal. 4th 841 ("[o]utside of racial and religious minorities, we can think of no group which has suffered such pernicious and sustained hostility . . . as homosexuals" [internal quotation marks omitted]); D. Satcher, Surgeon General, United States Department of Health and Human Services, "The Surgeon General's Call to Action to Promote Sexual Health and Responsible Sexual Behavior" (July 9, 2001) ("[O]ur culture often stigmatizes homosexual behavior, identity and relationships. . . . These anti-homosexual attitudes are associated with psychological distress for homosexual persons and may have a negative impact on mental health, including a greater incidence of depression and suicide, lower self-acceptance and a greater likelihood of hiding sexual orientation . . . ." [Citations omitted.]), available at http://www. surgeongeneral.gov/library/sexualhealth/call.htm.[26]

---

ment because they were suspected of being gay or lesbian." G. Chauncey, Why Marriage? The History Shaping Today's Debate Over Gay Equality (Basic Books 2004) c. 1, p. 6; see also *Forum for Academic & Institutional Rights* v. *Rumsfeld*, 390 F.3d 219, 225 n.3 (3d Cir. 2004) ("[although] the current statutory version of the military's exclusionary policy [in 10 U.S.C. § 654] has existed since 1993 . . . the military has had formal regulatory policies excluding gays and lesbians since World War I and a practice of such exclusion since the Revolutionary War"), rev'd on other grounds, 547 U.S. 47, 126 S. Ct. 1297, 164 L. Ed. 2d 156 (2006). See generally Developments in the Law—Sexual Orientation and the Law, 102 Harv. L. Rev. 1508, 1556–57 (1989).

[26] The Internet sources to which we cite throughout this opinion were accessed and verified immediately before the date of publication of this opinion for the purpose of ensuring accuracy. All such sources are on file with this court.

Of course, gay persons have been subjected to such severe and sustained discrimination because of our culture's long-standing intolerance of intimate homosexual conduct. As the United States Supreme Court has recognized, "[p]roscriptions against [homosexual sodomy] have ancient roots." *Bowers* v. *Hardwick*, 478 U.S. 186, 192, 106 S. Ct. 2841, 92 L. Ed. 2d 140 (1986), overruled on other grounds by *Lawrence* v. *Texas*, 539 U.S. 558, 123 S. Ct. 2472, 156 L. Ed. 2d 508 (2003); see also *High Tech Gays* v. *Defense Industrial Security Clearance Office*, 909 F.2d 375, 382 (9th Cir. 1990) (Canby, J., dissenting) ("mainstream society has mistreated [homosexuals] for centuries"); *Baker* v. *Wade*, 769 F.2d 289, 292 (5th Cir. 1985) ("the strong objection to homosexual conduct . . . has prevailed in Western culture for the past seven centuries"), cert. denied, 478 U.S. 1022, 106 S. Ct. 3337, 92 L. Ed. 2d 742 (1986). Much of the condemnation of homosexuality derives from firmly held religious beliefs and moral convictions. See, e.g., *Lawrence* v. *Texas*, supra, 571. Until not long ago, gay persons were widely regarded as deviants in need of treatment to deal with their sexual orientation.[27] See, e.g., *Conaway* v. *Deane*, 401 Md. 219, 283–84, 932 A.2d 571 (2007). Moreover, until 2003, when the United States Supreme Court concluded, contrary to its earlier holding in *Bowers* that consensual homosexual conduct is protected under the due process clause of the fourteenth amendment; see *Lawrence* v. *Texas*, supra, 578; such conduct carried criminal penalties in over one

[27] For example, at one time, "more than half of the nation's states, including New York, Michigan, and California, enacted laws authorizing the police to force persons who were convicted of certain sexual offenses, including sodomy—or, in some states, merely suspected of being 'sexual deviants'—to undergo psychiatric examinations. Many of these laws authorized the indefinite [commitment] of homosexuals in mental institutions, from which they were to be released only if they were cured of their homosexuality, something prison doctors soon began to complain was impossible." G. Chauncey, Why Marriage? The History Shaping Today's Debate Over Gay Equality (Basis Books 2004) c. 1, p. 11.

quarter of the states. See id., 573; see also *Bowers* v. *Hardwick,* supra, 193 (observing that "until 1961, all [fifty] [s]tates outlawed sodomy"). Connecticut did not repeal its anti-sodomy law until 1969; Public Acts 1969, No. 828, § 214 (repealing General Statutes [Rev. to 1968] § 53-216); and, as late as 1986, the court in *Bowers* noted that twenty-four states and the District of Columbia "still [made] such conduct illegal and ha[d] done so for a very long time." *Bowers* v. *Hardwick,* supra, 190. It therefore is not surprising that no court ever has refused to treat gay persons as a suspect or quasi-suspect class on the ground that they have not suffered a history of invidious discrimination. See E. Gerstmann, The Constitutional Underclass: Gays, Lesbians, and the Failure of Class-Based Equal Protection (University of Chicago Press 1999) c. 4, p. 66.

There is no question, therefore, that gay persons historically have been, and continue to be, the target of purposeful and pernicious discrimination due solely to their sexual orientation. We therefore turn to the second required factor, namely, whether the sexual orientation of gay persons has any bearing on their ability to participate in society.

### B

### Whether Sexual Orientation Is Related to a Person's Ability to Participate in or Contribute to Society

The defendants also concede that sexual orientation bears no relation to a person's ability to participate in or contribute to society, a fact that many courts have acknowledged, as well. See, e.g., *Watkins* v. *United States Army,* 875 F.2d 699, 725 (9th Cir. 1989) (Norris, J., concurring in the judgment) ("[s]exual orientation plainly has no relevance to a person's ability to perform or contribute to society" [internal quotation marks omitted]), cert. denied, 498 U.S. 957, 111 S. Ct. 384, 112

L. Ed. 2d 395 (1990); *Equality Foundation of Greater Cincinnati, Inc.* v. *Cincinnati,* 860 F. Sup. 417, 437 (S.D. Ohio 1994) ("[S]exual orientation . . . bears no relation whatsoever to an individual's ability to perform, or to participate in, or contribute to, society. . . . If homosexuals were afflicted with some sort of impediment to their ability to perform and to contribute to society, the entire phenomenon of 'staying in the [c]loset' and of 'coming out' would not exist; their impediment would betray their status."), rev'd on other grounds, 54 F.3d 261 (6th Cir. 1995), vacated and remanded, 518 U.S. 1001, 116 S. Ct. 2519, 135 L. Ed. 2d 1044 (1996); *Conaway* v. *Deane,* supra, 401 Md. 282 (gay persons have been subject to unique disabilities unrelated to their ability to contribute to society); *Hernandez* v. *Robles,* 7 N.Y.3d 338, 388, 855 N.E.2d 1, 821 N.Y.S.2d 770 (2006) (Kaye, C. J., dissenting) ("[o]bviously, sexual orientation is irrelevant to one's ability to perform or contribute"). In this critical respect, gay persons stand in stark contrast to other groups that have been denied suspect or quasi-suspect class recognition, despite a history of discrimination, because the distinguishing characteristics of those groups adversely affect their ability or capacity to perform certain functions or to discharge certain responsibilities in society. See, e.g., *Cleburne* v. *Cleburne Living Center, Inc.,* supra, 473 U.S. 442 (for purposes of federal constitution, mental retardation is not quasi-suspect classification because, inter alia, "it is undeniable . . . that those who are mentally retarded have a reduced ability to cope with and function in the everyday world"); *Massachusetts Board of Retirement* v. *Murgia,* supra, 427 U.S. 315 (age is not suspect classification because, inter alia, "physical ability generally declines with age"); see also *Gregory* v. *Ashcroft,* 501 U.S. 452, 472, 111 S. Ct. 2395, 115 L. Ed. 2d 410 (1991) ("[i]t is an unfortunate fact of life that physical [capacity] and mental capacity sometimes diminish with age").

Unlike the characteristics unique to those groups, however, "homosexuality bears no relation at all to [an] individual's ability to contribute fully to society." L. Tribe, American Constitutional Law (2d Ed. 1988) § 16-33, p. 1616. Indeed, because an individual's homosexual orientation "implies no impairment in judgment, stability, reliability or general social or vocational capabilities"; (internal quotation marks omitted) *Jantz* v. *Muci*, 759 F. Sup. 1543, 1548 (D. Kan. 1991) (quoting 1985 Resolution of the American Psychological Association), rev'd on other grounds, 976 F.2d 623 (10th Cir. 1992), cert. denied, 508 U.S. 952, 113 S. Ct. 2445, 124 L. Ed. 2d 662 (1993); the observation of the United States Supreme Court that race, alienage and national origin—all suspect classes entitled to the highest level of constitutional protection—"are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy"; *Cleburne* v. *Cleburne Living Center, Inc.*, supra, 473 U.S. 440; is no less applicable to gay persons.

It is highly significant, moreover, that it is the public policy of this state that sexual orientation bears no relation to an individual's ability to raise children; see, e.g., General Statutes § 45a-727 (permitting same sex couples to adopt children); see also General Statutes § 45a-727a (3) (finding of General Assembly that best interests of child are promoted whenever child is part of "loving, supportive and stable family" without reference to sexual preference of parents); to an individual's capacity to enter into relationships analogous to marriage; see General Statutes §§ 46b-38aa through 46b-38pp (granting same sex couples all rights and privileges afforded to opposite sex couples who enter into marriage); and to an individual's ability otherwise to participate fully in every important economic and social institution and activity that the government regulates.

See General Statutes §§ 46a-81a through 46a-81n (generally banning sexual orientation discrimination in employment, trade and professional association membership, public accommodations, housing, credit practices, state hiring practices, state licensing practices and in administration of state educational and vocational programs as well as state administered benefits programs). These statutory provisions constitute an acknowledgment by the state that homosexual orientation is no more relevant to a person's ability to perform and contribute to society than is heterosexual orientation. It therefore is clear that the plaintiffs have satisfied this second and final required prong for determining whether a group is entitled to recognition as a quasi-suspect or suspect class.

## C

### Immutability of the Group's Distinguishing Characteristic

A third factor that courts have considered in determining whether the members of a class are entitled to heightened protection for equal protection purposes is whether the attribute or characteristic that distinguishes them is immutable or otherwise beyond their control. See, e.g., *Bowen* v. *Gilliard*, supra, 483 U.S. 602. Of course, the characteristic that distinguishes gay persons from others and qualifies them for recognition as a distinct and discrete group is the characteristic that historically has resulted in their social and legal ostracism, namely, their attraction to persons of the same sex.

On a number of occasions, in connection with its consideration of a claim that a particular group is entitled to suspect or quasi-suspect class status, the United States Supreme Court has considered whether the group's distinguishing characteristic is immutable. See, e.g., *Mathews* v. *Lucas*, supra, 427 U.S. 505 (illegitimacy

is "a characteristic determined by causes not within the control of the illegitimate individual"); *Frontiero* v. *Richardson*, supra, 411 U.S. 686 (plurality opinion) ("since sex, like race and national origin, is an immutable characteristic determined solely by the accident of birth, the imposition of special disabilities [on] the members of a particular sex because of their sex would seem to violate the basic concept of our system that legal burdens should bear some relationship to individual responsibility" [internal quotation marks omitted]); cf. *Parham* v. *Hughes*, 441 U.S. 347, 351, 99 S. Ct. 1742, 60 L. Ed. 2d 269 (1979) (statute prohibiting father, who has failed to legitimate his illegitimate child, from suing for child's wrongful death does not create inherently suspect class "based [on] certain . . . immutable human attributes"); *Johnson* v. *Robison*, 415 U.S. 361, 375 n.14, 94 S. Ct. 1160, 39 L. Ed. 2d 389 (1974) (conscientious objectors do not constitute suspect class because, inter alia, they lack traditional indicia of suspect class, including "immutable characteristic"). Immutability has been deemed to be a relevant consideration because it "make[s] discrimination more clearly unfair." *High Tech Gays* v. *Defense Industrial Security Clearance Office*, supra, 909 F.2d 377 (Canby, J., dissenting). "Immutability may be considered important because it would be pointless to try to deter membership in the immutable group, or because individual group members cannot be blamed for their status, or because immutability heightens the sense of stigma associated with membership . . . ." Note, supra, 98 Harv. L. Rev. 1302–1303. Put differently, "[t]he degree to which an individual controls, or cannot avoid, the acquisition of a defining trait, and the relative ease or difficulty with which a trait can be changed, are relevant to whether a classification is 'suspect' or 'quasi-suspect' because this inquiry is one way of asking whether someone, rather than being victimized, has voluntarily joined a

persecuted group and thereby invited the discrimination." *Dean* v. *District of Columbia,* 653 A.2d 307, 346 (D.C. 1995) (Ferren, J., concurring in part and dissenting in part).

A number of courts that have considered this factor have rejected the claim that sexual orientation is an immutable characteristic.[28] Other courts, however, as well as many, if not most, scholarly commentators, have reached a contrary conclusion.[29] Although we do not

[28] See, e.g., *Equality Foundation of Greater Cincinnati, Inc.* v. *Cincinnati,* supra, 54 F.3d 267 ("[t]hose persons who fall within the orbit of legislation concerning sexual orientation are so affected not because of their orientation but rather by their *conduct* which identifies them as homosexual, bisexual, or heterosexual" [emphasis in original]); *High Tech Gays* v. *Defense Industrial Security Clearance Office,* 895 F.2d 563, 573 (9th Cir. 1990) ("[h]omosexuality is not an immutable characteristic; it is behavioral and hence is fundamentally different from traits such as race, gender or alienage, which define already existing suspect and quasi-suspect classes"); *Woodward* v. *United States,* 871 F.2d 1068, 1076 (Fed. Cir. 1989) ("[m]embers of recognized suspect or quasi-suspect classes, e.g., blacks or women, exhibit immutable characteristics, whereas homosexuality is primarily behavioral in nature"), cert. denied, 494 U.S. 1003, 110 S. Ct. 1295, 108 L. Ed. 2d 473 (1990); *Conaway* v. *Deane,* supra, 401 Md. 294 ("[i]n the absence of some generally accepted scientific conclusion identifying homosexuality as an immutable characteristic . . . we decline . . . to recognize sexual orientation as an immutable trait"); see also *Andersen* v. *King County,* 158 Wash. 2d 1, 20 and n.6, 138 P.3d 963 (2006) (although court "recognize[d] that th[e] question [of whether homosexuality is an immutable trait] is being researched and debated across the country . . . and . . . offer[ed] no opinion as to whether such a showing may be made at some later time," plaintiffs in that case failed to make showing of immutability).

[29] *Hernandez-Montiel* v. *Immigration & Naturalization Service,* 225 F.3d 1084, 1093 (9th Cir. 2000) ("[s]exual orientation and sexual identity are immutable"); E. Chemerinsky, Constitutional Law: Principles and Policies (3d Ed. 2006) § 9.7.4, p. 787 ("recent research suggests that sexual orientation is immutable and not a matter of individual choice"); see, e.g., *Able* v. *United States,* 968 F. Sup. 850, 864 (E.D.N.Y. 1997) ("[s]ame-sex sexual orientation persists in all societies and has proven to be almost completely resistant to change or 'treatment,' despite widespread discrimination and social pressure against homosexuals"), rev'd on other grounds, 155 F.3d 628 (2d Cir. 1998); *Equality Foundation of Greater Cincinnati, Inc.* v. *Cincinnati,* supra, 860 F. Sup. 426 ("[s]exual orientation is set . . . at a very early age . . . and is not only involuntary, but is unamenable to change"); *Jantz* v. *Muci,* supra, 759 F. Sup. 1547, 1548 (according to "the overwhelming weight of currently

doubt that sexual orientation—heterosexual or homosexual—is highly resistant to change, it is not necessary for us to decide whether sexual orientation is immutable in the same way and to the same extent that race, national origin and gender are immutable, because, even if it is not, the plaintiffs nonetheless have established that they fully satisfy this consideration.

Sexual intimacy is "a sensitive, key relationship of human existence, central to . . . the development of human personality . . . ." *Paris Adult Theatre I* v. *Slaton*, 413 U.S. 49, 63, 93 S. Ct. 2628, 37 L. Ed. 2d 446 (1973). Thus, the United States Supreme Court has recognized that, because "the protected right of homosexual adults to engage in intimate, consensual conduct . . . [represents] an integral part of human freedom"; *Lawrence* v. *Texas*, supra, 539 U.S. 576–77; individual decisions by consenting adults concerning the intimacies of their physical relationships are entitled to constitutional protection. See id., 578. Indeed, it is indisputable that sexual orientation "forms a significant part of a person's iden-

available scientific information . . . sexual orientation [whether homosexual or heterosexual] is generally not subject to conscious change" and is "not subject to voluntary control" [citations omitted]); *Gay Rights Coalition of Georgetown University Law Center* v. *Georgetown University*, 536 A.2d 1, 34–35 (D.C. 1987) (opinion announcing judgment) ("[H]omosexuality is as deeply ingrained as heterosexuality . . . . Neither homosexuals nor heterosexuals are what they are by design." [Internal quotation marks omitted.]); *Commonwealth* v. *Wasson*, 842 S.W.2d 487, 500 (Ky. 1993) (sexual orientation of homosexuals is characteristic that is likely to be beyond their control); L. Tribe, supra, § 16-33, p. 1616 (sexual orientation of homosexuals "is in all likelihood a characteristic determined by causes not within [their] control" [internal quotation marks omitted]); E. Kostoulas, "Ask, Tell, and Be Merry: The Constitutionality of 'Don't Ask, Don't Tell' Following *Lawrence* v. *Texas* and *United States* v. *Marcum*," 9 U. Pa. J. Const. L. 565, 586 (2007) ("[i]t is . . . generally accepted that homosexuals cannot change their sexual orientation"); see also *High Tech Gays* v. *Defense Industrial Security Clearance Office*, supra, 909 F.2d 377 (Canby, J., dissenting) ("There is every reason to regard homosexuality as an immutable characteristic for equal protection purposes. . . . Sexual identity is established at a very early age; it is not a matter of conscious or controllable choice.").

tity." *Able* v. *United States*, 968 F. Sup. 850, 863 (E.D.N.Y. 1997), rev'd on other grounds, 155 F.3d 628 (2d Cir. 1998); see also L. Tribe, supra, § 16-33, p. 1616 (sexual orientation, whether homosexual or heterosexual, is central to personality of individual). It is equally apparent that, "[b]ecause a person's sexual orientation is so integral an aspect of one's identity, it is not appropriate to require a person to repudiate or change his or her sexual orientation in order to avoid discriminatory treatment." *In re Marriage Cases*, supra, 43 Cal. 4th 842; see also *Hernandez-Montiel* v. *Immigration & Naturalization Service*, 225 F.3d 1084, 1093 (9th Cir. 2000) ("[s]exual orientation and sexual identity . . . are so fundamental to one's identity that a person should not be required to abandon them"); *Watkins* v. *United States Army*, supra, 875 F.2d 726 (Norris, J., concurring in the judgment) ("Scientific proof aside, it [also] seems appropriate to ask whether heterosexuals feel capable of changing *their* sexual orientation. Would heterosexuals living in a city that passed an ordinance burdening those who engaged in or desired to engage in sex with persons of the *opposite* sex find it easy not only to abstain from heterosexual activity but also to shift the object of their sexual desires to persons of the same sex? . . . [T]he possibility of such a difficult and traumatic change does not make sexual orientation 'mutable' for equal protection purposes." [Citations omitted; emphasis in original.]); *Jantz* v. *Muci*, supra, 759 F. Sup. 1548 ("to discriminate against individuals who accept their given sexual orientation and refuse to alter that orientation to conform to societal norms does significant violence to a central and defining character of those individuals").

In view of the central role that sexual orientation plays in a person's fundamental right to self-determination, we fully agree with the plaintiffs that their sexual orientation represents the kind of distinguishing charac-

teristic that defines them as a discrete group for purposes of determining whether that group should be afforded heightened protection under the equal protection provisions of the state constitution. This prong of the suspectness inquiry surely is satisfied when, as in the present case, the identifying trait is "so central to a person's identity that it would be abhorrent for government to penalize a person for refusing to change [it] . . . ." *Watkins* v. *United States Army*, supra, 875 F.2d 726 (Norris, J., concurring in the judgment); see also *Andersen* v. *King County*, 158 Wash. 2d 1, 105 n.78, 138 P.3d 963 (2006) (Bridge, J., concurring in the dissent) ("Courts . . . should not conclude that homosexuality is mutable [for purposes of determining whether gay persons are entitled to suspect or quasi-suspect class status] because reasonable minds disagree about the causes of homosexuality or because some religious tenets forbid gay persons from 'acting on' homosexual behavior. Instead, courts should ask whether the characteristic at issue is one *governments* have any business requiring a person to change." [Emphasis in original.]). In other words, gay persons, because they are characterized by a "central, defining [trait] of personhood, which may be altered [if at all] only at the expense of significant damage to the individual's sense of self"; *Jantz* v. *Muci*, supra, 759 F. Sup. 1548; are no less entitled to consideration as a suspect or quasi-suspect class than any other group that has been deemed to exhibit an immutable characteristic. See id.; see also note, supra, 98 Harv. L. Rev. 1303 (sexual orientation, like race and sex, is "one of only a handful of characteristics that ha[s] such a pervasive and profound impact on the [relevant] aspects of personhood"). To decide otherwise would be to penalize someone for being unable or unwilling to "change . . . a central aspect of individual and group identity"; *Watkins* v. *United States Army*, supra, 726 (Norris, J., concurring in the judgment); a

result repugnant "to the values animating the constitutional ideal of equal protection of the laws." Id.

## D

### Whether the Group Is a Minority or Lacking in Political Power

The final factor that bears consideration is whether the group is "a minority or politically powerless." (Internal quotation marks omitted.) *Bowen* v. *Gilliard*, supra, 483 U.S. 602. We therefore turn to that prong of the test.

### 1

We commence our analysis by noting that, in previous cases involving groups seeking heightened protection under the federal equal protection clause, the United States Supreme Court described this factor without reference to the minority status of the subject group, focusing instead on the group's lack of political power. See, e.g., *Massachusetts Board of Retirement* v. *Murgia*, supra, 427 U.S. 313 (explaining that "a suspect class is one saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process" [internal quotation marks omitted]); *San Antonio Independent School District* v. *Rodriguez*, supra, 411 U.S. 28 (same). In its most recent formulation of the test for determining whether a group is entitled to suspect or quasi-suspect classification, however, the court has indicated that this factor is satisfied upon a showing *either* that the group is a minority *or* that it lacks political power. *Bowen* v. *Gilliard*, supra, 483 U.S. 602; *Lyng* v. *Castillo*, supra, 477 U.S. 638. Indeed, in characterizing this factor in disjunctive terms, the court cited to *Murgia; Bowen* v. *Gilliard*, supra, 602–603; *Lyng* v. *Castillo*, supra, 638; thereby also indicating that, for purposes of this aspect of the inquiry, the test always has involved a determination of whether the

group is a "discrete and insular" minority; *United States* v. *Carolene Products Co.*, 304 U.S. 144, 152–53 n.4, 58 S. Ct. 778, 82 L. Ed. 1234 (1938); or, if not a true minority; see, e.g., *Frontiero* v. *Richardson*, supra, 411 U.S. 686 n.17, 688 (plurality opinion) (women accorded protected status although not minority); the group nonetheless is lacking in political power. This disjunctive test properly recognizes that a group may warrant heightened protection even though it does not fit the archetype of a discrete and insular minority. The test also properly recognizes that legislation singling out a true minority that meets the first three prongs of the suspectness inquiry must be viewed with skepticism because, under such circumstances, there exists an undue risk that legislation involving the historically disfavored group has been motivated by improper considerations borne of prejudice or animosity.

When this approach is applied to the present case, there is no doubt that gay persons clearly comprise a distinct minority of the population.[30] Consequently, they

[30] It is difficult to discern precisely the percentage of homosexuals in the population. Studies conducted by Alfred C. Kinsey in the mid-twentieth century indicated that approximately one out of every ten men was gay; A. Kinsey, W. Pomeroy & C. Martin, Sexual Behavior in the Human Male (W.B. Saunders 1948) p. 651; and that lesbians apparently comprised a somewhat smaller percentage of the population. A. Kinsey, W. Pomeroy & C. Martin et al., Sexual Behavior in the Human Female (Indiana University Press Ed. 1998) p. 474; see also *High Tech Gays* v. *Defense Industrial Security Clearance Office*, supra, 909 F.2d 378 (Canby, J., dissenting) (by most estimates, 10 percent of population is homosexual). Although these figures received widespread acceptance for many years, subsequent research suggests that the percentage of homosexuals in the population likely is lower. See, e.g., R. Michael, J. Gagnon & E. Laumann et al., Sex in America: A Definitive Survey (CSG Enterprises, Inc. 1994) c. 9, pp. 174–75 (study finding that 6 percent of men and 4 percent of women were attracted to members of same sex); R. Posner, supra, c. 11, p. 295 (noting that most estimates of percentage of homosexual men in population range from 2 to 5 percent and that estimates of homosexual women in population are lower); cf. *Equality Foundation of Greater Cincinnati, Inc.* v. *Cincinnati*, supra, 860 F. Sup. 426 (concluding, after evidentiary hearing, that homosexuals comprise between 5 and 13 percent of population).

clearly satisfy the first part of the disjunctive test and, thus, may be deemed to satisfy this prong of the suspectness inquiry on that basis alone.

### 2

The defendants nevertheless maintain that gay persons should not receive recognition as a quasi-suspect group because they are not politically powerless. In light of this claim, which represents the defendants' primary challenge to the plaintiffs' contention that they are entitled to quasi-suspect class status, and because some courts have applied that component of the suspectness inquiry to deny gay persons protected status even though they represent a minority of the population, we consider the defendants' contention.

In support of their claim, the defendants rely primarily on this state's enactment of the gay rights and civil union laws, which, of course, were designed to provide equal rights for gay persons, and which undoubtedly reflect a measure of political power. The defendants also rely on the fact that several state legislators in Connecticut are openly gay. From the defendants' standpoint, these significant advances undermine the plaintiffs' claim that gay persons are so lacking in political power that they are entitled to heightened judicial protection.

The plaintiffs contend that this test does not require proof that gay persons are wholly lacking in political influence but, rather, that the discrimination to which they have been subjected has been so severe and so persistent that, as with race and sex discrimination, it is not likely to be remedied soon enough merely by resort to the majoritarian political process. In support of their assertion that they do not wield sufficient political power to obviate the need for heightened judicial protection, the plaintiffs note that gay persons are demonstrably less powerful than African-Americans and

women, two groups that have been accorded protected status under the federal constitution. As the plaintiffs also emphasize, courts continue to apply heightened scrutiny to statutes that discriminate against women and racial minorities notwithstanding the great strides that both groups have made and continue to make in recent years in terms of their political strength. Indeed, heightened scrutiny is applied to statutes that discriminate against men; see *Craig* v. *Boren*, supra, 429 U.S. 197, 204; and against Caucasians. See, e.g., *Richmond* v. *J.A. Croson Co.*, 488 U.S. 469, 493–96, 109 S. Ct. 706, 102 L. Ed. 2d 854 (1989). Finally, the plaintiffs contend that when African-Americans and women first were recognized as suspect and quasi-suspect classes, respectively, comprehensive legislation barring discrimination against those groups had been in effect for years, and yet the existence of that legislation did not deter the United States Supreme Court from according them protected status. The plaintiffs argue, therefore, that similar legislation protecting gay persons cannot disqualify that group from recognition as a quasi-suspect class. We agree.

We commence our analysis by considering what the term "political powerlessness" actually means for purposes of the suspectness inquiry. Unfortunately, "in most cases the [United States] Supreme Court has no more than made passing reference to the 'political power' factor without actually analyzing it. See., e.g., *Bowen* v. *Gilliard*, [supra, 483 U.S. 602]; *Massachusetts Board of Retirement* v. *Murgia*, [supra, 427 U.S. 313]; *San Antonio Independent School District* v. *Rodriguez*, [supra, 411 U.S. 28]." *Equality Foundation of Greater Cincinnati, Inc.* v. *Cincinnati*, supra, 860 F. Sup. 437–38 n.17. In view of this fact, and because the extent to which a group possesses or lacks political power is neither readily discernible nor easily measurable, this facet of the suspectness inquiry aptly has been charac-

terized as "ill-defined . . . ." Id., 437 n.17. Our task is further complicated by the fact that, to our knowledge, no other court has undertaken a thorough analysis of this factor. The defendants are correct, of course, that gay persons are not entirely without political power, both because the legislature has been persuaded of the need for laws prohibiting sexual orientation discrimination and because some gay persons serve openly in public office. We agree with the plaintiffs, however, that they need not demonstrate that gay persons are politically powerless in any literal sense of that term in order to satisfy this component of the suspectness inquiry.

This conclusion is compelled by United States Supreme Court jurisprudence. We commence our review of that jurisprudence with *Frontiero* v. *Richardson*, supra, 411 U.S. 677 (plurality opinion), in which the court considered an equal protection challenge to a statutory scheme that treated female spouses of servicemen differently from the male spouses of servicewomen. See id., 678. After acknowledging this nation's "long and unfortunate history of sex discrimination"; id., 684; the court underscored the "gross, stereotyped distinctions between the sexes" that had been statutorily sanctioned for many years. Id., 685. The court further observed that "sex, like race and national origin, is an immutable characteristic" that "frequently bears no relation to ability to perform or contribute to society." Id., 686. In reliance on these considerations, the court concluded that classifications based on sex, like classifications based on race, alienage or national origin, are inherently suspect, and therefore must be subject to heightened judicial review.[31] Id., 688.

---

[31] The United States Supreme Court subsequently has made it clear that sex is a quasi-suspect classification and that statutes discriminating on that basis are subject to intermediate scrutiny rather than strict scrutiny. See, e.g., *Craig* v. *Boren*, supra, 429 U.S. 197. Although *Frontiero* was a plurality opinion, its holding subsequently has been approved repeatedly by the court. See, e.g., *Nevada Dept. of Human Resources* v. *Hibbs*, 538 U.S. 721, 730,

In reaching its conclusion, the court observed, first, that "the position of women in America has improved markedly in recent decades." Id., 685. Despite this improvement, however, the court also explained that "women still face[d] pervasive, although at times more subtle, discrimination in our educational institutions, in the job market and, perhaps most conspicuously, in the political arena." Id., 686.

The court nevertheless recognized the significant political advances that had been made toward gender equality, observing that "Congress ha[d] . . . manifested an increasing sensitivity to sex-based classifications. In [Title] VII of the Civil Rights Act of 1964, for example, Congress expressly declared that no employer, labor union, or other organization subject to the provisions of the [a]ct shall discriminate against any individual on the basis of race, color, religion, sex, or national origin. Similarly, the Equal Pay Act of 1963 provides that no employer covered by the [a]ct shall discriminate . . . between employees on the basis of sex. And § 1 of the [e]qual [r]ights [a]mendment, passed by Congress on March 22, 1972, and submitted to the legislatures of the [s]tates for ratification, declares that [e]quality of rights under the law shall not be denied or abridged by the United States or by any [s]tate on account of sex." (Internal quotation marks omitted.) Id., 687.

In light of these significant protections, the court also acknowledged that, "when viewed in the abstract, *women do not constitute a small and powerless minority.*" (Emphasis added.) Id., 686 n.17. The court further observed, however, that, in large part because of past

123 S. Ct. 1972, 155 L. Ed. 2d 953 (2003) (explaining that "measures that differentiate on the basis of gender warrant heightened scrutiny"); see also *United States* v. *Virginia,* supra, 518 U.S. 531; *J.E.B.* v. *Alabama ex rel. T.B.,* 511 U.S. 127, 136, 114 S. Ct. 1419, 128 L. Ed. 2d 89 (1994); *Cleburne* v. *Cleburne Living Center, Inc.,* supra, 473 U.S. 440-41.

discrimination, women were "vastly under-represented in this [n]ation's decisionmaking councils."[32] Id. Thus, after explaining that women reasonably could not be characterized as politically powerless in the literal sense of that term, the court nevertheless concluded that women are entitled to enhanced judicial protection because the discrimination to which they had been subjected was irrational and unlikely to be eliminated solely by the enactment of remedial legislation. In other words, as the court since has explained, heightened scrutiny of certain classifications, including gender, is warranted because those classifications "are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy . . . *and because such discrimination is unlikely to be soon rectified by legislative means* . . . ." (Emphasis added.) *Cleburne* v. *Cleburne Living Center, Inc.*, supra, 473 U.S. 440.

Women have continued to make significant political progress in the years following the court's decision in *Frontiero*.[33] Indeed, because females outnumber males

[32] As examples, the court noted that, as of the date of its decision in 1973, no woman ever had been elected president of the United States or appointed to the United States Supreme Court. *Frontiero* v. *Richardson*, supra, 411 U.S. 686 n.17 (plurality opinion). The court also noted that, at that time, no woman was serving in the United States Senate, and only fourteen women were serving in the United States House of Representatives. Id.

[33] For example, in the 110th Congress, sixteen women now serve in the United States Senate and seventy-eight currently serve in the United States House of Representatives. See "Women in Congress," available at http://womenincongress.house.gov/data/wic-by-congress.html?cong=110. Furthermore, two women have been appointed to the United States Supreme Court. In addition, in 1973, when *Frontiero* was decided, only three women ever had served as governor of a state. See J. Lewis, "Women Governors," available at http://womenshistory.about.com/od/governors/a/governors.htm. Since that date, twenty-seven women have held, or now hold, that position. See id.

in this country,[34] they do not constitute a minority, let alone a relatively powerless one. Nevertheless, the United States Supreme Court repeatedly has applied heightened scrutiny to statutory classifications based on sex and continues to do so. See, e.g., *Nevada Dept. of Human Resources* v. *Hibbs*, 538 U.S. 721, 728, 123 S. Ct. 1972, 155 L. Ed. 2d 953 (2003); *Nguyen* v. *Immigration & Naturalization Service*, 533 U.S. 53, 60, 121 S. Ct. 2053, 150 L. Ed. 2d 115 (2001); *United States* v. *Virginia*, supra, 518 U.S. 533; *Heckler* v. *Mathews*, 465 U.S. 728, 744, 104 S. Ct. 1387, 79 L. Ed. 2d 646 (1984); *Caban* v. *Mohammed*, 441 U.S. 380, 388, 99 S. Ct. 1760, 60 L. Ed. 2d 297 (1979); *Califano* v. *Goldfarb*, 430 U.S. 199, 210–11, 97 S. Ct. 1021, 51 L. Ed. 2d 270 (1977). Moreover, despite significant political gains by racial and ethnic minorities since they first were accorded treatment as a suspect class, both in terms of the enactment of antidiscrimination laws and electoral success,[35] courts also continue to apply strict scrutiny to statutes that draw distinctions on the basis of such classifications. See, e.g., *Parents Involved in Community Schools* v. *Seattle School District No. 1*, 551 U.S. 701,

[34] See R. Longley, "Still More Boys Than Girls Being Born" ("[i]n 2003, the Census Bureau estimated a total of 144,513,361 females of all ages, compared to 138,396,524 males"), available at http://usgovinfo.about.com/od/censusandstatistics/a/moreboys.htm.

[35] For example, African-Americans "are protected by three federal constitutional amendments, [several] major federal Civil Rights Acts of [the nineteenth and twentieth centuries], as well as by antidiscrimination laws in [no fewer than forty-eight] of the states." *High Tech Gays* v. *Defense Industrial Security Clearance Office*, supra, 909 F.2d 378 (Canby, J., dissenting). The magnitude of the political progress that African-Americans and women have made is exemplified by the fact that the Democratic party nominee for president of the United States in 2008 is an African-American man, and that a woman, who had been viewed by some as the favorite to win that party's nomination, ran a close second. Furthermore, the Republican party nominee for vice president of the United States in 2008 is a woman. Consequently, in 2009, following the general election in November, 2008, either an African-American man will be president of the United States or a woman will be vice president of the United States.

720, 127 S. Ct. 2738, 168 L. Ed. 2d 508 (2007); see also *Cleburne* v. *Cleburne Living Center, Inc.*, supra, 473 U.S. 467 (Marshall, J., concurring in the judgment in part and dissenting in part) ("[t]he [United States Supreme] Court . . . has never suggested that race-based classifications became any less suspect once extensive legislation had been enacted on the subject"); D. Richards, Women, Gays and the Constitution: The Grounds for Feminism and Gay Rights in Culture and Law (University of Chicago Press 1998) c. 5, p. 268 n.248 ("[r]acial classifications . . . remain as suspect as they have ever been irrespective of the political advances of African Americans"); D. Richards, supra, p. 268 (no sound reason exists to suggest "that the gains in political solidarity of groups subjected to deep racial or sexist or religious prejudice . . . disentitle them to constitutional protection").

It is apparent, then, that the political powerlessness aspect of the suspectness inquiry does not require a showing that the group seeking recognition as a protected class is, in fact, without political power. As we have explained, women were not politically powerless in an absolute sense when they first were accorded heightened constitutional protection in the early 1970s; indeed, prior to the recognition of women as a quasi-suspect class, gender discrimination had been prohibited statutorily—much like discrimination on the basis of sexual orientation has been barred by statute in this state—and Congress had adopted a joint resolution that caused the proposed equal rights amendment to the United States constitution to be presented to the states for ratification. Today, women, like African-Americans, continue to receive heightened protection under the equal protection clause even though they are a potent and growing political force. The term "political powerlessness," therefore, is clearly a misnomer. We apply this facet of the suspectness inquiry not to ascertain

whether a group that has suffered invidious discrimination borne of prejudice or bigotry is devoid of political power but, rather, for the purpose of determining whether the group lacks sufficient political strength to bring a prompt end to the prejudice and discrimination through traditional political means. Consequently, a group satisfies the political powerlessness factor if it demonstrates that, because of the pervasive and sustained nature of the discrimination that its members have suffered, there is a risk that that discrimination will not be rectified, sooner rather than later, merely by resort to the democratic process. See *Cleburne* v. *Cleburne Living Center, Inc.*, supra, 473 U.S. 440. Applying this standard, we have little difficulty in concluding that gay persons are entitled to heightened constitutional protection despite some recent political progress.

First, the discrimination that gay persons have suffered has been so pervasive and severe—even though their sexual orientation has no bearing at all on their ability to contribute to or perform in society—that it is highly unlikely that legislative enactments alone will suffice to eliminate that discrimination. As we previously have noted; see part V A of this opinion; prejudice against gay persons is long-standing and deeply rooted, in this state and throughout the nation. In fact, until recently, gay persons were widely deemed to be mentally ill; see footnote 27 of this opinion and accompanying text; and their intimate conduct was subject to criminal sanctions. See, e.g., *Bowers* v. *Hardwick*, supra, 478 U.S. 193–94. It is impossible to overestimate the stigma that attaches in such circumstances. "After all, there can hardly be more palpable discrimination against a class than making the conduct that defines the class criminal." (Internal quotation marks omitted.) *Lawrence* v. *Texas*, supra, 539 U.S. 583 (O'Connor, J., concurring in the judgment); accord *Padula* v. *Webster*,

822 F.2d 97, 103 (D.C. Cir. 1987); see also *Lawrence* v. *Texas*, supra, 575 ("[w]hen homosexual conduct is made criminal by the law of the [s]tate, that declaration in and of itself is an invitation to subject homosexual persons to discrimination both in the public and in the private spheres").

That prejudice against gay persons is so widespread and so deep-seated is due, in large measure, to the fact that many people in our state and nation sincerely believe that homosexuality is morally reprehensible. Indeed, homosexuality is contrary to the teachings of more than a few religions.[36] In its amicus brief submitted to this court, the Becket Fund for Religious Liberty, which represents "the interests . . . of religious persons and institutions that conscientiously object to treating [same] sex and [opposite] sex unions as moral equivalents," notes that "many religious groups do not accept [a sexual relationship] among same sex couples as a matter of conscience" and that "probably [the] majority . . . [of] religious groups . . . oppose same sex marriage." As the United States Supreme Court has recognized, "for centuries there have been powerful voices to condemn homosexual conduct as immoral. The condemnation [of homosexuality] has been shaped by religious beliefs, conceptions of right and acceptable behavior, and respect for the traditional family. For many persons these are not trivial concerns but profound and deep convictions accepted as ethical and moral principles to which they aspire and which thus determine the course of their lives." *Lawrence* v. *Texas*, supra, 539 U.S. 571. Former United States Supreme Court Chief Justice Warren Burger made this same point

---

[36] Indeed, it has been asserted that "[t]he predominating purpose motivating the exclusion of gay persons from state-recognized marriages is religious. . . . This may explain why the movement to exclude gay couples from the institution of marriage has been a fundamentally religious movement." Comment, " 'What's in a Name?' Civil Unions and the Constitutional Significance of 'Marriage,' " 10 U. Pa. J. Const. L. 607, 632–33 (2008).

not long ago: "Decisions of individuals relating to homosexual conduct have been subject to state intervention throughout the history of Western civilization. Condemnation of those practices is firmly rooted in Judeao-Christian moral and ethical standards"; *Bowers* v. *Hardwick*, supra, 478 U.S. 196 (Burger, C. J., concurring); and represents a "millennia of moral teaching." Id., 197. Feelings and beliefs predicated on such profound religious and moral principles are likely to be enduring, and persons and groups adhering to those views undoubtedly will continue to exert influence over public policy makers.[37]

Beyond moral disapprobation, gay persons also face virulent homophobia that rests on nothing more than feelings of revulsion toward gay persons and the intimate sexual conduct with which they are associated. Unfortunately, "[h]omosexuals are hated, quite irrationally, for what they are . . . ." *High Tech Gays* v. *Defense Industrial Security Clearance Office*, supra, 909 F.2d 382 (Canby, J., dissenting). Such visceral prejudice is reflected in the large number of hate crimes that are perpetrated against gay persons.[38] The prevalence

[37] Of course, we do not suggest that there is anything untoward or improper about such efforts to mold public policy or opinion, for such activity lies at the core of our democratic system. Nor do we equate religious beliefs with prejudice. Our point is simply that gay persons face steep, if not insurmountable, hurdles in changing or even modifying deeply held beliefs that their manner of sexual intimacy is morally unacceptable.

[38] "According to a national survey conducted in 2000, 74 percent of [gay persons] and bisexuals reported having been subjected to verbal abuse because of their sexual orientation and 32 percent reported being the target of physical violence. [See] . . . Henry J. Kaiser Family Foundation, Inside-Out: A Report on the Experiences of Lesbians, Gays and Bisexuals in America and the Public's View on Issues and Policies Related to Sexual Orientation (2001) pp. 3-4 . . . ." *In re Marriage Cases*, 49 Cal. Rptr. 3d 675, 757 n.18 (App. 2006) (Kline, J., concurring and dissenting), rev'd on other grounds, 43 Cal. 4th 757, 183 P.3d 384, 76 Cal. Rptr. 3d 683 (2008); see also D. Satcher, supra ("[a]veraged over two dozen studies, 80 percent of gay [persons] had experienced verbal or physical harassment on the basis of their orientation, 45 percent had been threatened with violence, and 17 percent had experienced a physical attack"). Even in Connecticut, which has been at the

of such crimes has prompted the legislature to pass hate crime legislation that includes sexual orientation, along with race, religion, ethnicity, disability and gender, as a protected class. See General Statutes §§ 53a-181j, 53a-181k and 53a-181*l*. The irrational nature of the prejudice directed at gay persons, who "are ridiculed, ostracized, despised, demonized and condemned" merely for being who they are; *Snetsinger* v. *Montana University System*, supra, 325 Mont. 160 (Nelson, J., concurring); is entirely different in kind than the prejudice suffered by other groups that previously have been denied suspect or quasi-suspect class status, such as the poor, the mentally disadvantaged and the aged. In fact, the bigotry and hatred that gay persons have faced are akin to, and, in certain respects, perhaps even more severe than, those confronted by some groups that have been accorded heightened judicial protection.[39] See, e.g., *People* v. *Garcia*, 77 Cal. App. 4th 1269, 1279, 92 Cal. Rptr. 2d 339 (2000) (only racial and religious minorities have suffered more intense and deep-seated hostility

forefront nationally in efforts to combat some of the most blatant forms of discrimination against its gay persons, the percentage of total anti-gay hate crimes increased more than twofold from approximately 9 percent of all reported hate crimes in 2000 to approximately 18 percent in 2004. Compare Partners Against Hate, "2000 Federal Bureau of Investigation Hate Crime Statistics," available at http://www.partnersagainsthate.org/statistics/connecticut-2000.html, with Partners Against Hate, "2004 Federal Bureau of Investigation Hate Crime Statistics," available at http://www.partnersagainst-hate.org/statistics/connecticut-2004.html. Recent data show that Connecticut ranks thirteenth nationally among all states in the total number of reported criminal offenses classified as hate crimes with a sexual orientation bias. See Crime Statistics, Sexual Oriented Related Hate Crimes by State, available at http://www.statemaster.com/graph/cri_hat_cri_sex_ori_rel-hatecrimes-sexual-orientation-related.

[39] In this regard, it is noteworthy that a poll taken in 1998 by the National Law Journal found that 17.1 percent of prospective jurors admitted to a bias against homosexuals that would make it impossible for them to be fair and impartial in a case in which one of the parties was a homosexual. "Juror Outlook Survey," National L.J., November 2, 1998, pp. A1, A24–A25. By contrast, only 4.8 percent indicated that they could not be fair to African-Americans, and 5 percent stated that they could not be fair to women. Id.

than homosexuals). This fact provides further reason to doubt that such prejudice soon can be eliminated and underscores the reality that gay persons face unique challenges to their political and social integration.[40]

Insofar as gay persons play a role in the political process, it is apparent that their numbers reflect their status as a small and insular minority. It recently has been noted that, of the more than one-half million people who hold a political office at the local, state and national level, only about 300 are openly gay persons. *Andersen* v. *King County*, supra, 158 Wash. 2d 105 (Bridge, J., concurring in dissent); see also R. La Corte, "State Legislature Has Second-Largest Gay Caucus in U.S." (January 24, 2008) (putting figure at about 400 openly gay persons), available at http://seattletimes.nwsource.com/html/nationworld/2004140976_webgaycaucus23.html?syn. No openly gay person ever has been appointed to a United States Cabinet position or to any federal appeals court.[41] In addition, no openly gay person has served in the United States Senate, and only two currently serve in the United States House of Representatives. See "Majority of Voters Open To Electing Gay President" (August 21, 2008), available at http://www.victoryfund.org/news/view/url:majority_of_voters_open_to_electing_gay_president. Gay per-

---

[40] Thus, as former United States Supreme Court Justice William Brennan, joined by Justice Thurgood Marshall, stated: "Because of the immediate and severe opprobrium often manifested against homosexuals once so identified publicly, members of this group are particularly powerless to pursue their rights openly in the political arena. Moreover, homosexuals have historically been the object of pernicious and sustained hostility, and it is fair to say that discrimination against homosexuals is 'likely . . . to reflect deep-seated prejudice rather than . . . rationality.'" *Rowland* v. *Mad River Local School District*, 470 U.S. 1009, 1014, 105 S. Ct. 1373, 84 L. Ed. 2d 392 (1985) (Brennan, J., dissenting), quoting *Plyler* v. *Doe*, supra, 457 U.S. 216 n.14.

[41] Indeed, as far as we know, there is only one openly gay or lesbian federal judge in the entire nation. See N. McDonald, "Queer Eye for the Ballot Box: Is Philadelphia Ready for Its First Gay Mayor" (January 17, 2007), available at http://www.citypaper.net/articles/2007/01/18/queer-eye-for-the-ballot-box.

sons also lack representation in the highest levels of business, industry and academia. For example, no openly gay person heads a Fortune 500 company; G. Shister, "Gay Chief Executives Come Out Winners" (January 28, 2008), available at http://web.archive.org/web/20080129030005/http:/www.philly.com/inquirer/local/20080128_Gay_chief_executives_come_out_winners.html; and it has been estimated that there are only fourteen openly gay college and university presidents or chancellors; see "An Openly Gay Chancellor Heads to Madison, Wis.," Chronicle of Higher Education News Blog (May 29, 2008), available at http://chronicle.com/news/article/?id=4574; a number that represents only one half of 1 percent of such positions nationwide.

In this state, no openly gay person ever has been elected to *statewide* office, and only five of the 187 members of the state legislature are openly gay or lesbian.[42] No openly gay man or lesbian ever has been appointed to the state Supreme Court or Appellate Court, and we are aware of only one openly gay or lesbian judge of the Superior Court. By contrast, this state's current governor, comptroller and secretary of the state are women, as are the current chief justice and two associate justices of the state Supreme Court, and other women now hold and previously have held statewide office and positions in the United States House of Representatives. By any standard, therefore,

---

[42] Apparently, this represents one of the largest contingents of gay persons of any state legislature in the nation. See "State Legislature Has Largest Gay Caucus in U.S." (January 23, 2008), available at http://www.komotv.com/news/local/14133022.html (reporting that, in addition to Connecticut, states with largest number of gay and lesbian legislators include New Hampshire, with seven gay and lesbian lawmakers, and Washington, which has six gay and lesbian lawmakers). Although we recognize that Connecticut is a leader in terms of the number of openly gay and lesbian lawmakers elected to the legislature, we view that fact as indicative of the political weakness of gay persons nationwide, and not as indicative of the political strength of gay persons in this state.

gay persons "remain a political underclass in our [state and] nation." *Andersen* v. *King County*, supra, 158 Wash. 2d 105 (Bridge, J., concurring in dissent).

In recent years, our legislature has taken substantial steps to address discrimination against gay persons. These efforts are most notably reflected in this state's gay rights law; see General Statutes §§ 46a-81a through 46a-81r; which broadly prohibits discrimination against a person because of his or her "preference for heterosexuality, homosexuality or bisexuality, having a history of such preference or being identified with such preference . . . ."[43] General Statutes § 46a-81a. This public policy extends to a wide range of activities, including membership in licensed professional associations; see General Statutes § 46a-81b; employment; see General Statutes § 46a-81c; public accommodations; see General Statutes § 46a-81d; housing; see General Statutes § 46a-81e; credit practices; see General Statutes § 46a-81f; employment in state agencies; see General Statutes §§ 46a-81h and 46a-81j; the granting of

[43] It is noteworthy that, in contrast to our state laws designed to protect gay persons from discrimination, federal law reflects Congress' reluctance to address such discrimination on a nationwide basis. Thus, for example, despite repeated attempts to extend the protections of Title VII to sexual orientation, the federal antidiscrimination provisions do not ban discrimination on that basis. See generally 42 U.S.C. § 2000e et seq. Under the "don't ask, don't tell" policy applicable to the armed forces of the United States, gay persons cannot serve in the military except under severely circumscribed circumstances. See 10 U.S.C. § 654 (2006); see also footnote 25 of this opinion. In addition, under the federal Defense of Marriage Act, which was enacted in 1996 and is codified at 1 U.S.C. § 7 and 28 U.S.C. § 1738C, no state is required to give effect to a same sex marriage solemnized in another state. Federal law, therefore, provides gay persons with little or no protection from discrimination. Furthermore, at least twenty-five states, including Alabama, Alaska, Arkansas, Colorado, Georgia, Idaho, Kansas, Kentucky, Louisiana, Michigan, Mississippi, Missouri, Montana, Nebraska, Nevada, North Dakota, Ohio, Oklahoma, Oregon, South Carolina, South Dakota, Tennessee, Texas, Utah and Wisconsin, have passed constitutional amendments banning same sex marriage, a development that many view as reflecting widespread opposition to equal rights for gay persons.

state licenses; see General Statutes § 46a-81k; educational and vocational programs of state agencies; see General Statutes § 46a-81m; and the allocation of state benefits. See General Statutes § 46a-81n. Other statutes also seek to prohibit discrimination against same sex couples and gay persons. See General Statutes § 45a-724 et seq. (permitting same sex couples to adopt children); General Statutes §§ 53a-181j, 53a-181k and 53a-181*l* (recognizing crimes of intimidation based on bigotry or bias for conduct directed at another on account of that person's actual or perceived sexual orientation). These antidiscrimination provisions, along with the civil union law, reflect the fact that gay persons are able to exert some degree of political influence in the state.

Notwithstanding these provisions, however, the legislature expressly has stated that the gay rights law shall *not* be "deemed or construed (1) to mean the state of Connecticut condones homosexuality or bisexuality or any equivalent lifestyle, (2) to authorize the promotion of homosexuality or bisexuality in educational institutions or require the teaching in educational institutions of homosexuality or bisexuality as an acceptable lifestyle, (3) to authorize or permit the use of numerical goals or quotas, or other types of affirmative action programs, with respect to homosexuality or bisexuality in the administration or enforcement of the [state's antidiscrimination laws], (4) to authorize the recognition of or the right of marriage between persons of the same sex, or (5) to establish sexual orientation as a specific and separate cultural classification in society."[44] General Statutes § 46a-81r. By singling out same

[44] Cf. General Statutes § 45a-726a ("Notwithstanding any provision of sections 4a-60a and 46a-81a to 46a-81p, inclusive, the Commissioner of Children and Families or a child-placing agency may consider the sexual orientation of the prospective adoptive or foster parent or parents when placing a child for adoption or in foster care. Nothing in this section shall be deemed to require the Commissioner of Children and Families or a child-placing agency to place a child for adoption or in foster care with a prospective adoptive or foster parent or parents who are homosexual or bisexual.").

sex relationships in this manner—there is, of course, no such statutory disclaimer for opposite sex relationships—the legislature effectively has proclaimed, as a matter of state policy, that same sex relationships are disfavored.[45] That policy, which is unprecedented among the various antidiscrimination measures enacted in this state, represents a kind of state-sponsored disapproval of same sex relationships and, consequently, serves to undermine the legitimacy of homosexual relationships, to perpetuate feelings of personal inferiority and inadequacy among gay persons, and to diminish the effect of the laws barring discrimination against gay persons.[46] Indeed, the purposeful description of homo-

[45] Not surprisingly, the relevant legislative history demonstrates that the disclaimer set forth in § 46a-81r (1) was a political compromise designed to assure persons opposed to homosexual conduct of this state's unwillingness to approve or condone such conduct. Indeed, when asked, during floor debate on the gay rights law, why heterosexuality was not included in the disclaimer, Representative Richard D. Tulisano, a sponsor of the bill, replied, "Why [is it] not included? Because maybe I want to condone heterosexuality." 34 H.R. Proc., Pt. 7, 1991 Sess., p. 2615; see also id., pp. 2614–26, remarks of Representatives Tulisano and William L. Wollenberg (addressing proviso that state does not condone homosexual lifestyle and acknowledging that it was political compromise aimed at distinguishing homosexual behavior from sexual orientation); cf. 34 S. Proc., Pt. 3, 1991 Sess., pp. 976–77, remarks of Senator Anthony V. Avallone ("One of the things—the issues that clouded . . . my judgment and others, one of the issues raised early on in this bill was does the [s]tate of Connecticut, by this bill, condone a particular activity that is offensive to a particular portion of the community and [that] is really the business of consenting adults . . . . I know this bill does not do that.").

[46] In his dissent, Justice Borden seeks to negate the import of § 46a-81r (1) by asserting that the provision merely reflects the state's neutrality with respect to the legitimacy or propriety of homosexual conduct. See footnote 16 of Justice Borden's dissenting opinion. In making this assertion, Justice Borden ignores the centuries of prejudice and discrimination that gay persons have faced, the fact that the legislature never has deemed it necessary to make such a statement of neutrality with respect to the heterosexual lifestyle, and the legislative history of § 46a-81r (1), which, as we have indicated; see footnote 45 of this opinion; demonstrates that the provision was intended to assuage those citizens and legislators who believed that sexual conduct involving persons of the same sex is immoral, wrong or otherwise not to be condoned. Construed fairly, therefore, § 46a-81r (1) is manifestly *not* neutral and must be read to express this state's preference for heterosexual conduct.

sexuality as a "lifestyle" not condoned by the state stigmatizes gay persons and equates their identity with conduct that is disfavored by the state. Furthermore, although the legislature eventually enacted the gay rights law, its enactment was preceded by nearly a decade of numerous, failed attempts at passage.[47] In addition, the bill that did become law provides more limited protection than the proposals that had preceded it, all of which would have added sexual orientation to the existing nondiscrimination laws and would have treated the classification in the same manner as other protected classes.[48] Finally, as we have explained, the legislation that ultimately emerged from this process

[47] See House Bill No. 7115, 1989 Sess.; Senate Bill No. 208, 1987 Sess.; House Bill No. 7584, 1987 Sess.; Senate Bill No. 398, 1983 Sess.; Senate Bill No. 813, 1981 Sess.; House Bill No. 6545, 1981 Sess.; see also Conn. Joint Standing Committee Hearings, Judiciary, Pt. 3, 1991 Sess., pp. 739–40, remarks of Father Christopher Rose (proposed legislation that would become gay rights law had "been kicking around in Connecticut for more than ten years and the fact that we continue to ignore passage of this [legislation] I think perpetuates a grave injustice against the segment of our population").

[48] See 34 S. Proc., Pt. 3, 1991 Sess., p. 986, remarks of Senator George C. Jepsen ("If anything, I personally feel that the legislation does not go far enough. I would prefer a stronger bill. I would prefer bills that we saw in previous years. I think, however, the bill before us today addresses the needs of society adequately. It takes into account the difficult situation, ploys by religion and deals with it appropriate[ly] . . . ."); id., p. 993, remarks of Senator Louis C. DeLuca ("In Senator [Anthony V.] Avallone's remarks he said that this bill [h]as carefully crafted exceptions. It seems to me when you introduce legislation and have to carefully craft all those exceptions, you understand from the beginning that this [is] an exceptional bill and it does not fit the norm of discrimination."); 34 H.R. Proc., Pt. 7, 1991 Sess., p. 2597, remarks of Representative Richard D. Tulisano ("[T]he bill before us represents a revised attempt, if you will, at dealing with the issue of discrimination on the basis of sexual orientation. The bill . . . does not, as we have done in past years, add to [the] list of protected classes, that dealing with sexual orientation and effectively we have narrowed this bill to apply or to create a new body of law . . . . So, therefore, the old approach we . . . obviously took into account and made sexual orientation the broad application that was dealt with race, religion, color, as is done in most of our Civil Rights Acts. This approach is somewhat different. It is narrower. It seeks to respond to some of the issues that have been raised over the years in this debate."); 34 H.R. Proc., supra, p. 2752, remarks of Representative Juan A. Figueroa ("[t]his is probably the most narrowly drawn civil rights bill to be passed in this state").

passed only after a compromise was reached that resulted in, inter alia, an unprecedented proviso expressing the position of the legislature that it does not condone homosexuality. Thus, to the extent that those civil rights laws, as well as the civil union law, reflect the fact that gay persons wield a measure of political power, the public policy articulated in § 46a-81r is clear evidence of the limits of that political influence.

Finally, although state law provides certain protections to gay persons, the United States Supreme Court has explained that such protective legislation, while indicative that the subject group possesses at least some political power; see, e.g., *Cleburne* v. *Cleburne Living Center, Inc.*, supra, 473 U.S. 445 (observing that unique legislative response to special needs of mentally disadvantaged persons belies claim that such persons are so lacking in political power that they cannot attract attention of lawmakers to those special needs); also is a factor *supporting* the conclusion that the subject group is in need of heightened constitutional protection. In particular, in *Frontiero* v. *Richardson,* supra, 411 U.S. 687 (plurality opinion), the court observed that Congress had taken significant steps, both statutory and otherwise, to eliminate gender discrimination. The court further explained that, in undertaking those efforts, Congress had manifested its determination that gender classifications are "inherently invidious"; id.; and that that "conclusion of a coequal branch of [g]overnment" was significant for the purpose of deciding whether gender constituted a suspect class for equal protection purposes. Id., 687–88. Thus, the court viewed the enactment of remedial legislation aimed at protecting women from discrimination not as reason to deny them protected class status but, rather, as a justification for granting them such treatment, because it reflected the determination of Congress that gender based classifications are likely to be founded on preju-

dice and stereotype. See id. We therefore agree with Chief Judge Judith S. Kaye of the New York Court of Appeals that "[s]uch measures acknowledge—rather than mark the end of—a history of purposeful discrimination . . . ."[49] *Hernandez* v. *Robles,* supra, 7 N.Y.3d 388–89 (Kaye, C. J., dissenting); see also *Watkins* v. *United States Army,* supra, 875 F.2d 727 (Norris, J., concurring in the judgment) ("[t]he very fact that homosexuals have historically been underrepresented in and victimized by political bodies is itself strong evidence that they lack the political power necessary to ensure fair treatment at the hands of government").

As this court has observed, the gay rights law "was enacted in order to protect people from pervasive and invidious discrimination on the basis of sexual orientation."[50] *Gay & Lesbian Law Students Assn.* v. *Board*

---

[49] The following comments of Justice Thurgood Marshall also are instructive in this regard: "[H]istory makes clear that constitutional principles of equality, like constitutional principles of liberty, property, and due process, evolve over time; what was once a 'natural' and 'self-evident' ordering later comes to be seen as an artificial and invidious constraint on human potential and freedom. Compare *Plessy* v. *Ferguson,* 163 U.S. 537 [16 S. Ct. 1138, 41 L. Ed. 256] (1896), and *Bradwell* v. *Illinois,* [83 U.S. (16 Wall.) 130, 141, 21 L. Ed. 442 (1873)] (Bradley, J., concurring in judgment), with *Brown* v. *Board of Education,* [supra, 347 U.S. 483], and *Reed* v. *Reed,* 404 U.S. 71 [92 S. Ct. 251, 30 L. Ed. 2d 225] (1971). Shifting cultural, political, and social patterns at times come to make past practices appear inconsistent with fundamental principles [on] which American society rests, an inconsistency legally cognizable under the [e]qual [p]rotection [c]lause. It is natural that evolving standards of equality come to be embodied in legislation. When that occurs, courts should look to the fact of such change as a source of guidance on evolving principles of equality." *Cleburne* v. *Cleburne Living Center, Inc.,* supra, 473 U.S. 466 (Marshall, J., concurring in the judgment in part and dissenting in part).

[50] Although that legislative determination is clear enough from the terms of the law's provisions, the legislative purpose—and the recognition that gay persons possess limited political power—is further reflected in the legislative history. For example, Senator George C. Jepsen, speaking in favor of the gay rights law, explained that discrimination on the basis of sexual orientation "is widespread, even systematic in our society . . . . [I]t is entirely appropriate to address this difficult and important subject in the Congress and in the [l]egislatures across our country.

*of Trustees,* 236 Conn. 453, 481–82, 673 A.2d 484 (1996). The antidiscrimination provisions of our gay rights law, no less than the provisions that Congress had enacted prior to *Frontiero* to counter gender discrimination; see *Frontiero* v. *Richardson,* supra, 411 U.S. 687 (plurality opinion) (citing Title VII of Civil Rights Act of 1964, Equal Pay Act of 1963 and proposed equal rights amendment to United States constitution); represent a legislative consensus that sexual orientation discrimination, like gender discrimination several decades ago, is widespread, invidious and resistant to change.

Gay persons, moreover, continue to "face an uphill battle in pursuing political success. The awareness of public hatred and the fear of violence that often accompanies it undermine efforts to develop an effective gay political identity. [Gay persons] are disinclined to risk

"I believe that the mark of a civilized society is how well it addresses the *needs of those least well-equipped to protect themselves* and that . . . throughout our history each generation has had to stand up and be counted on whether they're going to protect those *most poorly situated to protect themselves,* whether it was . . . to protect political activists in the wake of World War I or in the McCarthy era, whether it was to protect against religious discrimination . . . throughout our history, whether it was the [c]ivil [r]ights struggle to protect blacks and Hispanics, culminating in the 1960s, whether it was the struggle for equality for women in the 1960s, 1970s and today and now we have the issue of sexual orientation.

\* \* \*

"[C]ountless gays . . . fear discrimination in their jobs, in their housing if their identity is know[n]. I know of overt acts of discrimination, whether it's slurs, ugly slurs painted on the sides of houses or on the cars of homosexuals, whether it was the testimony of individuals before the [j]udiciary [c]ommittee earlier this year, whether it was the letters and the write-ins from countless individuals who are gay and who have faced discrimination in their lives . . . ." (Emphasis added.) 34 S. Proc., Pt. 3, 1991 Sess., pp. 983–85. Senator Jepsen's remarks concerning the intense and pervasive prejudice and discrimination that gays have suffered for so long, their relative lack of political power, and the need for an extraordinary legislative response affording gay persons a measure of legal protection, speak volumes about the extent to which gay persons constitute "a discrete and insular minority . . . for whom . . . heightened judicial solicitude is appropriate." (Citation omitted; internal quotation marks omitted.) *Graham* v. *Richardson,* supra, 403 U.S. 372.

retaliation by open identification with the movement, and potential allies from outside the gay [and lesbian] community may think twice about allying their fortunes with such a despised population. That may explain why many gay [and lesbian] officials hide their sexual orientation until they have built up considerable public trust, or why gay [and lesbian] candidates have not been elected to public office in due proportion to the size of the gay [and lesbian] community or [have not] enjoyed the same level of political success as blacks, Latinos, and other minority groups." K. Wald, The Context of Gay Politics, in The Politics of Gay Rights (The University of Chicago Press, C. Rimmerman, K. Wald & C. Wilcox eds., 2000) pp. 1, 14; see also, e.g., *Jantz* v. *Muci*, supra, 759 F. Sup. 1550 ("Due to the harsh penalties imposed by society on persons identified as homosexual, many homosexual persons conceal their sexual orientation. Silence, however, has its cost. It may allow a given individual to escape from the discrimination, abuse, and even violence which is often directed at homosexuals, but it ensures that homosexuals as a group are unheard politically.").

With respect to the comparative political power of gay persons, they presently have no greater political power—in fact, they undoubtedly have a good deal less such influence—than women did in 1973, when the United States Supreme Court, in *Frontiero*, held that women are entitled to heightened judicial protection. *Frontiero* v. *Richardson*, supra, 411 U.S. 688 (plurality opinion). After all, at that time, women were not a true minority, and they had begun to flex their political muscle on the national scene. Indeed, the court in *Frontiero* accorded women protected status even though gender discrimination *already* was broadly prohibited by federal legislation—just as sexual orientation discrimination is statutorily prohibited in this state. Moreover, when *Frontiero* was decided, the proposed equal rights amendment to the United States constitution,

which would have accorded women suspect class status; see id., 692 (Powell, J., concurring in the judgment) (explaining that equal rights amendment, "if adopted [would] resolve the substance of [the] precise question [before the court]"); had broad support in Congress, where it passed overwhelmingly; see 118 Cong. Rec. 9598 (1972) (Senate vote on H.R.J. Res. 208); 117 Cong. Rec. 35,815 (1971) (House vote on H.R.J. Res. 208); and among the states, where it nearly achieved the votes necessary for adoption. See R. Lee, A Lawyer Looks at the Equal Rights Amendment (Brigham Young University Press 1980) c. 5, p. 37. In addition, "both major political parties ha[d] repeatedly supported [the amendment] in their national party platforms"; S. Rep. No. 92-689 (1972) p. 2; and it had been endorsed by Presidents Eisenhower, Kennedy, Johnson and Nixon, along with an extraordinary array of civic, labor and legal organizations. Id., pp. 2–3. In 1974, a nationwide poll indicated overwhelming public support for the amendment. G. Steiner, Constitutional Inequality: The Political Fortunes of the Equal Rights Amendment (Brookings Institution 1985) c. 2, p. 27. In view of the conclusion of the court in *Frontiero* that women were entitled to heightened judicial protection despite their emergence as a growing political force and despite the widespread, bipartisan support for the equal rights amendment—the imminent ratification of which seemed all but assured— we see no justification for depriving gay persons of such protection. Tellingly, the defendants have proffered no justification for applying a different standard to gay persons under the state constitution than the court in *Frontiero* applied to women for purposes of the federal constitution.[51]

---

[51] In his dissenting opinion, Justice Borden concludes that gay persons are not entitled to protected status because they have too much political power to warrant such protection. As we discuss more fully in part V D 3 of this opinion, this conclusion is flawed because, at the time women were accorded protected status under the federal constitution, they possessed more political power than gays in this state currently possess.

We also note that, despite the likelihood of ratification when *Frontiero* was decided in 1973, the equal rights amendment ultimately did not muster enough support among the states, and it therefore never was adopted. See R. Lee, supra, c. 5, p. 37. Thus, one of the lessons to be learned from *Frontiero* and its treatment of the equal rights amendment—an initiative that seemed far more likely to succeed nationally than any current effort to enact a gay marriage law in this state—is that, because support for particular legislation may ebb or flow at any time, the adjudication of the rights of a disfavored minority cannot depend solely on such an eventuality.

Finally, gay persons clearly lack the political power that African-Americans and women possess today. See, e.g., *High Tech Gays* v. *Defense Industrial Security Clearance Office*, supra, 909 F.2d 378 (Canby, J., dissenting) ("[c]ertainly, homosexuals as a class wield less political power than blacks, a suspect [class], or women, a quasi-suspect one"); see also *Dean* v. *District of Columbia*, supra, 653 A.2d 351 (Ferren, J., concurring in part and dissenting in part) (observing that gay persons "have considerably less political power than African-Americans"). Yet political gains by African-Americans and women have not been found to obviate the need for heightened judicial scrutiny of legislation that draws distinctions on the basis of race or gender. We therefore agree fully with the California Supreme Court's recent observation in recognizing gay persons as a suspect class under the California constitution: "[I]f a group's *current* political powerlessness were a prerequisite to a characteristic's being considered a constitutionally suspect basis for differential treatment, it would be impossible to justify the numerous decisions that continue to treat sex, race, and religion as suspect [or quasi-suspect] classifications. Instead, [the relevant case law] make[s] clear that the most important factors

in deciding whether a characteristic should be considered a constitutionally suspect basis for classification are whether the class of persons who exhibit a certain characteristic historically has been subjected to invidious and prejudicial treatment, and whether society now recognizes that the characteristic in question generally bears no relationship to the individual's ability to perform or contribute to society." (Emphasis in original.) *In re Marriage Cases*, supra, 43 Cal. 4th 843. Under the standard for political powerlessness that the defendants advocate, however, African-Americans and women necessarily would have lost their protected status. The fact that courts have not seen fit to remove those groups from that status, even though they wield considerable political power, leads inexorably to the conclusion that gay persons cannot be deprived of heightened judicial protection merely because of their relatively limited political influence.[52]

[52] We recognize that several federal and state courts have held that sexual orientation is not a suspect or quasi-suspect classification, holdings that have been based, in part, on the determination that gay persons are not politically powerless. See *High Tech Gays* v. *Defense Industrial Security Clearance Office*, 895 F.2d 563, 573–74 (deciding issue under federal constitution), reh. denied, 909 F.2d 375 (9th Cir. 1990) (en banc); *Ben-Shalom* v. *Marsh*, 881 F.2d 454, 464, 466 (7th Cir. 1989) (deciding issue under federal constitution), cert. denied sub nom. *Ben-Shalom* v. *Stone*, 494 U.S. 1004, 110 S. Ct. 1296, 108 L. Ed. 2d 473 (1990); *Conaway* v. *Deane*, supra, 401 Md. 277, 290 (deciding issue under state constitution); *Andersen* v. *King County*, supra, 158 Wash. 2d 21 (deciding issue under state constitution). In each such case, the court had predicated its conclusion on the assertion that the political power of gay persons is increasing, a fact sometimes manifested in the enactment of laws affording gay persons certain legal protections.

These cases are unpersuasive because, first, the courts applied the term "politically powerless" more or less literally to deprive gay persons protected status. As we previously have explained, such an application of the political powerlessness prong fails to account for the fact that the United States Supreme Court properly accorded African-Americans and women enhanced judicial protection at a time when they had more political power than gay persons currently possess. See E. Gerstmann, supra, c. 4, pp. 81–84 (explaining that courts should apply to gay persons same political powerlessness standard that had been applied to African-Americans and women

## 3

In his dissenting opinion, Justice Borden expresses his agreement that gay persons satisfy the first three prongs of the suspectness inquiry, that is, they have suffered a deplorable history of invidious discrimination, their sexual orientation is a distinguishing characteristic that defines them as a discrete group, and a person's sexual orientation bears no relation to a person's ability to contribute to society. In Justice Borden's view, however, gay persons are not entitled to heightened protection, even though they meet the first three criteria, because the political power of gay persons overrides those three considerations.[53] In support of his conclusion, Justice Borden relies primarily on the existence of our state statutes barring discrimination against gay persons, the civil union law and the statements of several persons in favor of legislation supporting the right of gay persons to marry.[54] We disagree with

in determining whether they constituted suspect classes for equal protection purposes). Because those courts failed to consider the political power of gay persons in comparison to the political power of such other protected groups, their conclusions were based on a fundamentally flawed legal predicate in each case.

The cases also are not persuasive because the courts applied the political powerlessness prong as dispositive of the suspectness inquiry. As we have explained, to the extent that the Supreme Court has considered the political power of a group in determining whether it is entitled to suspect or quasi-suspect class status, it has accorded that prong the least amount of weight. See part IV of this opinion.

[53] Thus, in Justice Borden's view, *any* statute that discriminates against gay persons would pass muster under the equal protection provisions of the state constitution if a court could conceive of any plausible justification for sustaining the discriminatory legislation, the same highly deferential standard that applies in the area of economics and social welfare. See, e.g., *Batte-Holmgren* v. *Commissioner of Public Health*, 281 Conn. 277, 296, 914 A.2d 996 (2007).

[54] Justice Borden's analysis is predicated primarily on certain language in *Cleburne* v. *Cleburne Living Center, Inc.*, supra, 473 U.S. 432, in which the court referred to legislation affording special benefits to the mentally disadvantaged as negating "any claim that the mentally retarded are politically powerless in the sense that they have no ability to attract the attention of the lawmakers." Id., 445. It is important to note, however, that the political

Justice Borden's analysis and his conclusion because it is absolutely clear that, under the test that Justice Borden acknowledges is applicable to the equal protection provisions of both the federal and state constitutions, gay persons today are entitled to heightened protection under the state constitution no less than women were entitled to heightened protection under the federal constitution in 1973.

Our fundamental disagreement with Justice Borden stems from his assertion that the holding of *Frontiero* according women protected status under the federal constitution in 1973 is "irrelevant" to the state constitu-

influence of the mentally disadvantaged hardly was a primary reason why the court in *Cleburne* concluded that the mentally disadvantaged are not entitled to heightened protection under the federal constitution. In fact, in *Cleburne*, the court cited several other overriding reasons in support of its conclusion, relying first and foremost on the "undeniable" fact "that those who are mentally retarded have a reduced ability to cope with and function in the everyday world"; id., 442; such that the state has a legitimate interest in "dealing with and providing for them" legislatively. Id.; see also id., 441 (observing that "the lesson of [controlling precedent] is that [when] individuals in the group affected by a law have distinguishing characteristics relevant to interests the [s]tate has the authority to implement, the courts have been very reluctant . . . to closely scrutinize legislative choices as to whether, how, and to what extent those interests should be pursued"). The court also observed that the beneficent legislative response to the particular needs of the mentally disadvantaged, a response that the court characterized as "singling out the [mentally] retarded for special treatment"; id., 444; in addressing their "unique problems . . . belies a continuing antipathy or prejudice" against them as a group. Id., 443. Thus, the court concluded that, in light of these two considerations, heightened judicial scrutiny of laws pertaining to the mentally disadvantaged was not necessary. See id., 446.

Thus, *Cleburne* merely raises the possibility that, if a class historically has been subjected to invidious discrimination, but the defining characteristic of that class, like that of the mentally disadvantaged in *Cleburne*, bears a legitimate relation to the ability to perform in society, that class still might be deemed quasi-suspect if the members of that class "are politically powerless *in the sense* that they have no ability to attract the attention of the lawmakers." (Emphasis added.) Id., 445. When, however, as in the present case, the defining characteristic of the class bears no relationship to the ability to perform in society, the mere ability of the group "to attract the attention of the lawmakers"; id.; would not provide a reason to deprive the group of protected status.

tional issue raised by this case. Footnote 14 of Justice Borden's dissenting opinion. To support this assertion, Justice Borden maintains that, because gender already is a suspect class under the state constitution, the status of women under the federal constitution is "beside the point." Id. On the contrary, Justice Borden completely misses the point in attempting to explain why *Frontiero* and, in particular, its treatment of the political power-lessness component of the suspectness inquiry, is unimportant to this case. Simply put, that point is: if, as Justice Borden acknowledges, the court in *Frontiero* was correct in according women protected status under the same test that we apply for purposes of the state constitution, why would we deny gay persons, who have less political power than women possessed in 1973, the same measure of protection under the state constitution? This question is hardly irrelevant; in fact, it is *the* critical issue with respect to this component of the suspectness inquiry, for gay persons are entitled to have their claim for heightened constitutional protection under the state constitution given the same, even-handed consideration of the political powerlessness standard that other historically maligned groups, including women, have received under the federal constitution.

In other words, as one commentator has explained, "[because] the term [political] 'powerlessness' is not self-defining . . . [t]here must be some yardstick of political power to which the power of [gay persons] can be compared.

"The only logical standard of comparison is other . . . quasi-suspect classes such as . . . women. If [women were] sufficiently powerless to be [accorded] . . . quasi-suspect [class status], then logically [gay persons] must be, at a minimum, more politically powerful than these groups if they are in fact too powerful to be a . . . quasi-suspect class.

"Amazingly [however], not a single court has ever compared the political power of [gay persons] to that of women . . . .

\* \* \*

"The point, of course, is not that the courts should tolerate gender discrimination. The point is that the courts are applying a very different standard to [gay persons] than they have been applying to other [protected] groups. No court has been willing to evaluate the political power of women . . . by the same standard that they have applied to [gay persons. Although] the equal protection of the laws does not require the same result for all groups seeking [quasi-suspect] class status, surely it requires that courts apply the same *standards* to all who seek judicial protection." (Emphasis in original.) E. Gerstmann, supra, c. 4, pp. 81–83.

This is precisely the flaw in Justice Borden's analysis. Because gay persons, like women, fully satisfy the first three criteria of the suspectness inquiry, it would be manifestly unfair to the plaintiffs, and to gay persons generally, to ignore or dismiss the analysis and result of *Frontiero*, which correctly concluded that women were not so politically powerful as to obviate the need for heightened judicial scrutiny of gender-based classifications. A brief recapitulation of the political status of women when *Frontiero* was decided makes it crystal clear that, upon application of the standard applied by the court in *Frontiero*, gay persons have the same right to protected status under the state constitution that women have been accorded under the federal constitution.[55]

---

[55] We note that Justice Borden also fails to explain why African-Americans properly were afforded suspect class status because, at the time they received such recognition, they, like gay persons in this state, were the subject of antidiscrimination legislation. See *High Tech Gays* v. *Defense Industrial Security Clearance Office*, supra, 909 F.2d 378 (Canby, J., dissenting). We focus on women, however, because they have been deemed to be entitled to protection as a quasi-suspect class, the level of protection that we conclude applies to gay persons under the state constitution.

As we previously have discussed, when *Frontiero* was decided in 1973, women wielded considerable political clout. In fact, women were not even a voting minority. Census data reveal that, in 1970, there were approximately 70 million women of voting age in the United States and approximately 63 million men of that age. See United States Census Bureau, "Democratic Trends in the 20th Century" (November, 2002) p. A-9, available at http://www.census.gov/prod/2002pubs/censr-4.pdf. Thus, voting age women outnumbered voting age men by approximately 7 million. By contrast, gay persons undisputedly comprise a small minority of the population.

Furthermore, by the time *Frontiero* was decided in 1973, Congress already had passed comprehensive anti-discrimination legislation in recognition of the long history of discrimination to which women had been subjected. See *Frontiero* v. *Richardson*, supra, 411 U.S. 687 (plurality opinion). The court in *Frontiero*, however, accorded women protected status despite the existence of this legislation and notwithstanding the fact that they comprised a majority of the population. See id., 688. Of even greater significance for present purposes, however, the equal rights amendment was pending approval at that time, and its ratification would have accorded women status as a *suspect class*. In other words, upon ratification of that amendment, *no statutory classification* pertaining to women would have been sustainable unless the state could establish that the classification was truly necessary to achieve a compelling state interest. Thus, the equal rights amendment would have afforded women the highest possible level of constitutional protection. Most significantly, therefore, the *constitutional* protection to be afforded women under the equal rights amendment would have far exceeded, both in scope and in import, the *statutory* benefit of a civil

union law and, in the event of its enactment, a same sex marriage law.

Because Justice Borden places so much emphasis on what he perceives to be the future of gay marriage in this state; see part I C 1 of Justice Borden's dissenting opinion (quoting certain selected legislators voicing optimism about future of gay marriage in Connecticut); we look to the status of the equal rights amendment when *Frontiero* was decided in 1973. As we already have noted, the amendment passed overwhelmingly in Congress: the vote in the United States Senate in favor of the amendment was 84 to 8, with 7 abstaining; 118 Cong. Rec. 9598 (1972); and the vote in the United States House of Representatives was 354 to 24, with 51 abstaining. 117 Cong. Rec. 35,815 (1971). As one scholar has observed about that vote, "[t]he triumph of the [equal rights amendment] in Congress was complete, deliberate, and overpowering, an outcome clearly attributable to a congressional perception that a national consensus had been achieved." G. Steiner, supra, c. 2, p. 26. "When the [e]qual [r]ights [a]mendment passed the Senate on March 22, 1972, it appeared to be riding an irresistible high. The Judiciary Committee had reported the resolution without amendment on a 15-1 vote. Hugh Scott of Pennsylvania, Republican leader in the Senate, then solicited and got an endorsement from President [Richard M.] Nixon. 'Throughout [twenty-one] years,' the president wrote, 'I have not altered my belief that equal rights for women warrant a constitutional guarantee—and I therefore continue to favor the enactment of the constitutional amendment to achieve this goal.'" Id., p. 22. Thus, "[a] high level of optimism [for its ultimate approval] seemed well warranted. . . . House passage had been by nearly fifteen to one and Senate passage by better than ten to one. Congressional action reflected a bipartisan effort . . . . Unless experienced and politically sensitive fed-

eral officeholders were wildly out of touch with sentiment in the states, or compelling new considerations were to surface, or proponents were to commit some egregious blunder, ratification then seemed a foregone conclusion." Id., p. 23.

Supporters of the equal rights amendment were therefore all but certain that it soon would become law. For example, United States Senator Birch Bayh, the principal proponent of the amendment in the Senate, expressed his view that the amendment would be ratified "with dispatch." (Internal quotation marks omitted.) E. Shanahan, "Equal Rights Amendment Is Approved by Congress," N.Y. Times, March 22, 1972, p. A1. Moreover, in his testimony before the Senate, Senator Bayh explained that more than one half of the members of the Senate had sponsored the equal rights amendment, and that "[b]oth the Citizens' Advisory Council on the Status of Women, created by President [John F.] Kennedy, and the President's Task Force on Women's Rights and Responsibilities, created by President Nixon, have recommended in strongest terms approval of the amendment." 118 Cong. Rec. 8900 (1972). Senator Bayh also identified more than fifty major civic and professional organizations that supported the amendment, including the American Association of College Deans, American Association of University Women, American Civil Liberties Union, American Jewish Congress, American Newspaper Guild, American Nurses Association, Common Cause, Council for Christian Social Action, United Church of Christ, International Association of Human Rights Agencies, International Brotherhood of Painters and Allied Trades, International Brotherhood of Teamsters, International Union of United Automobile, Aerospace and Agricultural Implement Workers, National Association of Colored Women, National Education Association, National Organization for Women and United

Automobile Workers. Id. Furthermore, the chief sponsor of the equal rights amendment in the House of Representatives, Representative Martha W. Griffiths, testified that, in her view, the amendment would "be ratified almost immediately." 117 Cong. Rec. 35,815 (1971). In fact, "[w]ithin forty-eight hours of congressional passage, six states had ratified the [equal rights amendment], and within nine months, twenty-two states had ratified it." A. Held, S. Herndon & D. Stager, "The Equal Rights Amendment: Why the ERA Remains Legally Viable and Properly Before the States," 3 Wm. & Mary J. Women & L. 113, 116 (1997). The equal rights amendment ultimately was approved by thirty-five states, only three short of the thirty-eight states needed for ratification. R. Lee, supra, c. 5, p. 37.

Thus, in stark contrast to the proposed gay marriage bill on which Justice Borden relies in concluding that gay persons in this state are too politically powerful to warrant heightened constitutional protection, the equal rights amendment sailed through Congress and very nearly was ratified by the requisite number of states. As we have explained, moreover, the equal rights amendment would have provided women with the broadest and most comprehensive constitutional protection possible. Even though it appeared certain that the amendment would promptly receive final approval, and despite the political power manifested by such a feat, the court in *Frontiero* nevertheless concluded that women were entitled to heightened protection under the federal equal protection clause. Despite this precedent, Justice Borden attributes overriding political power to gay persons in this state—power that he concludes disqualifies them from heightened protection under the state constitution—on the basis of a few statements of support for a gay marriage bill that was not even submitted to a vote in the legislature because its supporters knew that, as in the past, the bill had no

chance of passage. This analysis cannot be squared with *Frontiero*.

In sum, because, in 1973, (1) women constituted a majority of the population, (2) they possessed enormous potential electoral strength due to their majority status, (3) they were protected by comprehensive federal antidiscrimination legislation, and (4) imminent ratification of the equal rights amendment to the federal constitution appeared certain, there can be no question that women possessed more political power nationally in 1973 than gay persons currently possess in this state.[56] It therefore is impossible to conclude that, even though the court in *Frontiero* properly determined that women were *not* disqualified from heightened constitutional protection by virtue of the political power that they possessed, gay persons in this state *are* disqualified from such protection because of their political power.[57] In failing to acknowledge this fact—indeed, in failing even to reach the merits of this issue—Justice Borden avoids a critically important aspect of the plaintiffs' equal protection claim, and, as a consequence, he reaches a result that is incompatible with precedent that he himself agrees is correct.[58] Thus, it is apparent

[56] Moreover, although women as a group have been subjected to invidious discrimination in the form of stereotyping about their proper role and ability to perform in society, in contrast to gay persons, they have not been the object of hatred and revulsion for who they are.

[57] Just as Justice Borden fails to recognize the import of *Frontiero* to the present case, he also fails to explain how *Frontiero* is compatible with *United States* v. *Carolene Products Co.*, supra, 304 U.S. 144, a case on which he places primary emphasis. In *Carolene Products Co.*, the United States Supreme Court indicated that it might be appropriate, in some future case, to afford "discrete and insular" minorities special constitutional protection because the ordinary "political processes" might not be sufficiently open to them. Id., 152–53 n.4. We do not see how women possibly could have been characterized as a politically impotent insular minority in 1973, as that term is used in *Carolene Products Co.*, and yet women were accorded protected status at that time.

[58] To support the result that he reaches, Justice Borden turns to the fact that, at a televised "news briefing" or news conference in January, 2007, attended by legislative supporters of a gay marriage bill that ultimately was

## that Justice Borden's conclusion that gay persons must

never even submitted to a vote by the full legislature, certain elected officials observed that support for a gay marriage bill in this state is growing. They also expressed optimism that such a bill might, at some point, have enough support in this state to pass and receive gubernatorial approval, support that so far has not been forthcoming. From these various statements and opinions, and from certain statements contained in a press release, apparently issued on May 11, 2007, by the cochairmen of the state legislature's judiciary committee, Justice Borden concludes, as a matter of fact, that proponents of gay marriage in this state "now have the political power to enact gay marriage legislation" and that such legislation is "about to [be enacted]." Justice Borden further asserts that the statements of selected supporters of gay marriage in this state, coupled with the legislative advances that gay persons have made over the last several decades, demonstrate that gay persons are so politically powerful that they do not need heightened judicial protection. We disagree.

Before addressing the substance of Justice Borden's argument, we first note our disapproval of Justice Borden's reliance on a news conference and press release that are not part of the record of this case, have not been made available to the parties for their review and comment, and do not contain facts or information that is undisputed or otherwise appropriate for judicial notice by this or any other court. Because the parties never have been afforded the opportunity to be heard about the statements contained in the press conference and the press release—which apparently were retrieved by Justice Borden after the oral argument in this case—we have not heard the parties' views concerning the relevance and import of the two items, if any, to the present case. Furthermore, *all* of the statements that Justice Borden lifts from the news conference and the press release constitute the rankest form of hearsay, and merely represent the sentiments and opinions of several selected legislators as expressed at a particular point in time and in a particular forum. Indeed, to infer, on the basis of those opinions, that a gay marriage bill soon will become law in this state, as Justice Borden does, contravenes the prohibition against appellate fact-finding. See *Weil* v. *Miller*, 185 Conn. 485, 502, 441 A.2d 142 (1981) ("[t]his court cannot find facts; that function is, according to our constitution, our statute, and our cases, exclusively assigned to the trial courts"); see also *State* v. *Lawrence*, 282 Conn. 141, 156, 920 A.2d 236 (2007) (*Borden, J.*) (appellate tribunal does not assess credibility or find facts). For all these reasons, we conclude that reliance on these items cannot be justified.

Nonetheless, with respect to the conclusions that Justice Borden has reached on the basis of selected excerpts from statements made at the news conference and contained in the press release, we reject his interpretation of those statements as indicating that gay marriage necessarily is likely in this state, let alone inevitable, merely because one or more legislators suggested as much. We also reject Justice Borden's conclusion because, in any event, statements made at a political rally by those advocating for a

be denied protected status under the state constitution is based on the application of a standard that differs markedly from the standard applied by the court in *Frontiero*.[59] Because we agree both with the standard applied by the court in *Frontiero* and with its holding,

particular cause invariably represent a certain degree—frequently a great degree—of posturing and hyperbole that are designed to elicit enthusiasm and support for that cause. Justice Borden's reliance on these statements from a few legislators also ignores the fact that, however hopeful or even optimistic some may be about the future legislative response to gay marriage—notwithstanding, for example, the governor's vow to veto any such legislation—there simply is no way to know how such a bill will fare if and when it is introduced in the legislature. As we previously have observed, the ultimate failure of the equal rights amendment despite overwhelming support proves this point. Indeed, there can be no doubt that any gay marriage bill will face strong opposition in the state and in the legislature, just as it has in the past, and that such opposition will be fueled by the argument that gay marriage now is unnecessary in light of the availability of civil unions. It therefore is impossible to predict what the future holds for gay marriage in this state. In fact, the difficulty inherent in making such predictions, like the difficulty in discerning the relative political power of a historically disfavored group, is compelling reason why the political powerlessness factor warrants little, if any, weight in the suspectness inquiry, and why the court in *Frontiero* afforded women protected status even though imminent ratification of the equal rights amendment appeared to be a virtual certainty.

[59] Thus, Justice Borden's criticism of our application of the political powerlessness test to gay persons as "cramped" is, in reality, directed at the test as applied by the court in *Frontiero* and its progeny because that is the test that we apply today. Indeed, if the court in *Frontiero* had applied that test to women, as Justice Borden would apply it in the present case to gay persons, there is no way that women would have been accorded protected status in light of the political power that they already had possessed in 1973.

We also disagree with Justice Borden's claim that we have "short-circuited the democratic process." In fact, that is precisely the claim that Justice Powell made in support of his contention that the court in *Frontiero* should not accord women heightened constitutional protection. See *Frontiero* v. *Richardson*, supra, 411 U.S. 692 (Powell, J., concurring) ("If [the equal rights] [a]mendment is duly adopted, it will represent the will of the people accomplished in the manner prescribed by the [c]onstitution. By acting prematurely and unnecessarily . . . the [c]ourt has assumed a decisional responsibility at the very time when state legislatures, functioning within the traditional democratic process, are debating the proposed [a]mendment. It seems to me that this reaching out to [preempt] by judicial action a major political decision which is currently in process of resolution does not reflect

we reject Justice Borden's conclusion that women are entitled to greater protection under the federal constitution than gay persons are entitled to under the state constitution.

We note, finally, Justice Borden's assertion that we are "alone in mandating gay marriage as a matter of state constitutional law in the presence of . . . a . . . civil union [law]" and an indication of "support for gay marriage through legislation." This assertion, like Justice Borden's suggestion that the political power of gay persons in this state is somehow unique is inaccurate. For example, in California, which has the equivalent of a civil union statute, the legislature *twice passed* a gay marriage bill, but, on each occasion, the bill was vetoed by the governor. See J. Tucker, "Schwarzenegger Vetoes Same-Sex Marriage Bill Again" (October 13, 2007), available at http://www.sfgate.com/cgi-bin/article.cgi?f=/c/a/2007/10/13/BAT7SPC72.DTL. Thus, under the standard on which Justice Borden relies, gay persons in California have demonstrated far greater political power than gay persons in this state. Nevertheless, following the vetoes of the gay marriage legislation in California, the California Supreme Court concluded that, under that state's constitution, gay persons, as a suspect class, cannot be barred from marrying the same sex person of their choice. See *In re Marriage Cases*, supra, 43 Cal. 4th 843–44, 855–57. The Massachusetts Supreme Judicial Court also has determined that same sex marriage is mandated under the Massachusetts constitution and declaration of rights after expressly concluding that a civil union alternative, which was proposed by the Massachusetts legislature,

appropriate respect for duly prescribed legislative processes."). We reject Justice Borden's claim for the same reason that the court rejected Justice Powell's identical contention in *Frontiero*: gay persons, like women, are not so politically powerful as to eliminate the need for heightened constitutional protection.

would have been unconstitutional; see *Opinions of the Justices to the Senate,* supra, 440 Mass. 1209–10; notwithstanding significant support for gay marriage in that state. See National Gay and Lesbian Task Force, "Recent State Polls on Same-Sex Marriage and Civil Unions" (May 6, 2005), available at http:/www. thetaskforce.org/downloads/reports/reports/May2005 StatePolls.pdf. Furthermore, the highest courts of two other states have reserved judgment on whether civil unions will suffice to provide gay persons with the equal rights to which they have been found to be entitled under the state constitutions of those states. See *Lewis* v. *Harris,* supra, 188 N.J. 458–60; *Baker* v. *State,* supra, 170 Vt. 224–25. We therefore reject Justice Borden's assertion that our state constitutional interpretation with respect to the rights of same sex couples is in any way unique or unprecedented.

4

In sum, the relatively modest political influence that gay persons possess is insufficient to rectify the invidious discrimination to which they have been subjected for so long. Like the political gains that women had made prior to their recognition as a quasi-suspect class, the political advances that gay persons have attained afford them inadequate protection, standing alone, in view of the deep-seated and pernicious nature of the prejudice and antipathy that they continue to face. Today, moreover, women have far greater political power than gay persons, yet they continue to be accorded status as a quasi-suspect class. See *Breen* v. *Carlsbad Municipal Schools,* supra, 138 N.M. 338 (explaining that intermediate scrutiny is appropriate with respect to discrimination based on sex "even though the darkest period of discrimination may have passed for [the] historically maligned group" and that "[such] scrutiny should still be applied to protect against more subtle forms of unconstitutional discrimi-

nation created by unconscious or disguised prejudice"). We conclude, therefore, that, to the extent that gay persons possess some political power, it does not disqualify them from recognition as a quasi-suspect class under the state constitution in view of the pervasive and invidious discrimination to which they historically have been subjected due to an innate personal characteristic that has absolutely no bearing on their ability to perform in or contribute to society.

## VI

### ADDITIONAL RELEVANT CONSIDERATIONS UNDER *GEISLER*

Although we conclude that gay persons meet each of the four factors identified by the United States Supreme Court for determining whether a group is entitled to heightened judicial scrutiny as a quasi-suspect class, we are obliged, under this court's state constitutional jurisprudence, also to consider the extent to which any of the considerations identified by this court in *State* v. *Geisler*, supra, 222 Conn. 685, may counsel for or against recognizing gay persons as a quasi-suspect class.[60] We therefore turn to those factors.

### A

#### Textual Analysis

Article first, § 20, of the Connecticut constitution provides in relevant part that "[n]o person shall be denied the equal protection of the law . . . ." This provision prohibits the state from treating similarly situated persons differently without sufficient reason to do so. See

[60] Although our suspectness inquiry necessarily implicates many of the considerations identified in *Geisler*, we nevertheless deem it appropriate to undertake a separate *Geisler* analysis because the plaintiffs' claim raises an issue under the state constitution that never has been decided by the United States Supreme Court under the analogous provisions of the federal constitution.

part II of this opinion. Whether a legislative enactment passes muster under this portion of article first, § 20, frequently will depend on the level of judicial scrutiny to which the enactment is subject, a determination that in turn depends on whether the statutory classification affects a suspect or quasi-suspect class or infringes on a fundamental right. Because the pertinent language of article first, § 20, says nothing about that test or how it is to be applied, the provision is facially neutral and, therefore, does not favor either the plaintiffs or the defendants.[61]

The defendants maintain, however, that the remaining language of article first, § 20, as amended by article twenty-one of the amendments, supports their contention that gay persons do not comprise a quasi-suspect class. That language provides that no person shall "be subjected to . . . discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability." Conn. Const., amend. XXI. The defendants contend that, because sexual orientation is not included in the list of suspect classes enumerated in article first, § 20, as amended, sexual orientation cannot comprise a quasi-suspect class for purposes of the state constitution's equal protection provisions. We reject this claim for the reasons that we expressed previously in part III of this opinion.

B

Decisions of This Court and the Appellate Court

This court never has considered whether classifications that discriminate against gay persons are subject

---

[61] Article first, § 1, of the Connecticut constitution, which provides in relevant part that "[a]ll men when they form a social compact, are equal in rights," also contains no facial indication as to whether this state's prohibition of same sex marriage infringes on the rights of gay persons. We note, moreover, that the plaintiffs do not claim that they are entitled to greater rights under article first, § 1, than they are afforded under article first, § 20.

to heightened scrutiny under the equal protection provisions of the state constitution. The Appellate Court recently addressed the issue,[62] however, in *State* v. *John M.*, 94 Conn. App. 667, 894 A.2d 376 (2006), rev'd on other grounds sub nom. *State* v. *John F.M.*, 285 Conn. 528, 940 A.2d 755 (2008), and concluded that such classifications are entitled only to rational basis review on the basis of its reading of federal and sister state precedent. Id., 678–85. For several reasons, we are not persuaded by the Appellate Court's analysis in *John M.* First, the Appellate Court decided the issue under the federal constitution, not the state constitution. See id., 678–79 n.10. Second, the Appellate Court did not apply the four-pronged test for determining whether a group

---

[62] The specific issue that the Appellate Court addressed in *State* v. *John M.*, 94 Conn. App. 667, 894 A.2d 376 (2006), rev'd on other grounds sub nom. *State* v. *John F.M.*, 285 Conn. 528, 940 A.2d 755 (2008), was whether the equal protection clause of the fourteenth amendment was implicated when the state prohibited sexual intercourse between a stepparent and a stepchild of the opposite sex but not a stepparent and stepchild of the same sex, although the statutes at issue, namely, General Statutes §§ 46b-21 and 53a-72a (a) (2), were not facially clear as to whether they prohibited only heterosexual intercourse or both heterosexual and homosexual intercourse. See id., 676–77. The Appellate Court concluded that, because the civil union law does not prohibit a stepparent from entering into a civil union with a stepchild of the same sex; see General Statutes § 46b-38cc; the legislature could not have intended for § 53a-72a (a) (2) to prohibit sexual relations between such persons. See id., 678. The court thus concluded that "kindred persons engaged in homosexual relations are similarly situated to those engaged in heterosexual relations." Id. The court went on to conclude that, although sexual orientation is not a suspect classification under the federal equal protection clause; id., 684; there was no rational basis for prohibiting heterosexual relations between stepparent and stepchild while permitting homosexual relations between such persons. See id., 685–94. Thus, the court concluded that the right of the defendant, who had been convicted under § 53a-72a (a) (2) for having heterosexual relations with his stepchild, to equal protection had been violated by virtue of his conviction under that statute. Id., 694. The Appellate Court's equal protection analysis appeared to be dictum, however, because the court had reversed the defendant's conviction on another, nonconstitutional ground. See id., 695 (*Schaller, J.*, concurring) (majority should not have addressed constitutional issue because there was nonconstitutional ground on which to dispose of case).

is entitled to heightened protection but, rather, relied solely on case law from other jurisdictions. See id., 679–85. Third, for the reasons set forth in parts VI C and D of this opinion, the cases on which the Appellate Court did rely are not persuasive because those cases either failed to address the issue of whether gay persons comprise a suspect or quasi-suspect class; see *Muth* v. *Frank*, 412 F.3d 808, 817–18 (7th Cir.), cert. denied, 546 U.S. 988, 126 S. Ct. 575, 163 L. Ed. 2d 480 (2005); *Standhardt* v. *Superior Court*, 206 Ariz. 276, 283–85, 77 P.3d 451 (App. 2003), review denied sub nom. *Standhardt* v. *MCSC*, Docket No. CV-03-0422-PR, 2004 Ariz. LEXIS 62 (Ariz. May 25, 2004); *People* v. *Downin*, 357 Ill. App. 3d 193, 199–200, 828 N.E.2d 341, appeal denied, 216 Ill. 2d 703, 839 N.E.2d 1029 (2005); failed to engage in any analysis of that issue, relying instead on the fact that, to date, the United States Supreme Court has not held that sexual orientation constitutes a suspect or quasi-suspect classification; see *Johnson* v. *Johnson*, 385 F.3d 503, 532 (5th Cir. 2004); *State* v. *Limon*, 280 Kan. 275, 286, 122 P.3d 22 (2005); or were predicated on precedent that has been overruled. See *Lofton* v. *Secretary of the Dept. of Children & Family Services*, 358 F.3d 804, 818 & n.16 (11th Cir. 2004), cert. denied, 543 U.S. 1081, 125 S. Ct. 869, 160 L. Ed. 2d 825 (2005). Because the analysis in *John M.* is not persuasive, it provides no support for the defendants' claim that gay persons are not entitled to recognition as a quasi-suspect class.

C

Persuasive Federal Precedent

When interpreting our state constitution, it is appropriate to consider relevant federal precedent. "We employ this precedent for guidance and analogy [in construing our own constitution, however, only] when the federal authorities are 'logically persuasive and well-

reasoned.' W. Brennan, 'State Constitutions and the Protection of Individual Rights,' 90 Harv. L. Rev. 489, 502 (1977) ('state court judges, and also practitioners, do well to scrutinize constitutional decisions by federal courts, [but] only if they are found to be logically persuasive and well-reasoned, paying due regard to precedent and the policies underlying specific constitutional guarantees, may they properly claim persuasive weight as guideposts when interpreting counterpart state guarantees')." *State* v. *Joyce*, 229 Conn. 10, 20, 639 A.2d 1007 (1994).

As the defendants correctly assert, the vast majority of federal circuit courts that have considered the issue have concluded that sexual orientation is not a suspect or quasi-suspect classification, and, consequently, legislation that classifies on the basis of sexual orientation is subject to rational basis review.[63] These courts, however, relied primarily on the holding of *Bowers* v. *Hardwick*, supra, 478 U.S. 196, in which the United States Supreme Court upheld the constitutionality of a Georgia statute that criminalized consensual homosexual sodomy.[64] *Bowers* held that gay persons have no fundamen-

---

[63] See, e.g., *Lofton* v. *Secretary of the Dept. of Children & Family Services*, supra, 358 F.3d 818; *Richenberg* v. *Perry*, 97 F.3d 256, 260 (8th Cir. 1996), cert. denied sub nom. *Richenberg* v. *Cohen*, 522 U.S. 807, 118 S. Ct. 45, 139 L. Ed. 2d 12 (1997); *Thomasson* v. *Perry*, 80 F.3d 915, 928 (4th Cir.), cert. denied, 519 U.S. 948, 117 S. Ct. 358, 136 L. Ed. 2d 250 (1996); *Steffan* v. *Perry*, 41 F.3d 677, 684 n.3 (D.C. Cir. 1994); *High Tech Gays* v. *Defense Industrial Security Clearance Office*, 895 F.2d 563, 571 (9th Cir. 1990); *Ben-Shalom* v. *Marsh*, 881 F.2d 454, 464 (7th Cir. 1989), cert. denied sub nom. *Ben-Shalom* v. *Stone*, 494 U.S. 1004, 110 S. Ct. 1296, 108 L. Ed. 2d 473 (1990); *Woodward* v. *United States*, 871 F.2d 1068, 1076 (Fed. Cir. 1989), cert. denied, 494 U.S. 1003, 110 S. Ct. 1295, 108 L. Ed. 2d 473 (1990). But see *Able* v. *United States*, supra, 968 F. Sup. 864 (stating in dictum that "[h]omosexuals meet the criteria of a group warranting heightened protection under the equal protection clause"); *Jantz* v. *Muci*, supra, 759 F. Sup. 1550–51 ("[t]here is . . . no way to . . . reach any conclusion other than that discrimination based on sexual orientation is inherently suspect").

[64] These federal circuit courts either relied on *Bowers* explicitly or relied on cases that were predicated on *Bowers*. E.g., *Richenberg* v. *Perry*, 97 F.3d 256, 260–61 n.5 (8th Cir. 1996) (relying on cases predicated on *Bowers*),

tal right to engage in such conduct; id., 190–92; that rational basis review of the antisodomy statute therefore was appropriate; see id., 196; and that the Georgia legislature's moral disapproval of that conduct constituted sufficient justification for the law. See id. Although *Bowers* was a due process case; see id., 190; the various federal circuit courts faced with equal protection challenges to statutory classifications based on sexual orientation have reasoned that because, under *Bowers*, it is constitutionally permissible to criminalize intimate homosexual conduct, a group that is defined by that conduct cannot constitute a suspect or quasi-suspect class. E.g., *Equality Foundation of Greater Cincinnati, Inc.* v. *Cincinnati*, 54 F.3d 261, 266 (6th Cir. 1995) ("[s]ince *Bowers*, every circuit court which has addressed the issue has decreed that homosexuals are entitled to no special constitutional protection, as either a suspect or a quasi-suspect class, because the conduct which places them in that class is not constitutionally protected"), vacated on other grounds and remanded, 518 U.S. 1001, 116 S. Ct. 2519, 135 L. Ed. 2d 1044 (1996); *Steffan* v. *Perry*, 41 F.3d 677, 684 n.3 (D.C. Cir. 1994) ("if the government can criminalize homosexual conduct, a group that is defined by reference to that conduct cannot constitute a suspect class" [internal quotation marks omitted]); *High Tech Gays* v. *Defense Industrial Security Clearance Office*, 895 F.2d 563, 571 (9th Cir. 1990) ("[o]ther circuits are in accord and have held that although the court in [*Bowers*] analyzed the constitutionality of the [antisodomy] statute on a due process rather than equal protection basis, by the [*Bowers*] majority holding that the [c]onstitution confers no fundamental right [on] homosexuals to engage in sod-

cert. denied sub nom. *Richenberg* v. *Cohen*, 522 U.S. 807, 118 S. Ct. 45, 139 L. Ed. 2d 12 (1997); *High Tech Gays* v. *Defense Industrial Security Clearance Office*, 895 F.2d 563, 571 (9th Cir. 1990) (relying on *Bowers*); *Woodward* v. *United States*, 871 F.2d 1068, 1076 (Fed. Cir. 1989) (relying on *Bowers*), cert. denied, 494 U.S. 1003, 110 S. Ct. 1295, 108 L. Ed. 2d 473 (1990).

omy, and because homosexual conduct can thus be criminalized, homosexuals cannot constitute a suspect or quasi-suspect class entitled to greater than rational basis review for equal protection purposes"); *Woodward* v. *United States*, 871 F.2d 1068, 1076 (Fed. Cir. 1989) ("[a]fter [*Bowers*] it cannot logically be asserted that discrimination against homosexuals is constitutionally infirm"), cert. denied, 494 U.S. 1003, 110 S. Ct. 1295, 108 L. Ed. 2d 473 (1990). "Thus, the impact of *Bowers* . . . on the equal protection claims of [gay persons was] enormous." E. Gerstmann, supra, c. 4, p. 69. "*Bowers* . . . prevent[ed] courts from finding [gay persons] to be a suspect or quasi-suspect class even if [gay persons were] able to demonstrate a history of discrimination and substantial current discrimination against them." Id.

Because *Bowers* was so widely viewed as disqualifying gay persons from recognition as a suspect or quasi-suspect class, in the wake of *Bowers*, courts gave only cursory consideration to claims by gay persons that statutes that discriminate on the basis of sexual orientation are subject to enhanced judicial scrutiny. Thus, as one court has noted, "given [*Bowers*'] sanction of such a severe curtailment of the liberty of [gay persons, it is not surprising that] the issue of whether states should or must permit marriage between same-sex partners has only recently come into public debate." *In re Marriage Cases*, 49 Cal. Rptr. 3d 675, 703 (App. 2006), rev'd on other grounds, 43 Cal. 4th 757, 183 P.3d 384, 76 Cal. Rptr. 3d 683 (2008).

Five years ago, however, in *Lawrence* v. *Texas*, supra, 539 U.S. 578, the United States Supreme Court overruled *Bowers*, thus removing the precedential underpinnings of the federal case law supporting the defendants' claim that gay persons are not a quasi-suspect class. The court in *Lawrence* acknowledged that, in framing the issue in *Bowers* as it did, that is, "whether the [f]ederal [c]on-

stitution confers a fundamental right [on] homosexuals to engage in sodomy"; *Bowers* v. *Hardwick*, supra, 478 U.S. 190; the court had "fail[ed] to appreciate the extent of the liberty at stake. To say that the issue in *Bowers* was simply the right to engage in certain sexual conduct demeans the claim the individual put forward, just as it would demean a married couple were it to be said [that] marriage is simply about the right to have sexual intercourse." *Lawrence* v. *Texas*, supra, 567. The court identified the real issue, both in *Bowers* and in *Lawrence*, as whether the right to liberty that gay persons share with all of our citizenry under the due process clause of the United States constitution includes the right to engage in "sexual practices common to a homosexual lifestyle" without government intervention. Id., 578.

The court in *Lawrence* also explained that "[t]he foundations of *Bowers* have sustained serious erosion from . . . [two] decisions" that were decided after *Bowers*, namely, *Planned Parenthood* v. *Casey*, 505 U.S. 833, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992), and *Romer* v. *Evans*, 517 U.S. 620, 116 S. Ct. 1620, 134 L. Ed. 2d 855 (1996). *Lawrence* v. *Texas*, supra, 539 U.S. 576. The court in *Lawrence* further explained: "In [*Casey*], the [c]ourt reaffirmed the substantive force of the liberty protected by the [d]ue [p]rocess [c]lause. The *Casey* decision again confirmed that our laws and tradition afford constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education. . . . In explaining the respect the [c]onstitution demands for the autonomy of the person in making these choices, [the court] stated as follows:

" 'These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the [f]ourteenth [a]mend-

ment. At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the [s]tate.' . . .

"Persons in a homosexual relationship may seek autonomy for these purposes, just as heterosexual persons do. The decision in *Bowers* would deny them this right." (Citations omitted.) Id., 573–74.

The court continued: "The second post-*Bowers* case of principal relevance is *Romer* . . . . There the [c]ourt struck down class-based legislation directed at homosexuals as a violation of the [e]qual [p]rotection [c]lause. *Romer* invalidated an amendment to Colorado's [c]onstitution which named as a solitary class persons who were homosexuals, lesbians, or bisexual either by 'orientation, conduct, practices or relationships' . . . and deprived them of protection under state antidiscrimination laws. We concluded that the provision was 'born of animosity toward the class of persons affected' and further that it had no rational relation to a legitimate governmental purpose." (Citations omitted.) Id., 574.

*Lawrence* thereafter expressly endorsed the following portion of Justice John Paul Stevens' dissent in *Bowers*: " 'Our prior cases make two propositions abundantly clear. First, the fact that the governing majority in a [s]tate has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice; neither history nor tradition could save a law prohibiting miscegenation from constitutional attack. Second, individual decisions by married persons, concerning the intimacies of their physical relationship, even when not intended to produce offspring, are a form of "liberty" protected by the [d]ue [p]rocess [c]lause of the [f]ourteenth [a]mend-

ment. Moreover, this protection extends to intimate choices by unmarried as well as married persons.' " Id., 577–78, quoting *Bowers* v. *Hardwick*, supra, 478 U.S. 216 (Stevens, J., dissenting). Thus, as the court stated, "[w]hen sexuality finds overt expression in intimate conduct with another person, the conduct can be but one element in a personal bond that is more enduring. The liberty protected by the [c]onstitution allows homosexual persons the right to make this choice." *Lawrence* v. *Texas*, supra, 539 U.S. 567. *Bowers'* contrary conclusion, the court observed, "demeans the lives of homosexual persons"; id., 575; by depriving them of the "respect for their private lives"; id., 578; that the constitution guarantees.

*Lawrence* represents a sea change in United States Supreme Court jurisprudence concerning the rights of gay persons. To a very substantial degree, *Lawrence* undermines the validity of the federal circuit court cases that have held that gay persons are not entitled to heightened judicial protection because, as we have explained, the courts in those cases relied heavily— and in some cases exclusively—on *Bowers* to support their conclusions. See *Witt* v. *Dept. of the Air Force*, 527 F.3d 806, 828 (9th Cir. 2008) (Canby, J., concurring in part and dissenting in part) ("[b]ecause *Lawrence* unequivocally overruled *Bowers*, it undercut the theory [and] reasoning underlying [the cases that have relied on *Bowers* to deny gay persons heightened protection under the federal equal protection clause] in such a way that the cases are clearly irreconcilable" [internal quotation marks omitted]). In stark contrast to *Bowers*, *Lawrence* recognizes that gay persons, no less than heterosexuals, are constitutionally entitled to freedom from state interference in matters of sexual intimacy. In acknowledging this liberty interest, *Lawrence* rejected the notion that moral disapproval of gay persons can justify discriminatory state action that

infringes on their right of personal autonomy. See *Lawrence* v. *Texas*, supra, 539 U.S. 578 (state antisodomy statute "furthers no legitimate state interest which can justify its intrusion into the personal and private life of the individual"). Thus, whereas *Bowers* erected a profound impediment to gay persons seeking protected status, *Lawrence* removed that barrier. Gay persons, therefore, cannot be deprived of suspect or quasi-suspect class status merely because others may find their intimate sexual conduct objectionable, repugnant or immoral. In fact, after *Lawrence*, the social and moral disapprobation that gay persons historically have faced supports their claim that they are entitled to heightened protection under the state constitution.[65] See part V A of this opinion.

Finally, we reject the defendants' contention that, in *Romer* v. *Evans*, supra, 517 U.S. 631–32, the United States Supreme Court implicitly concluded that gay persons do not comprise a suspect or quasi-suspect class under the federal constitution because the court applied rational basis review, rather than heightened scrutiny,

---

[65] Subsequent to *Lawrence*, several federal circuit courts have held that gay persons are not a suspect class. Those cases, however, generally have relied upon pre-*Lawrence* case law; see, e.g., *Scarbrough* v. *Morgan County Board of Education*, 470 F.3d 250, 261 (6th Cir. 2006) (citing 1997 case from Sixth Circuit Court of Appeals and stating that, "[i]nasmuch as homosexuality is not a suspect class in this circuit, we cannot hold that persons who associate with homosexuals constitute a suspect class"); *Citizens for Equal Protection* v. *Bruning*, 455 F.3d 859, 866 (8th Cir. 2006) (discussing *Romer* and concluding that "the Supreme Court has never ruled that sexual orientation is a suspect classification for equal protection purposes"); *Johnson* v. *Johnson*, 385 F.3d 509, 532 (5th Cir. 2004) ("[n]either the Supreme Court nor this court has recognized sexual orientation as a suspect classification [or protected group]"); *Lofton* v. *Secretary of Dept. of Children & Family Services*, supra, 358 F.3d 818 (citing pre-*Lawrence* circuit court cases and stating that "all of [the] . . . circuits that have considered the question have declined to treat homosexuals as a suspect class"); and, like the pre-*Lawrence* line of cases, they suffer from a complete lack of analysis of the factors relevant to a determination of whether gay persons are a class entitled to suspect or quasi-suspect classification.

in sustaining an equal protection challenge to a Colorado state constitutional amendment that prohibited "all legislative, executive or judicial action at any level of state or local government designed to protect . . . [gay] persons . . . ."[66] Id., 624. Because the court indicated that the Colorado constitutional amendment could not withstand even rational basis review, the lowest level of judicial scrutiny, the court had no reason to decide whether heightened review was appropriate. See id., 632. In the absence of any contrary indication in *Romer*, we must presume that the court followed its own well established principle "never to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." (Internal quotation marks omitted.) *Brockett* v. *Spokane Arcades, Inc.*, 472 U.S. 491, 501, 105 S. Ct. 2794, 86 L. Ed. 2d 394 (1985). Indeed, in accordance with this general rule of judicial restraint, the United States Supreme Court previously has declined to decide whether heightened scrutiny is applicable when a statutory classification fails rational basis review. See *Hooper* v. *Bernalillo County Assessor*, 472 U.S. 612, 618, 105 S. Ct. 2862, 86

---

[66] Although the court in *Romer* stated that the state constitutional amendment at issue violated the federal equal protection clause because the amendment did not "bear a rational relationship to a legitimate governmental purpose"; *Romer* v. *Evans*, supra, 517 U.S. 635; courts and commentators alike have opined that the standard that the court applied in *Romer* was more akin to heightened scrutiny than rational basis review. See *Lawrence* v. *Texas*, supra, 539 U.S. 580 (O'Connor, J., concurring in the judgment) (noting that court applied "a more searching form of rational basis review" in striking down constitutional amendment in *Romer*); see also E. Gerstmann, supra, c. 6, p. 136 ("[o]bviously, the Supreme Court was actually applying a test far stricter than rational-basis scrutiny [in *Romer*]"); cf. *In re Marriage Cases*, supra, 49 Cal. Rptr. 3d 744 (Kline, J., concurring and dissenting) ("a fair reading of *Lawrence* renders it impossible to think that the court's failure to explicitly state that it was applying strict scrutiny means it did not do so"); L. Tribe, "*Lawrence* v. *Texas*: The 'Fundamental Right' that Dare Not Speak Its Name," 117 Harv. L. Rev. 1893, 1917 (2004) ("the strictness of the [c]ourt's standard in *Lawrence*, however articulated, could hardly have been more obvious").

L. Ed. 2d 487 (1985) (declining to determine whether to apply heightened scrutiny when classification did not meet rational basis test because "if the statutory scheme cannot pass even the minimum rationality test, [the court's] inquiry ends"); cf. *Mississippi University for Women* v. *Hogan*, 458 U.S. 718, 724 n.9, 102 S. Ct. 3331, 73 L. Ed. 2d 1090 (1982) (declining to decide whether to apply strict scrutiny when classification could not survive intermediate scrutiny). *Romer*, therefore, lends no support to the defendants' claim that statutory classifications based on sexual orientation are subject only to rational basis review.

In sum, although federal case law is nearly unanimous in concluding that gay persons are not a suspect or quasi-suspect class, those cases ultimately are not persuasive because they rely so heavily on *Bowers* v. *Hardwick*, supra, 478 U.S. 186, which has been overruled. *Lawrence* v. *Texas*, supra, 539 U.S. 578 ("*Bowers* was not correct when it was decided, and it is not correct today. It ought not to remain binding precedent. *Bowers* . . . should be and now is overruled."). In addition, the federal circuit courts that have determined that gay persons are not entitled to heightened protection have failed altogether to reconcile their analyses with the one that the United States Supreme Court used in concluding that women comprise a quasi-suspect class. See part V D of this opinion. Indeed, in our view, the individual federal circuit and district courts and judges that have analyzed the issue most carefully and applied the standard for determining a group's status as a suspect or quasi-suspect class most consistently with the Supreme Court's jurisprudence have concluded that statutes discriminating against gay persons are, in fact, subject to heightened scrutiny. See, e.g., *High Tech Gays* v. *Defense Industrial Security Clearance Office*, supra, 909 F.2d 376–82 (Canby, J., dissenting); *Watkins* v. *United States Army*, supra, 875 F.2d 724–28 (Norris,

J., concurring in the judgment); *Able* v. *United States*, supra, 968 F. Sup. 862–64; *Equality Foundation of Greater Cincinnati, Inc.* v. *Cincinnati*, supra, 860 F. Sup. 434–40; *Jantz* v. *Muci*, supra, 759 F. Sup. 1547–51. Thus, although the weight of federal precedent favors the defendants, the weight of *persuasive* federal precedent favors the plaintiffs.

## D

### Persuasive Sister State Precedent

The majority of sister state courts that have addressed the issue also have concluded that gay persons are not a suspect or quasi-suspect class. See, e.g., *Conaway* v. *Deane*, supra, 401 Md. 277; *Hernandez* v. *Robles*, supra, 7 N.Y.3d 364–65; *Andersen* v. *King County*, supra, 158 Wash. 2d 21, 24; see also *State* v. *Limon*, supra, 280 Kan. 286–87 (court's reading of federal precedent led it to conclude that classification based on sexual preference was subject to rational basis review); *Dean* v. *District of Columbia*, supra, 653 A.2d 308 (affirming in per curiam opinion trial court's refusal to afford gay persons heightened protection under fifth amendment to federal constitution). The California Supreme Court, however, recently determined that gay persons do qualify as a suspect class under the equal protection provisions of that state's constitution; *In re Marriage Cases*, supra, 43 Cal. 4th 840–41; and that the reasons given by the state of California for barring same sex couples from marrying were insufficient to justify the prohibition. Id., 854–56.[67] We conclude that the state

---

[67] At least two other state courts of last resort, without deciding whether sexual orientation is a suspect or quasi-suspect class, have determined that a statutory ban on same sex marriage violates their state constitutions; *Baehr* v. *Lewin*, 74 Haw. 530, 580–83, 852 P.2d 44 (1993) (statutes that exclude same sex couples from marriage discriminate on basis of sex and, therefore, are subject to strict scrutiny under equal protection clause of Hawaii constitution); *Goodridge* v. *Dept. of Public Health*, supra, 440 Mass. 331 (prohibiting same sex couples from marrying fails rational basis scrutiny under Massachusetts constitution); and two others have concluded that same sex couples are constitutionally entitled to the same rights as married

court cases that have determined that gay persons do not constitute a quasi-suspect class, like the federal cases described in this part of the opinion, employed a flawed analysis, and, therefore, they do not constitute persuasive authority.

In three of the cases concluding that gay persons do not constitute a protected class, the courts did so without applying the four-pronged test used by the United States Supreme Court for determining whether a group qualifies as a suspect or quasi-suspect class. In one such case, *State* v. *Limon*, supra, 280 Kan. 275, the Kansas Supreme Court invalidated, on equal protection grounds, a criminal statute that resulted in punishment for unlawful voluntary sexual conduct between members of the opposite sex that was less harsh than the punishment for the same conduct between members of the same sex.[68] Id., 276. Although ultimately conclud-

couples without expressly deciding whether the legislature must permit same sex couples to marry. *Lewis* v. *Harris*, supra, 188 N.J. 457–60 (holding under New Jersey constitution that legislature must provide same sex couples with same rights as married couples but concluding that it would be premature to decide whether same sex marriage is required prior to legislative response to court's decision); *Baker* v. *State*, supra, 170 Vt. 224 (holding under Vermont constitution that same sex couples are entitled to same benefits, protections and security incident to marriage but explaining that, because plaintiffs' claims "focused primarily [on] the consequences of official exclusion from" those rights, court need not address claim that same sex marriage is constitutionally required). In addition, one state intermediate appellate court has concluded that gay persons comprise a suspect class entitled to special constitutional protection. *Tanner* v. *Oregon Health Sciences University*, 157 Or. App. 502, 524, 971 P.2d 435 (1998). But cf. *Standhardt* v. *Superior Court*, supra, 206 Ariz. 283 (fundamental right of marriage does not include right to marry same sex partner under Arizona constitution). Because we focus on the plaintiffs' claim that they comprise a quasi-suspect class, however, we discuss only those cases that have determined whether gay persons are a suspect or quasi-suspect class.

[68] Although the Kansas Supreme Court decided the case under the Kansas constitution, the court noted that the same standard applied for deciding claims under the analogous provisions of the federal constitution. See *State* v. *Limon*, supra, 280 Kan. 301. The court therefore engaged in no independent state constitutional analysis.

ing that the statute did not satisfy even rational basis review; id., 301; the court first rejected the defendant's claim that heightened scrutiny was warranted on the basis of the United States Supreme Court's decisions in *Lawrence* v. *Texas*, supra, 539 U.S. 558, and *Romer* v. *Evans*, supra, 517 U.S. 620; see *State* v. *Limon*, supra, 286–87; in which the United States Supreme Court struck down the legislation at issue in those cases as lacking a rational relation to a legitimate state objective.[69] See *Lawrence* v. *Texas*, supra, 578; *Romer* v. *Evans*, supra, 634. For the reasons set forth in part VI C of this opinion, we disagree that the court's apparent application of the rational basis test in *Lawrence* and *Romer* has any bearing on whether gay persons constitute a quasi-suspect class.

In a second case, *Hernandez* v. *Robles*, supra, 7 N.Y.3d 361, 365, the New York Court of Appeals rejected an equal protection challenge to the state's prohibition against same sex marriage under the New York state constitution. In so doing, the court declined to decide whether, for purposes other than marriage, gay persons comprise a suspect or quasi-suspect class. See id., 364. Instead, the court concluded that "[a] person's preference for the sort of sexual activity that cannot lead to the birth of children is relevant to the [s]tate's interest in fostering relationships that will serve children best"; id., 364–65; and, therefore, it was appropriate to apply rational basis review to the state's ban on same sex marriage. Id. Because we fundamentally disagree with

---

[69] The court in *Limon* acknowledged that, although *Romer* involved an equal protection claim, *Lawrence* was decided on due process grounds. *State* v. *Limon*, supra, 280 Kan. 287. The court stated, however, that "[d]espite not deciding the case on equal protection grounds and never explicitly identifying the standard utilized for its due process analysis," the majority in *Lawrence* had "approvingly cit[ed] and discuss[ed] the equal protection analysis in *Romer* . . . ." Id. Consequently, the court in *Limon* relied on both *Romer* and *Lawrence* in support of its conclusion that statutes discriminating against gay persons are subject to rational basis review. See id.

the court in *Hernandez* that a group seeking suspect or quasi-suspect class status is not entitled to a determination of whether it falls into one of those two categories unless the statutory classification at issue is first deemed to be irrational as applied to the group, however, we find the case unpersuasive. This approach is untenable because it turns the suspectness inquiry on its head: any group that is deemed to be entitled to heightened judicial protection because of past invidious discrimination has the right to have *all* statutes that discriminate against its members subjected to heightened scrutiny. In contrast to the *Hernandez* majority, Chief Judge Kaye, in dissent, engaged in the requisite suspectness inquiry, and explained—persuasively, in our view—why statutes that discriminate against gay persons should be subject to heightened judicial scrutiny. Id., 387–89 (Kaye, C. J., dissenting).

The final case to conclude that gay persons are not a suspect or quasi-suspect class without performing the four-pronged equal protection analysis is *Dean* v. *District of Columbia*, supra, 653 A.2d 307, in which the District of Columbia Court of Appeals concluded that the applicable statutory scheme barring same sex marriage did not discriminate against gay persons, first, because marriage, by definition, is limited to opposite sex couples; id., 361 (Terry, J.); and second, because the statute was not motivated by any invidious or discriminatory purpose. See id., 362–63 (Steadman, J., concurring). Because the fact that marriage traditionally has been defined as a union between a man and a woman does not insulate from judicial review a statute that defines marriage in accordance with that definition, and because legislation that has a discriminatory effect may violate equal protection irrespective of the motivation underlying the enactment, we do not find *Dean* to be persuasive precedent.[70]

---

[70] The third member of the panel in *Dean*, Judge John M. Ferren, undertook a comprehensive analysis of the plaintiffs' claim that gay persons are a

In contrast to the foregoing cases, the Maryland Court of Appeals, in *Conaway* v. *Deane*, supra, 401 Md. 278–94, and the Washington Supreme Court, in *Andersen* v. *King County*, supra, 158 Wash. 2d 19–24, did apply the four part test for determining whether a group is entitled to heightened protection in holding that gay persons do not qualify as a suspect or quasi-suspect class under the Maryland and Washington state constitutions, respectively.[71] In so concluding, both courts determined that the plaintiffs had failed to demonstrate, first, that homosexuality is a strictly immutable characteristic and, second, that gays and lesbians are politically powerless because of the enactment of state statutes prohibiting sexual orientation discrimination. See *Conaway* v. *Deane*, supra, 286, 292–94; *Andersen* v. *King County*, supra, 20, 21. For the reasons set forth in part V C and D of this opinion, we disagree with those cases because the distinguishing characteristic does not need to be strictly immutable and because legislation barring discrimination on the basis of sexual orientation is insufficient to establish that gay persons possess political power adequate to counter the pervasive and extreme discrimination to which they historically have been subjected.

Although the opinion of the California Supreme Court in *In re Marriage Cases*, supra, 43 Cal. 4th 757, repre-

suspect or quasi-suspect class for equal protection purposes. See *Dean* v. *District of Columbia*, supra, 653 A.2d 334–55 (Ferren, J., concurring in part and dissenting in part). Judge Ferren ultimately concluded that the case should be remanded for a trial, following which the trial court initially would decide whether strict or heightened scrutiny of the marriage statute is required, and whether the District of Columbia "has demonstrated a compelling or substantial enough governmental interest to justify refusing [the plaintiffs] a marriage license." Id., 358 (Ferren, J., concurring in part and dissenting in part).

[71] Because the court in *Andersen* previously had concluded that the equal protection provisions of the Washington state constitution provide the same level of protection as the equal protection provisions of the federal constitution, the court did not undertake an independent state constitutional analysis. *Andersen* v. *King County*, supra, 158 Wash. 2d 18.

sents the minority view, we agree fundamentally with the analysis and conclusion of that case that gay persons are entitled to heightened judicial protection as a suspect[72] class. Id., 843, 847. In deciding that issue, the court first observed that the state had conceded that sexual orientation is a characteristic that (1) bears no relation to a person's ability to perform or contribute to society, (2) is associated with pernicious discrimination marked by a history of legal and social disabilities, and (3) is immutable for purposes of the suspectness inquiry. Id., 841–42. Although California case law generally does not require a showing by the group seeking suspect class status that it is politically powerless, the state of California maintained that the court should adopt that requirement as a prerequisite to the recognition of a suspect class and, further, that gay persons did not meet that standard. Id., 842–43. The court rejected the need for a definitive or categorical showing of political powerlessness, observing that such a requirement would be impossible to square with the fact that classifications based on gender and race continue to be treated as suspect. Id., 843. The court emphasized, rather, that the most important consideration in the determination of a group's entitlement to recognition as a suspect class is whether that group has been subjected to invidious and prejudicial treatment because of a distinguishing characteristic that bears no relation to the individual's ability to perform or contribute to society. Id. As the court explained, "courts must look closely at classifications based on that characteristic lest *outdated* social stereotypes result in invidious laws or practices." (Emphasis in original; internal quota-

---

[72] We note that, for purposes of the California constitution, classifications are either suspect or nonsuspect; the former are subject to strict scrutiny and the latter are subject to rational basis review. *In re Marriage Cases*, supra, 43 Cal. 4th 832. Because there is no quasi-suspect classification under the California constitution, there is no intermediate level of review. See id., 832 n.55.

tion marks omitted.) Id. We agree with the California Supreme Court that "[t]his rationale clearly applies to statutory classifications that mandate differential treatment on the basis of sexual orientation." Id.

For the foregoing reasons, we are not persuaded by the logic or analysis of the courts that have declined to grant suspect or quasi-suspect status to gay persons. We are persuaded, rather, by the California Supreme Court in *In re Marriage Cases*, supra, 43 Cal. 4th 841–43, and by the dissenting opinion of Chief Judge Kaye in *Hernandez* v. *Robles*, supra, 7 N.Y.3d 387–89 (Kaye, C. J., dissenting). We reach this conclusion because, in our view, the California court and Chief Judge Kaye have applied the relevant criteria most objectively and with due regard for the manner in which those criteria have been applied to other quasi-suspect and suspect groups. Although the decision of the California Supreme Court and the dissenting opinion of Chief Judge Kaye reflect the minority position, we believe that they nevertheless represent the most persuasive sister state precedent.

E

Economic and Sociological Considerations[73]

We address, finally, the sixth *Geisler* factor, which requires us to consider the public policy implications of recognizing gay persons as a quasi-suspect class under our state constitution. See *State* v. *Diaz*, 226 Conn. 514, 540, 628 A.2d 567 (1993) ("[i]n effect, [the sixth *Geisler*] factor directs our attention to considerations of public policy"). Of course, granting gay persons quasi-suspect class status would not automatically

[73] Neither the plaintiffs nor the defendants contend that the history of this state's equal protection provisions, the fifth factor to be considered under *Geisler*, bears materially on the determination of whether gay persons are a quasi-suspect class. We therefore turn to the sixth *Geisler* factor, namely, contemporary economic and sociological considerations.

result in the conclusion that same sex couples are constitutionally entitled to marry because, even if gay persons are accorded such status, the state still may be able to establish a sufficiently strong reason to deny them the right to marry. At a minimum, however, recognizing gay persons as a quasi-suspect class would substantially increase the likelihood of a determination that same sex couples are entitled to marry in view of the fact that the state would be required to provide strong justification for denying them that right.[74] Accordingly, we consider the public policy ramifications of invalidating the statutory scheme barring same sex marriage. For several reasons, we conclude that this factor militates strongly in favor of the plaintiffs.

First, granting same sex couples the right to marry "will not alter the substantive nature of the legal institution of marriage; same-sex couples who choose to enter into the relationship with that designation will be subject to the same duties and obligations to each other, to their children, and to third parties that the law currently imposes [on] opposite-sex couples who marry." *In re Marriage Cases*, supra, 43 Cal. 4th 854. Nor will same sex marriage deprive opposite sex couples of any rights. In other words, limiting marriage to opposite sex couples is not necessary to preserve the rights that those couples now enjoy. In this regard, removing the barrier to same sex marriage is no different than the action taken by the United States Supreme Court in *Loving* v. *Virginia,* supra, 388 U.S. 1, when it invalidated laws barring marriage between persons of different races. Although it is true that authorizing same sex couples to marry represents a departure from the way marriage historically has been defined, the change would *expand* the right to marry without any adverse effect on those

---

[74] As we explain more fully in part VII of this opinion, the state's reasons for the statutory prohibition against same sex marriage are indeed insufficient to satisfy heightened or intermediate scrutiny.

already free to exercise the right.[75] We therefore agree with the Massachusetts Supreme Judicial Court that "broadening civil marriage to include same-sex couples . . . [will] not disturb the fundamental value of marriage in our society" and "[r]ecognizing the right of an individual to marry a person of the same sex will not diminish the validity or dignity of opposite-sex marriage, any more than recognizing the right of an individual to marry a person of a different race devalues the marriage of a person who marries someone of her own race. If anything, extending civil marriage to same-sex couples reinforces the importance of marriage to individuals and communities. That same-sex couples are willing to embrace marriage's solemn obligations of exclusivity, mutual support, and commitment to one another is a testament to the enduring place of marriage in our laws and in the human spirit."[76] *Goodridge* v. *Dept. of Public Health*, supra, 440 Mass. 337.

Second, although "retention of the limitation of marriage to opposite-sex couples is not needed to preserve the rights and benefits of opposite-sex couples, the exclusion of same-sex couples from the designation of marriage works a real and appreciable harm [on] same-

---

[75] Because of the significance of marriage in our society, the freedom to marry is an extraordinarily important right for all persons who wish to exercise it. As the Alliance for Marriage acknowledged in its amicus brief in support of the defendants, "children reared by married couples and married couples themselves benefit greatly from marriage—apart from any legal benefits conferred on the family. Benefits to the married couple include greater longevity, greater wealth, more fulfilling sexual relationships, and greater happiness."

[76] In this regard, the following observation of Connecticut Catholic Conference, Inc., which filed an amicus brief in support of the defendants, is relevant. "In our culture, there has been a consensus on . . . [the] unique ethical foundations [of marriage]: that the union should be for life (permanency), that the union should be exclusive (fidelity), and that the love that sustains and nurtures the union should be characterized by mutual support and self-sacrifice (selflessness)." These ideals apply equally to committed same sex and committed opposite sex couples who wish to marry.

sex couples and their children. . . . [B]ecause of the long and celebrated history of the term 'marriage' and the widespread understanding that this word describes a family relationship unreservedly sanctioned by the community, the statutory provisions that continue to limit access to this designation exclusively to opposite-sex couples—while providing only a novel, alternative institution for same-sex couples—likely will be viewed as an official statement that the family relationship of same-sex couples is not of comparable stature or equal dignity to the family relationship of opposite-sex couples." *In re Marriage Cases*, supra, 43 Cal. 4th 855.

For this reason, the ban on same sex marriage is likely to have an especially deleterious effect on the children of same sex couples. A primary reason why many same sex couples wish to marry is so that their children can feel secure in knowing that their parents' relationships are as valid and as valued as the marital relationships of their friends' parents. "Excluding same-sex couples from civil marriage will not make children of opposite-sex marriages more secure, but it does prevent children of same-sex couples from enjoying the immeasurable advantages that flow from the assurance of a stable family structure in which the children will be reared, educated, and socialized."[77] (Internal quotation

---

[77] Several of the plaintiffs in the present case are parents of young children. In their affidavits filed in support of their motion for summary judgment, those plaintiffs share the concern that the exclusion of their families from the institution of marriage will have an adverse effect on their children, who, understanding the social and cultural significance of marriage, have been or will be forced to explain to their friends and others why their parents cannot marry. As one of the plaintiffs, J.E. Martin, stated: "We want our children to know that their family is as secure as their best friends' families and that it is equal in society's eyes . . . . We know what 'married' means, our neighbors and friends know what it means, and our children [now eleven and eight years old] know what it means. Marriage means a committed couple, sharing love, sharing responsibilities, supporting each other, which is what we are and what we do." Another plaintiff, Jeffrey Busch, speaking on behalf of himself and his partner, Stephen Davis, explains: "As our son Eli [now age six] grows up, we plan to convey to him that there are all kinds of families, and our family is as legitimate as any

marks omitted.) *Goodridge* v. *Dept. of Public Health*, supra, 440 Mass. 335.

Third, because of the long history of discrimination that gay persons have faced, there is a high likelihood that the creation of a second, separate legal entity for same sex couples will be viewed as reflecting an official state policy that that entity is inferior to marriage, and that the committed relationships of same sex couples are of a lesser stature than comparable relationships of opposite sex couples. As a consequence, "retaining the designation of marriage exclusively for opposite-sex couples and providing only a separate and distinct designation for same-sex couples may well have the effect of perpetuating a more general premise [namely] . . . that gay individuals and same-sex couples are in some respects 'second-class citizens' who may, under the law, be treated differently from, and less favorably than, heterosexual individuals or opposite-sex couples." *In re Marriage Cases*, supra, 43 Cal. 4th 784–85; see also *Goodridge* v. *Dept. of Public Health*, supra, 440 Mass. 333 (statutory bar on same sex marriage "confers an official stamp of approval on the destructive stereotype that same-sex relationships are inherently unstable and inferior to opposite-sex relationships and are not worthy of respect").

Finally, religious autonomy is not threatened by recognizing the right of same sex couples to marry civilly. Religious freedom will not be jeopardized by the marriage of same sex couples because religious organizations that oppose same sex marriage as irreconcilable

other. But I don't want Eli to have to explain to anyone who asks that what his parents have is something that is 'like a marriage,' something that is 'almost a marriage.' I don't want Eli to feel different than other kids. He should not have to grow up feeling that his family is not as good as his friends' famil[ies] because his parents are not permitted to marry. Without equal access to marriage, [we] will someday have to explain to Eli that this is because, under Connecticut law, we are deemed to be a less valid family."

with their beliefs will not be required to perform same sex marriages or otherwise to condone same sex marriage or relations. Because, however, marriage is a state sanctioned and state regulated institution, religious objections to same sex marriage cannot play a role in our determination of whether constitutional principles of equal protection mandate same sex marriage.

## F

### Summary

Application of the *Geisler* factors does not alter our conclusion that gay persons are entitled to recognition as a quasi-suspect class. Persuasive federal and state precedent, albeit representative of the minority view, and considerations of public policy, all support such recognition. Heightened review of our state's ban on same sex marriage is therefore appropriate. We now consider that remaining issue.

## VII

## APPLICATION OF THE HEIGHTENED SCRUTINY STANDARD

The test for determining whether the reasons given by the state in defense of the statutory classification at issue are sufficiently strong to satisfy heightened judicial scrutiny is settled. "Focusing on the differential treatment or denial of opportunity for which relief is sought, the reviewing court must determine whether the proffered justification is exceedingly persuasive. The burden of justification is demanding and it rests entirely on the [s]tate. . . . The [s]tate must show at least that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives. . . . The justification must be genuine, not hypothesized or invented post hoc in response to [the] litigation. And it must not rely on

overbroad generalizations about the different talents, capacities, or preferences of [the groups being classified]." (Citations omitted; internal quotation marks omitted.) *United States* v. *Virginia*, supra, 518 U.S. 532–33. Thus, "[i]n cases of this genre, [United States Supreme Court] precedent instructs that 'benign' justifications proffered in defense of categorical exclusions will not be accepted automatically; a tenable justification must describe actual state purposes, not rationalizations for actions in fact differently grounded." Id., 535–36; see also *Cleburne* v. *Cleburne Living Center, Inc.*, supra, 473 U.S. 472 (Marshall, J., concurring in the judgment in part and dissenting in part) ("The government must establish that the classification is substantially related to important and legitimate objectives . . . so that valid and sufficiently weighty policies actually justify the departure from equality. Heightened scrutiny . . . seek[s] to assure that the hostility or thoughtlessness with which there is reason to be concerned has not carried the day. By invoking heightened scrutiny, the [c]ourt recognizes, and compels lower courts to recognize, that a group may well be the target of the sort of prejudiced, thoughtless, or stereotyped action that offends principles of equality found in [the equal protection clause]. [When] classifications based on a particular characteristic have done so in the past, and the threat that they may do so remains, heightened scrutiny is appropriate." [Citation omitted.]).

The defendants posit two essential reasons why the legislature has prohibited same sex marriage: (1) to promote uniformity and consistency with the laws of other jurisdictions; and (2) to preserve the traditional definition of marriage as a union between one man and one woman.[78] The defendants contend that these

---

[78] The defendants also rely on the state's interest in providing rights to same sex couples incrementally as an additional justification for the statutory bar on same sex marriage. For purposes of the present case, however, characterizing the state's interest in terms of changing the law incrementally is simply another way of asserting that the state currently has an interest

reasons justify the statutory prohibition against same sex marriage under the heightened standard of review that is applicable to statutes that discriminate against quasi-suspect classes.[79]

The defendants' first proffered justification, that is, uniformity and consistency with other state and federal laws, may be rationally related to the state's interest in limiting marriage to opposite sex couples, but it cannot withstand heightened scrutiny. Although the defendants maintain that this reason is sufficient to satisfy their demanding burden, they have identified no precedent in support of their claim. Indeed, beyond the mere assertion that uniformity and consistency with the laws of other jurisdictions represent a truly important gov-

in maintaining the status quo out of respect for tradition. We therefore see no need to treat this proffered reason separately from the state's asserted interest in tradition.

[79] Under the standard of review applicable to statutes that discriminate against quasi-suspect classes, we consider only the reasons that actually motivated the legislature to create the statutory classification at issue. See *United States* v. *Virginia*, supra, 518 U.S. 532–33. Consequently, although several amici curiae, as well as Justice Zarella in his dissenting opinion have articulated reasons in justification of our statutory scheme limiting marriage to opposite sex couples in addition to those identified by the defendants, we limit our review to the reasons that, in fact, prompted the legislature to enact the civil union law. We note, however, that none of those additional reasons proffered in support of our statutory scheme constitutes the kind of exceedingly persuasive justification required to warrant the classification at issue in the present case, including Justice Zarella's assertion regarding the state's purported interest in "privileg[ing] and regulat[ing] procreative conduct . . . ." To whatever extent that interest might constitute a rational basis for limiting marriage to opposite sex couples, it certainly does not represent a strong or overriding reason for the classification because allowing same sex couples to marry in no way undermines any interest that the state may have in regulating procreative conduct between opposite sex couples.

Furthermore, contrary to the unsupported suggestion of Justice Zarella, we most certainly do not believe that "anyone who opposes same sex marriage must harbor animus toward gay persons"; footnote 12 of Justice Zarella's dissenting opinion; and nothing in this opinion warrants such a suggestion. We, no less than Justice Zarella, appreciate the fact that same sex marriage is a subject about which persons of good will reasonably and sincerely disagree.

ernmental interest, the defendants have offered no reason why that is so, and we know of none. In the absence of such a showing, the defendants cannot prevail on their claim that the state's interest in defining marriage as most other jurisdictions do is sufficiently compelling to justify the discriminatory effect that that definition has on gay persons.

It is abundantly clear that preserving the institution of marriage as a union between a man and a woman is the overriding reason why same sex couples have been barred from marrying in this state.[80] We therefore must determine whether this reason alone is sufficient to justify the statutory ban on same sex marriage.

Before doing so, however, we note that the defendants expressly have disavowed any claim that the legislative decision to create a separate legal framework for committed same sex couples was motivated by the belief that the preservation of marriage as a heterosexual institution is in the best interests of children, or that prohibiting same sex couples from marrying promotes responsible heterosexual procreation, two reasons often relied on by states in defending statutory provisions barring same sex marriage against claims that those provisions do not pass even rational basis review. See, e.g., *Hernandez* v. *Robles*, supra, 7 N.Y.3d 359–60.

---

[80] This conclusion is amply supported by the legislative history of the civil union law. Although a majority of the legislators ultimately agreed to grant same sex couples all of the rights and privileges that married couples enjoy, creating a separate legal entity for that purpose was the overarching concern of many of the legislators who spoke and voted in favor of the measure recognizing civil unions. As one legislator explained, the critical task before the General Assembly was to determine how to extend rights to same sex couples in such a manner that permitted members of the legislature to return to their respective districts and inform their constituencies that "we didn't . . . do it in a way that you [would find] offensive either to your core beliefs, to your religious beliefs, or to your view of what marriage is." 48 H.R. Proc., Pt. 7, 2005 Sess., p. 2002, remarks of Representative Robert M. Ward.

In the present case, the defendants' sole contention is that the legislature has a compelling interest in retaining the term "marriage" to describe the legal union of a man and woman because "that is the definition of marriage that has always existed in Connecticut . . . and continues to represent the common understanding of marriage in almost all states in the country." The defendants acknowledge that many legislators hold "strong personal beliefs . . . about the fundamental nature of marriage" as being between a man and a woman, and that no measure providing equal rights for same sex couples would have passed the legislature unless it expressly defined marriage in those terms.

Although we acknowledge that many legislators and many of their constituents hold strong personal convictions with respect to preserving the traditional concept of marriage as a heterosexual institution, such beliefs, no matter how deeply held, do not constitute the exceedingly persuasive justification required to sustain a statute that discriminates on the basis of a quasi-suspect classification. "That civil marriage has traditionally excluded same-sex couples—i.e., that the 'historic and cultural understanding of marriage' has been between a man and a woman—cannot in itself provide a [sufficient] basis for the challenged exclusion. To say that the discrimination is 'traditional' is to say only that the discrimination has existed for a long time. A classification, however, cannot be maintained merely 'for its own sake' [*Romer* v. *Evans*, supra, 517 U.S. 635]. Instead, the classification ([that is], the exclusion of gay [persons] from civil marriage) must advance a state interest that is separate from the classification itself [see id., 633, 635]. Because the 'tradition' of excluding gay [persons] from civil marriage is no different from the classification itself, the exclusion cannot be justified on the basis of 'history.' Indeed, the justification of 'tradition' does not explain the classification; it merely

repeats it. Simply put, a history or tradition of discrimination—no matter how entrenched—does not make the discrimination constitutional . . . ." (Citation omitted.) *Hernandez* v. *Robles*, supra, 7 N.Y.3d 395 (Kaye, C. J., dissenting); cf. *Goodridge* v. *Dept. of Public Health*, supra, 440 Mass. 348 (Greaney, J., concurring) ("[t]o define the institution of marriage by the characteristics of those to whom it always has been accessible, in order to justify the exclusion of those to whom it never has been accessible, is conclusory and bypasses the core question [that the court has been] asked to decide"). Indeed, "the fact that same-sex couples have traditionally been prohibited from marrying is the reason [the action challenging the ban on same sex marriage] was commenced; it cannot be converted into the dispositive reason it cannot succeed." *In re Marriage Cases*, supra, 49 Cal. Rptr. 3d 750 (Kline, J., concurring and dissenting).

Thus, when tradition is offered to justify preserving a statutory scheme that has been challenged on equal protection grounds, we must determine whether the *reasons* underlying that tradition are sufficient to satisfy constitutional requirements. Tradition alone never can provide sufficient cause to discriminate against a protected class, for "[neither] the length of time a majority [of the populace] has held its convictions [nor] the passions with which it defends them can withdraw legislation from [the] [c]ourt's scrutiny." *Bowers* v. *Hardwick*, supra, 478 U.S. 210 (Blackmun, J., dissenting).

Furthermore, discrimination against one group also cannot be justified merely because the legislature prefers another group. See *Metropolitan Life Ins. Co.* v. *Ward*, 470 U.S. 869, 882 n.10, 105 S. Ct. 1676, 84 L. Ed. 2d 751 (1985); see also *Hernandez* v. *Robles*, supra, 7 N.Y.3d 394 (Kaye, C. J., dissenting) ("[t]he government cannot legitimately justify discrimination against one group of persons as a mere desire to preference another

group"). Without sound justification for denying same sex couples the right to marry, it therefore may be true, as Justice Scalia has asserted, that " 'preserving the traditional institution of marriage' is just a kinder way of describing the [s]tate's moral disapproval of same-sex couples." *Lawrence* v. *Texas*, supra, 539 U.S. 601 (Scalia, J., dissenting). Moral disapproval alone, however, is insufficient reason to benefit one group and not another because statutory classifications cannot be "drawn for the purpose of disadvantaging the group burdened by the law." *Romer* v. *Evans*, supra, 517 U.S. 633. Thus, just as "a bare . . . desire to harm a politically unpopular group" is not a legitimate basis for a statutory classification; (internal quotation marks omitted) *Cleburne* v. *Cleburne Living Center, Inc.*, supra, 473 U.S. 447; so, too, is moral disapprobation an inadequate reason for discriminating against a disfavored minority. See *Lawrence* v. *Texas*, supra, 577. As the United States Supreme Court has stated more than once, "[p]rivate biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." *Palmore* v. *Sidoti*, 466 U.S. 429, 433, 104 S. Ct. 1879, 80 L. Ed. 2d 421 (1984); accord *Cleburne* v. *Cleburne Living Center, Inc.*, supra, 448; see also *Bowers* v. *Hardwick*, supra, 478 U.S. 212 (Blackmun, J., dissenting) (quoting *Palmore* for same proposition).

The defendants nevertheless maintain, in accordance with the teaching of *Moore* v. *Ganim*, 233 Conn. 557, 660 A.2d 742 (1995), that this court should be "extremely hesitant to choose sides in the policy debate" over same sex marriage by "enshrin[ing] one policy choice as a matter of constitutional law." Id., 614. The defendants contend that the authority to define marriage rests with the people and their elected representatives, and the courts should not appropriate to themselves the power to change that definition. Although we reaffirm the

aforementioned principles articulated in *Ganim*, we do not agree that those principles dictate the outcome of the present case.

In *Ganim*, this court was required to determine whether the state had an affirmative duty under the state constitution to provide subsistence benefits to the poor. Id., 558–59. In declining to recognize such a duty, we stated, inter alia, that, "[a]lthough we do not foreclose the possibility that unenumerated rights may inhere in our state constitution, we are unpersuaded that our constitution obligates the state to provide its citizens with economic subsistence benefits." Id., 593. We further stated that "[o]ur state and nation's continuing attempt to grapple with the complex societal problem of poverty is indicative of the intricacies of the problem. On the one hand . . . some legislators believe that the best way to help the indigent is to limit entitlement programs. On the other hand . . . other people contend that such policies are misguided, as they will only increase malnutrition, crime, substance abuse and general human suffering. . . .

"[W]e are extremely hesitant to choose sides in this policy debate and to enshrine one policy choice as a matter of constitutional law. . . . Although we are sympathetic to the plight of indigent persons, the [c]onstitution does not provide judicial remedies for every social and economic ill." (Citations omitted; internal quotation marks omitted.) Id., 614.

*Ganim*, however, did not involve an equal protection challenge to the legislative action at issue. In *Ganim*, rather, we were asked to recognize a new fundamental and unenumerated right under the state constitution, an exercise of authority that quite properly required great restraint lest we create rights without convincing evidence of their existence. See id., 560; cf. *Washington* v. *Glucksberg*, supra, 521 U.S. 720 (courts should be

"reluctant to expand the concept of substantive due process" by "extending constitutional protection to an asserted right or liberty interest" that heretofore has not been so protected [internal quotation marks omitted]). The present case requires that we apply well established equal protection principles to determine whether gay persons are a quasi-suspect class. Because gay persons meet all of the criteria, they are entitled to recognition as a sensitive class and, along with such recognition, the right to heightened judicial protection from laws that discriminate against them.[81]

That recognition itself, however, does not alter the nature of marriage. It is only because the state has not advanced a sufficiently persuasive justification for denying same sex couples the right to marry that the traditional definition of marriage necessarily must be expanded to include such couples. If the defendants were able to demonstrate sufficient cause to deny same sex couples the right to marry, then we would reject the plaintiffs' claim and honor the state's desire to preserve the institution of marriage as a union between a man and a woman. In the absence of such a showing, however, we cannot refuse to follow settled equal protection jurisprudence merely because doing so will

---

[81] We note that the defendants' legislative deference argument was used by the commonwealth of Virginia in *Loving* v. *Virginia,* supra, 388 U.S. 1, to urge the United States Supreme Court to uphold the Virginia law barring interracial marriage. See M. Bonauto, S. Murray & B. Robinson, "The Freedom to Marry for Same-Sex Couples: The Reply Brief of Plaintiffs Stan Baker et al. in *Baker et al.* v. *State of Vermont,*" 6 Mich. J. Gender & L. 1, 40 n.143 (1999) (commonwealth argued that court "had no authority to evaluate the wisdom of Virginia's race restriction in marriage, and that the social theories and research surrounding interracial marriage were too complex and controversial for judicial, rather than legislative review"). The argument was not persuasive in *Loving,* and it is not persuasive here. Although legislative enactments generally are entitled to deference, our equal protection jurisprudence, in particular, the suspectness test itself, incorporates that important principle.

result in a change in the definition of marriage.[82] Contrary to the suggestion of the defendants, therefore, we do not exceed our authority by mandating equal treatment for gay persons; in fact, any other action would be an abdication of our responsibility. See, e.g., *Sheff* v. *O'Neill*, 238 Conn. 1, 13, 678 A.2d 1267 (1996) ("it is the role and the duty of the judiciary to determine whether the legislature has fulfilled its affirmative obligations within constitutional principles").

In sum, the state has failed to establish adequate reason to justify the statutory ban on same sex marriage. Accordingly, under the equal protection provisions of the state constitution, our statutory scheme governing marriage cannot stand insofar as it bars same sex couples from marrying.

## VIII

## CONCLUSION

We recognize, as the Massachusetts Supreme Judicial Court did in *Goodridge* v. *Dept. of Public Health*, supra, 440 Mass. 309, that "our decision marks a change in the history of our marriage law. Many people hold deep-seated religious, moral, and ethical convictions that marriage should be limited to the union of one man and one woman, and that homosexual conduct is immoral. Many hold equally strong religious, moral, and ethical convictions that same-sex couples are entitled to be married, and that homosexual persons should be

---

[82] Until relatively recently, "it remained the prevailing doctrine that government, both federal and state, could withhold from women opportunities accorded men so long as any 'basis in reason' could be conceived for the discrimination." *United States* v. *Virginia*, supra, 518 U.S. 531. The state would have us apply a test under which the statutory ban on same sex marriage would survive judicial scrutiny so long as there were any "basis in reason" for the prohibition. As a quasi-suspect class, gay persons, no less than women, are entitled to a more searching judicial review of that statutory prohibition, as well as any other classification that singles them out for discriminatory treatment.

treated no differently than their heterosexual neighbors. Neither view answers the question before [the court]. Our concern is with [our state] [c]onstitution as a charter of governance for every person properly within its reach." Id., 312.

The drafters of our constitution carefully crafted its provisions in general terms, reflecting fundamental principles, knowing that a lasting constitution was needed. Like the framers of the federal constitution, they also "knew [that] times can blind us to certain truths, and later generations can see that laws once thought necessary and proper in fact serve only to oppress. As the [c]onstitution endures, persons in every generation can invoke its principles in their own search for greater freedom." *Lawrence* v. *Texas*, supra, 539 U.S. 579. Not long ago, this court made the same essential point, explaining that "as we engage over time in the interpretation of our state constitution, we must consider the changing needs and expectations of the citizens of our state." *State* v. *Webb*, 238 Conn. 389, 411, 680 A.2d 147 (1996). This admonition applies no less to the guarantee of equal protection embodied in our constitution than to any other state constitutional provision.

Even though the right to marry is not enumerated in our constitution, it long has been deemed a basic civil right. E.g., *Loving* v. *Virginia*, supra, 388 U.S. 12 ("[m]arriage is one of the basic civil rights of man" [internal quotation marks omitted]); *Skinner* v. *Oklahoma ex rel. Williamson*, 316 U.S. 535, 541, 62 S. Ct. 1110, 86 L. Ed. 1655 (1942) (same). Although we traditionally have viewed that right as limited to a union between a man and a woman, "if we have learned anything from the significant evolution in the prevailing societal views and official policies toward members of minority races and toward women over the past half-century, it is that even the most familiar and generally

accepted of social practices and traditions often mask unfairness and inequality that frequently is not recognized or appreciated by those not directly harmed by those practices or traditions. It is instructive to recall in this regard that the traditional, well-established legal rules and practices of our not-so-distant past (1) barred interracial marriage, (2) upheld the routine exclusion of women from many occupations and official duties, and (3) considered the relegation of racial minorities to separate and assertedly equivalent public facilities and institutions as constitutionally equal treatment." *In re Marriage Cases*, supra, 43 Cal. 4th 853–54.

Like these once prevalent views, our conventional understanding of marriage must yield to a more contemporary appreciation of the rights entitled to constitutional protection. Interpreting our state constitutional provisions in accordance with firmly established equal protection principles leads inevitably to the conclusion that gay persons are entitled to marry the otherwise qualified same sex partner of their choice. To decide otherwise would require us to apply one set of constitutional principles to gay persons and another to all others.[83] The guarantee of equal protection under the law, and our obligation to uphold that command, forbids us

---

[83] As we previously observed, in his dissenting opinion, Justice Borden asserts that "[i]t is the unfortunate consequence of the majority opinion that it has short-circuited the democratic process." For the reasons that we set forth previously; see footnote 59 of this opinion; we disagree with Justice Borden's criticism. We note, however, that, like Justice Borden, we take our responsibility as judges very seriously, with a full appreciation of the proper limits of the role of the judiciary in our tripartite form of government. Although that role frequently entails the exercise of judicial restraint, we cannot shirk what we view as our duty to strike down an unconstitutional statute in the name of such restraint, or because our decision may be controversial or unpopular in some quarters. We are content that, ultimately, our decision, like that of Justice Borden, will be judged on the basis of its adherence to fundamental constitutional principles and not on any suggestion that we are either unaware or unmindful of the court's proper role in our democratic system.

from doing so. In accordance with these state constitutional requirements, same sex couples cannot be denied the freedom to marry.[84]

The judgment is reversed and the case is remanded with direction to grant the plaintiffs' motion for summary judgment and application for injunctive relief.

In this opinion NORCOTT, KATZ and HARPER, Js., concurred.

BORDEN, J., with whom VERTEFEUILLE, J., joins, dissenting. The majority concludes that sexual orientation is a quasi-suspect class under our state constitutional provisions guaranteeing equal protection of the laws; Conn. Const., § 20, art. I, §§ 1 and 20;[1] and, based on that conclusion, the majority further concludes that our statute confining marriage to opposite sex couples violates the rights of same sex couples under those constitutional provisions because the statute does not survive the heightened scrutiny required by that constitutional classification.[2] In my view, the majority's decision to grant quasi-suspect class status to sexual orientation is contrary to a sound and prudent interpretation of constitutional standards regarding equal pro-

[84] We note that this case only addresses the state's prohibition against same sex marriage, a ban that we conclude violates the state constitution. Our holding does not affect the recognition of civil unions in this state.

[1] Article first, § 1, of the constitution of Connecticut provides: "All men when they form a social compact, are equal in rights; and no man or set of men are entitled to exclusive public emoluments or privileges from the community."

Article first, § 20, of the constitution of Connecticut, as amended by articles five and twenty-one of the amendments, provides: "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability."

[2] I use the term "heightened scrutiny" in this dissent to refer collectively to strict scrutiny and intermediate level scrutiny.

tection of the laws because it unduly minimizes the unique and extraordinary political power of gay persons[3] in this state, both generally speaking, and particularly in regard to the question of whether gay marriage should be recognized in this state.

I conclude that sexual orientation does not constitute either a suspect or a quasi-suspect class under our state constitution. I also reject the other claims raised under our state constitution, by the plaintiffs, eight same sex couples,[4] namely, that our definition of marriage as limited to the union of a man and a woman creates an impermissible gender classification in violation of the plaintiffs' right to equal protection and deprives the plaintiffs of their fundamental constitutional right to marry, and conclude, accordingly, that our civil union and marriage statutes survive the constitutionally minimum standard of rational basis review. I therefore dissent and would affirm the trial court's judgment.[5]

## I

## SEXUAL ORIENTATION IS NOT A QUASI-SUSPECT CLASS UNDER ARTICLE FIRST, §§ 1 AND 20, OF THE CONSTITUTION OF CONNECTICUT

### A

### Background

I begin by noting my agreement with much of what the majority says in its eloquently written opinion. First,

---

[3] Like the majority, for convenience and economy of language, I use the term "gay persons" to refer to both gay men and lesbians.

[4] See footnote 2 of the majority opinion for the names of all the plaintiffs involved in this appeal.

[5] In reaching this conclusion, I emphasize that, if I were a legislator voting on legislation, I would recognize the legitimacy of the plaintiffs' aspirations to have the legal status of marriage and would vote accordingly. I am, however, not a legislator; I am a judge, and my analysis of the applicable legal principles leads me to conclude, contrary to the majority, that the legislation at issue is not unconstitutional. That is where my obligation must end, and that of the legislature begin. As Justice Madsen stated, writing for the majority in *Andersen* v. *King County*, 158 Wash. 2d 1, 8, 138 P.3d 963

I agree with the majority that, contrary to the conclusion of the trial court, the plaintiffs have stated a cognizable constitutional claim.[6] I agree that there is enough of a difference between the new institution of civil union and the ancient institution of marriage to permit a constitutional challenge on equal protection grounds. There is no doubt that the institution of marriage carries with it a unique and important history and tradition in our society and state. Although the civil union statute provides all of the benefits and obligations of marriage, because it is so new, we cannot know with any reasonable degree of certitude whether it is now or soon will be viewed by the citizens of our state as the social equivalent of marriage. In my view, this uncertainty is enough to trigger equal protection analysis.

The majority concludes that the civil union statute has relegated the plaintiffs to an inferior status and affords them second class citizenship, that civil unions are perceived to be inferior to marriage, and that, "[d]espite the truly laudable effort of the legislature in equalizing the legal rights afforded same sex and opposite sex couples, there is no doubt that civil unions enjoy a lesser status in our society than marriage." Unlike the majority, I do have such a doubt, and I do not think that the plaintiffs have established that proposition as beyond doubt.

First, the majority's determination that civil union status is a second class or inferior status is not, as the majority presents it, an established fact that serves as the starting point of the debate, but an issue of fact that has not yet been resolved in the present case. In fact, in the trial court on the cross motions for summary

(2006), "[p]ersonal views must not interfere with the judge's responsibility to decide cases as a judge and not as a legislator."

[6] I also agree with the majority that the plaintiffs are similarly situated with respect to opposite sex couples regarding the right to marry.

judgment in the present case, the plaintiffs presented a statement of undisputed facts in support of their motion. In that statement, one of the plaintiffs, Gloria Searson, alleged that "[b]eing 'placed into a separate category, such as civil union, brands [her] relationship [with her civil union spouse, Damaris Navarro] as second class and makes [her] feel substandard.' " In response, the defendants, certain state and local officials, stated that, solely for purposes of the cross motions, they did not dispute the allegations of that particular paragraph, "except that to the extent that the statement '[b]eing placed into a separate category, such as civil union, brands [the couple's] relationship as second class' is asserted as a statement of fact, as opposed to a statement of [Searson] and [Navarro's] opinion, that fact is denied." Thus, the procedural posture of this appeal has not yet allowed the fact finder to make the factual determination of whether the civil union statute relegates same sex couples to an inferior status. Thus, the majority has drawn this conclusion without questioning whether the underlying factual assumption is true, without having allowed the parties to present evidence to the trial court in support of their positions, and without having allowed the trial court to make the disputed factual finding.

This is particularly significant given the fact that the question of what is perceived or considered to be an inferior status in a given society may not be readily apparent when the subject is a brand new institution, such as civil union. One only needs to open the New York Times on a given Sunday and see civil unions announced on the same page and in the same style as marriages. It is questionable, at least, that a couple that views their civil union as a sign of second class citizenship would choose to publicize it in the society column of the newspaper, particularly one with a circu-

lation as large as the New York Times.[7] And, of course, the factual question of whether the statute relegates same sex couples to a perceived second class status would be readily subject to such proof by way, for example, of public opinion polls on the views of the people of this state.[8] Thus, the majority has ignored this essentially factual dispute and made its own factual assertion without evidence.

In this connection, I also note that this court is constitutionally prohibited from finding facts. *Weil* v. *Miller*, 185 Conn. 495, 502, 441 A.2d 142 (1981) ("[t]his court cannot find facts; that function is, according to our constitution, our statute, and our cases, exclusively assigned to the trial courts"); see also Conn. Const., amend. XX, § 1 ("The judicial power of the state shall be vested in a supreme court, an appellate court, a superior court, and such lower courts as the general assembly shall, from time to time, ordain and establish. The powers and jurisdiction of these courts shall be defined by law."). Thus, to the extent that the perceived status of civil unions in this state is factual in nature, the majority has, by making its findings regarding that status, exceeded this court's power. This further undermines the majority's assertion of second class status attached to civil unions at this point in our history.

[7] The New York Times is reported to have the third largest newspaper circulation in the nation, exceeding one million copies daily. See http://www.huffingtonpost.com/2008/04/28emnew-york-timesem-cirul_n_98991.html (last visited October 8, 2008) (copy contained in the file of this case with the Supreme Court Clerk's Office).

[8] Compare *Brown* v. *Board of Education*, 347 U.S. 483, 493–94, 74 S. Ct. 686, 98 L. Ed. 2d 873 (1954), for example, in which the United States Supreme Court's statement of how racial segregation affected the African-American plaintiffs, by making them feel generally inferior to white persons, was based, not on the Supreme Court's assertion of fact, but on the factual finding of the United States District Court, which was, in turn, based on the famous study, conducted by the sociologist, Kenneth Clark, that had been introduced into evidence in the trial court.

Moreover, we have had civil unions in our state only since October 1, 2005, when the statutory scheme became effective. See Public Acts 2005, No. 05-10, § 1. Indeed, we are one of only two states in the nation that have legislatively enacted a civil union statutory scheme that was not mandated by its Supreme Court.[9] In addition, both the Vermont and the New Jersey Supreme Courts have held, under their state constitutions, that the legislature must enact, in effect, *civil union* (but not same sex marriage) statutes to remedy the unconstitutionality of their respective marriage statutes. See *Baker* v. *State*, 170 Vt. 194, 744 A.2d 864 (1999); *Lewis* v. *Harris*, 188 N.J. 415, 908 A.2d 196 (2006).[10] Both Vermont and New Jersey already have done so—Vermont several years before the enactment of our civil

[9] The other state is California, which calls its statutory scheme domestic partnership, rather than civil union. See *In re Marriage Cases*, 43 Cal. 4th 757, 779, 183 P.3d 384, 76 Cal. Rptr. 3d 683 (2008). Nonetheless, I have some doubt that the California domestic partnership statute is truly equivalent to our civil union statute, which equates such a union to marriage in every legal respect but name. By contrast, the California legislation differs from marriage in nine respects. See id., 805 n.24.

[10] In this respect, I also disagree with the majority opinion that the Vermont and New Jersey courts did not address the name of the status that they mandated for same sex couples. See *Baker* v. *State*, supra, 170 Vt. 197–98 ("We hold that the [s]tate is constitutionally required to extend to same-sex couples the common benefits and protections that flow from marriage under Vermont law. *Whether this ultimately takes the form of inclusion within the marriage laws themselves or a parallel 'domestic partnership' system or some equivalent statutory alternative, rests with the [l]egislature.*" [Emphasis added.]); *Lewis* v. *Harris*, supra, 188 N.J. 423 ("[t]*he name to be given to the statutory scheme* that provides full rights and benefits to same-sex couples, *whether marriage or some other term, is a matter left to the democratic process*" [emphasis added]).

Indeed, both the Vermont and New Jersey cases should give one pause when considering the premise of the majority's opinion, namely, that our civil union statute, by defining marriage as the union of a man and a woman, relegates such a union to second class citizenship. It is difficult to read the thoughtful and sensitive decisions of those two courts and conclude that, by deciding that their state constitutions required civil unions but not marriage for same sex couples, they were denigrating the plaintiffs whose claims they vindicated in large part.

union statute, and New Jersey some time thereafter. Undoubtedly, at this point in time, there have been thousands of civil union ceremonies performed in Connecticut, Vermont and New Jersey, with the result that there are now thousands of families headed by same sex couples joined in civil union, both with and without children.

I acknowledge that, because of its name, civil union is a different status from marriage. In this connection, I also note my agreement with Justice Zarella's observation in part I of his dissenting opinion regarding the nature of that different status, namely, that the institution of civil union is a creature of statute, while marriage is a fundamental civil right protected by the constitution. At this point in our state's history, however, and without any appropriate fact-finding on the issue, I am unable to say that it is widely considered to be less than or inferior to marriage, or that it does not bring with it the same social recognition as marriage. It is simply too early to know this with any reasonable measure of certitude.[11]

I agree with the New Jersey Supreme Court that "same-sex couples [are] free to call their relationships by the name they choose . . . ." *Lewis* v. *Harris*, supra, 188 N.J. 461. Indeed, parties to a civil union are free to—and do, in my experience—refer to their partner as "my spouse," or any other appellation that is derived from the vocabulary of marriage. For that matter, I know of no barrier, legal or otherwise, to such parties referring to themselves as "married," if they choose to do so. After all, in the eyes of the law, they have all of the rights and obligations "as are granted to spouses in a marriage . . . ." General Statutes § 46b-38nn. Moreover, General Statutes § 46b-38oo specifi-

[11] In this regard, I acknowledge the deeply held feelings and perceptions of the plaintiffs that, in their view, a civil union is of lesser social status and inferior to a marriage. I respect those feelings and perceptions. We do not know, however, that this is the prevailing view of the citizenry in general.

cally includes civil unions in any use in the General Statutes of the term " 'spouse' . . . or any other term that denotes the spousal relationship," and also specifically provides that, with certain exceptions, whenever "the term 'marriage' is used or defined, a civil union shall be included in such use or definition." In fact, as I have noted, the New York Times treats them the same as marriages for purposes of public announcement in the Sunday edition. In short, the state of social flux in this entire realm is simply too new and too untested for four members of this court to declare as an established social fact that civil unions are of lesser status than marriage in our state. In my view, that has not been established at this stage of our history. Judge Learned Hand has wisely reminded us as judges never to be too sure that we are always right.[12]

Thus, our experience with civil unions is simply too new and the views of the people of our state about it as a social institution are too much in flux to say with any certitude that the marriage statute must be struck down in order to vindicate the plaintiffs' constitutional rights. "[J]udicial authority . . . is certainly not the only repository of wisdom. 'When a democracy is in moral flux, courts may not have the best or the final answers. Judicial answers may be wrong. They may be counterproductive even if they are right. Courts do best by proceeding in a way that is catalytic rather than preclusive and that is closely attuned to the fact that courts are participants in the system of democratic deliberation.' " *Baker* v. *State*, supra, 170 Vt. 228, quoting C. Sunstein, "Foreword: Leaving Things Undecided," 110 Harv. L. Rev. 4, 101 (1996). The majority has disregarded this wise counsel.

---

[12] Judge Hand, quoting Oliver Cromwell, stated: "I should like to have every court begin, 'I beseech ye . . . think that ye may be mistaken.' " L. Hand, Morals in Public Life (1951), in The Spirit of Liberty 225, 230 (I. Dillard ed., 1952).

Consider and compare, for example, the change in social attitudes toward unmarried opposite sex couples living together. It was not long ago that there was a widespread attitude of moral disapproval, and stronger than that on the part of many persons, toward such couples. Yet, it is fair to say that, even independent of or without any positive statutory reinforcement or judicial decisions, now such living arrangements are widely accepted as an ordinary and common part of our social landscape, without social stigma of any kind. It is certainly possible that, but for the majority's decision in this case, social attitudes toward civil unions would have proven not to have the negative connotations that the majority suggests, either independent of or because such unions have the positive reinforcement of legal approval.[13] The point is that at this time it is

[13] The demographic trend since 1990 of same sex couples living together and identifying themselves as such, and the public acceptance of that trend, appears to track what happened with opposite sex couples living together. According to the Williams Institute of the University of California at Los Angeles (UCLA), which analyzed "trends among same-sex couples using the 1990 and 2000 United States decennial census enumerations along with data from the 2002 through 2006 American Community Surveys," nationally "[t]he number of same-sex couples reporting themselves as 'unmarried partners' has quintupled since 1990 from 145,000 to nearly 780,000." G. J. Gates, "Geographic Trends Among Same-Sex Couples in the U.S. Census and the American Community Survey," The Williams Institute, UCLA School of Law (November 2007) p. 1. This is an increase twenty-one times faster than the United States population increase from 1990 to 2006. Id. One of the two important factors contributing to increases in same sex couples is "[c]oming out. National polls since the early 1990s clearly demonstrate an increased acceptance of lesbian and gay people and same-sex couples in the United States population. This acceptance results in increasing numbers of lesbians and gay men being more forthcoming about their sexual orientation and living arrangements in surveys." Id.

In the New England states, there has been a 398 percent increase in the number of same sex couples living together from 1990 to 2006. Id., p. 10. In Connecticut, the increase is generally in line with that percentage increase: the number of same sex unmarried partner couples has increased from 2088 in 1990, to 9540 in 2006. Id., p. 17. This nationwide trend, mirrored in our state and our neighboring New England states, undermines the majority's certainty that a civil union, which is the legal equivalent of marriage for all of those same sex couples, is undoubtedly of lesser social status than a marriage.

simply impossible to say what the current prevailing view is, and what it would have turned out to be in the future.

I also agree, however, with the majority that the same factors that trigger strict scrutiny under our equal protection clauses trigger intermediate scrutiny, and I agree generally with the majority's four factor test applicable to trigger those tiers of judicial scrutiny, including the notion that there is no formula for applying the four factor test. Furthermore, applying those four factors to the facts of this case, I agree that gay persons have suffered a deplorable history of invidious discrimination, that their sexual orientation is a distinguishing characteristic that defines them as a discrete group, and that one's sexual orientation has no relation to a person's ability to contribute to society.

My fundamental disagreement with the majority focuses, however, on the relevance and application of the fourth factor, namely, the political power of gay persons in this state. The majority discounts this factor as the least important of the factors in the equal protection calculus, and applies it in a way that, in my view, renders it all but irrelevant. To the contrary, I view this factor as equal to the other factors, and think that, under our state constitution, it should be given its due weight.

In this connection, I emphasize the limitations on the scope of my analysis. First, we decide this case under the equal protection clauses of our state constitution. When we do so, we ordinarily look to those equal protection principles articulated by the United States Supreme Court; but we do so as a matter of jurisprudential choice, not as a matter of state constitutional mandate. Second, as I explain in part II of this opinion, in my view those classes specified in article first, § 20; see footnote 1 of this dissenting opinion; and only those classes, are entitled to strict scrutiny under our consti-

tution. Thus, the four factor test employed by the majority, and with which I agree generally, applies only to determine whether, as in the present case, an unspecified class is entitled to heightened scrutiny.[14]

Furthermore, in applying the political power factor to the facts of this case, I conclude that, because one of the fundamental purposes of heightened review scrutiny is, as I explain in part I B of this opinion, the need for judicial intervention into the process of legislative classification to protect discrete and insular minorities who cannot effectively use the political process to protect themselves, the political power of gay persons in this state at this time regarding the right of gay marriage is so strong that the political power factor outweighs the other factors. I turn now, therefore, to the political power factor in the suspect class status analysis.

## B

### The History and Significance of the Political Power Factor

Some history is necessary in order to understand the significance of the political power factor in equal

[14] Accordingly, the majority's suggestion that my interpretation of the political power factor as it applies to this case would mean that neither women nor African-Americans would be entitled to heightened scrutiny is both wrong and irrelevant. That is, as I explain more fully in part II of this dissent, under our state constitution classifications based on gender or race are specifically entitled to strict scrutiny. Therefore, the majority's suggestion that my analysis of the political factor under the state constitution would mean that neither women nor African-Americans would be entitled to heightened scrutiny is unwarranted.

Moreover, I am deciding this case as a justice of the Connecticut Supreme Court in 2008 under our state constitution. I am not deciding, and have no authority to decide, the different cases of gender discrimination in 1973, or racial discrimination in 1954, as a justice of the United States Supreme Court under the federal constitution—although I agree that in both cases, the court correctly accorded heightened scrutiny to those classes. Consequently, the majority's criticism of how my analysis in the present case under the state constitution would or would not have decided those cases is simply beside the point. Engaging in retroactive hypothetical decision making does not strike me as a useful method of adjudication. I further note that race

protection jurisprudence. One of the principal purposes of the four factor test for heightened scrutiny, based on its history, is to provide for the extraordinary remedy of judicial intervention into legislative classification in those instances in which, because of the status of the group affected by the classification, the group has no likely effective means of redressing any discrimination effected by means of the classification through the normal political process.

The starting point for evaluating the constitutionality of a legislative classification under equal protection principles has long been the rational basis test, which applies to economic and social regulation. See *Metropolitan Casualty Ins. Co.* v. *Brownell*, 294 U.S. 580, 583, 55 S. Ct. 538, 79 L. Ed. 1070 (1935). This test is rooted in the notion that the principal function of the legislature is to draw lines—in effect, to make classifications, so that it is not necessary for all legislation to apply to everyone in the first instance—and that, when the legislature does so, "the [c]onstitution presumes that even improvident decisions will eventually be rectified by the democratic process." *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U.S. 432, 440, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985). As the United States Supreme Court has recognized: "Classification is the essence of all legislation, and only those classifications which are invidious, arbitrary, or irrational offend the [e]qual [p]rotection [c]lause of the [c]onstitution." *Clements* v. *Fashing*, 457 U.S. 957, 967, 102 S. Ct. 2836, 73 L. Ed. 2d 508 (1982). Thus, the rational basis test is based on judicial respect for the separation of powers.

In 1938, in *United States* v. *Carolene Products Co.*, 304 U.S. 144, 152, 58 S. Ct. 778, 82 L. Ed. 1234 (1938),

classifications were accorded "heightened" scrutiny before the court had even evolved a tiered analysis of equal protection claims, and before the court had set forth its four-pronged inquiry in *Frontiero* v. *Richardson*, 411 U.S. 677, 686 n.17, 93 S. Ct. 1764, 36 L. Ed. 2d 583 (1973). See *Brown* v. *Board of Education*, 347 U.S. 483, 79 S. Ct. 686, 98 L. Ed. 2d 873 (1954).

the United States Supreme Court upheld a legislative classification created by the federal Filled Milk Act as having a rational basis. In what has now been recognized as its seminal footnote 4; id., 152–53 n.4; however, the court for the first time suggested the rationale for a more searching level of judicial inquiry for certain cases. One category of such cases was those in which "those political processes which can ordinarily be expected to bring about repeal of undesirable legislation" were, by the nature of the legislation itself, restrictive of those processes, such as legislation restricting the right to vote, restraining the dissemination of information and interfering with political organizations. Id. The court then broadened its suggestion of the possibility of a more searching level of judicial inquiry to another category of cases. The court stated: "Nor need we enquire whether similar considerations enter into the review of statutes directed at particular religious . . . or national . . . or racial minorities . . . [or] *whether prejudice against discrete and insular minorities may be a special condition, which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities, and which may call for a correspondingly more searching judicial inquiry*." (Citations omitted; emphasis added.) Id., 153 n.4.

Footnote 4 has had such great impact on constitutional law that it is often referred to as the "most famous" and "most celebrated" footnote in the Supreme Court's history. See, e.g., D. Hutchinson, "Symposium, Discrimination and Inequality: Emerging Issues, 'Gay Rights' for 'Gay Whites'?: Race, Sexual Identity, and Equal Protection Discourse," 85 Cornell L. Rev. 1358, 1379 n.107 (2000) ("'most famous footnote'"); P. Linzer, "The *Carolene Products* Footnote and the Preferred Position of Individual Rights: Louis Lusky and John Hart Ely vs. Harlan Fiske Stone," 12 Const. Com-

mentary 277 (1995) (same); A. Amar, "The Bill of Rights and the Fourteenth Amendment," 101 Yale L.J. 1193, 1195 (1992) (same); S. Delchin, comment, "*United States* v. *Virginia* and Our Evolving 'Constitution': Playing Peek-a-boo with the Standard of Scrutiny for Sex-Based Classifications," 47 Case W. Res. L. Rev. 1121, 1154 n.206 (1997) (" 'most celebrated footnote' "); L. Wardle, "A Critical Analysis of Constitutional Claims for Same-Sex Marriage," 1996 BYU L. Rev. 1, 92 (same); L. Powell, "*Carolene Products* Revisited," 82 Colum. L. Rev. 1087 (1982) (first description as "most celebrated footnote").

Justice Powell, delivering the Harlan Fiske Stone Lecture at Columbia University in New York, observed that *Carolene Products Co.* was an "unremarkable" case. L. Powell, supra, 82 Colum. L. Rev. 1087. Justice Powell explained that footnote 4, which, ironically, was not only relegated to a footnote, but also was dicta, is the sole reason for the continuing fascination with the case. Indeed, Justice Powell noted that the footnote "now is recognized as a primary source of strict scrutiny judicial review," which "many scholars think . . . actually commenced a new era in constitutional law." (Internal quotation marks omitted.) Id., 1088.

Justice Powell's explanation of the theory underlying footnote 4 is significant. "The fundamental character of our government is democratic. Our constitution assumes that majorities should rule and that the government should be able to govern. Therefore, for the most part, Congress and the state legislatures should be allowed to do as they choose. But there are certain groups that cannot participate effectively in the political process. And the political process therefore cannot be trusted to protect these groups in the way it protects most of us. Consistent with these premises, the theory continues, the Supreme Court has two special missions in our scheme of government: First, to clear away

impediments to participation, and ensure that all groups can engage equally in the political process; and [s]econd, to review with heightened scrutiny legislation inimical to discrete and insular minorities *who are unable to protect themselves in the legislative process.*" (Emphasis added.) Id., 1088–89.

Thus, a principal purpose underlying heightened scrutiny judicial intervention into the realm of legislative judgment—into its essential process of classification—is directly related to the political power factor. Heightened scrutiny analysis is designed as an extraordinary form of judicial intervention on behalf of those insular minority classes who presumably are unlikely to be able to rectify burdensome or exclusive legislation through the political process.

The United States Supreme Court's equal protection case law reflects the importance of footnote 4 of *Carolene Products Co.*, and the close tie between heightened scrutiny analysis and the relative political power of the group being considered for protected class status. See, e.g., *San Antonio Independent School District* v. *Rodriguez*, 411 U.S. 1, 105, 93 S. Ct. 1278, 36 L. Ed. 2d 16 (1973) (Marshall, J., dissenting) ("The reasons why such classifications [of race, nationality and alienage] call for close judicial scrutiny are manifold. Certain racial and ethnic groups have frequently been recognized as 'discrete and insular minorities' who are relatively powerless to protect their interests in the political process. See *Graham* v. *Richardson*, [403 U.S. 365, 372, 91 S. Ct. 1848, 29 L. Ed. 2d 534 (1971)]; cf. *United States* v. *Carolene Products Co.*, [supra, 304 U.S. 152–53] n.4."); *Massachusetts Board of Retirement* v. *Murgia*, 427 U.S. 307, 313, 96 S. Ct. 2562, 49 L. Ed. 2d 520 (1976) ("[b]ut even old age does not define a 'discrete and insular' group, *United States* v. *Carolene Products Co.*, [supra, 152–53 n.4], in need of 'extraordinary protection from the majoritarian political process' "); *Plyler* v. *Doe*, 457

U.S. 202, 217 n.14, 102 S. Ct. 2382, 72 L. Ed. 2d 786 (1982) ("[C]ertain groups . . . have historically been 'relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process.' . . . [S]ee *United States* v. *Carolene Products Co.*, [supra, 152–53 n.4]." [Citations omitted.]).

Although the United States Supreme Court has not always cited the *Carolene Products Co.* footnote in its formulation of the test for heightened scrutiny, it has applied the political power factor in determining whether legislation affecting a particular class is to be made subject to that scrutiny, and its reasoning and language clearly have echoed the purpose of that factor as explained by Justice Powell. In *Cleburne* v. *Cleburne Living Center, Inc.*, supra, 473 U.S. 440, the court, in determining that the mentally retarded were not a quasi-suspect class, used language and reasoning that established clearly that the political power factor is integral to the determination of whether a class is entitled to suspect or quasi-suspect class status, and, therefore, whether legislation affecting that class should be subjected to heightened or merely rational basis scrutiny. First, in contrasting the rational basis test with the strict scrutiny test, the court noted that statutes that classify on the basis of race, alienage or national origin "are deemed to reflect prejudice and antipathy—a view that those in the burdened class are not as worthy or deserving as others. For these reasons *and because such discrimination is unlikely to be soon rectified by legislative means*, these laws are subjected to strict scrutiny . . . ." (Emphasis added.) Id. In summarizing the rational basis test, the court referred to the fact that, where the group involved has characteristics relevant to state interests, "courts have been very reluctant, as they should be in our federal system *and with our respect for the separation of powers*, to closely scrutinize legis-

lative choices . . . ." (Emphasis added.) Id., 441. The court then turned to its explanation of why it rejected quasi-suspect classification for the mentally retarded, stating: "[T]he distinctive legislative response, both national and state, to the plight of those who are mentally retarded demonstrates not only that they have unique problems, *but also that lawmakers have been addressing their difficulties in a manner that belies a continuing antipathy or prejudice and a corresponding need for more intrusive oversight by the judiciary.*" (Emphasis added.) Id., 443. After cataloguing the federal and state legislation demonstrating those legislative responses, the court stated: "[T]he legislative response, which could hardly have occurred and survived without public support, *negates any claim that the mentally retarded are politically powerless in the sense that they have no ability to attract the attention of the lawmakers.*" (Emphasis added.) Id., 445. One cannot reasonably read these passages without hearing and seeing the important relevance of the political power factor to the three tier analysis; it is integral to the determination of whether a particular class should be elevated to protected status.

Contrary to the majority, therefore, I conclude that the political power of the group that seeks heightened scrutiny is a highly relevant consideration in the formulation and application of the four part test to determine whether the legislation at issue is to be subject to that degree of scrutiny. I would, therefore, as a matter of our own state constitutional law, retain the political power factor as an equal consideration in the equal protection calculus because it constitutes one of the fundamental purposes of the entire heightened scrutiny analysis. Finally, as I explain in part I C of this opinion, I agree with the majority's formulation of how to define that factor and, in applying it to this case, I conclude that, under that definition, the plaintiffs are not entitled

to heightened scrutiny. I turn now to the application of that factor in the present case.

## C

### Application of the Political Power Factor to the Right to Gay Marriage in Connecticut

I agree with the majority in its formulation of the political power factor: "[A] group satisfies the political powerlessness factor if it demonstrates that, because of the pervasive and sustained nature of the discrimination that its members have suffered, there is a risk that that discrimination will not be rectified, sooner rather than later, merely by resort to the political process. See *Cleburne* v. *Cleburne Living Center, Inc.*, supra, 473 U.S. 440." The majority has "little difficulty in concluding that gay persons are entitled to heightened constitutional protection despite some recent political progress." Unlike the majority, however, I come to the opposite conclusion: it is very clear to me that the discrimination to which the plaintiffs have been subjected in the past is no longer a factor preventing them from availing themselves of the political process to secure their rights. The most compelling illustration of that development is that the differential treatment of which the plaintiffs complain and seek to remedy by this case—the denial of the right to marry—*would be rectified* by the political process very soon. It is the unfortunate consequence of the majority opinion that it has short-circuited the democratic process.

I first emphasize that this case must be viewed realistically. It is not a case about trying to remedy the history of discrimination against gay persons in this state in general. As I explain in part I C 1 of this opinion, our current legislation effectively has done that, insofar as any law—legislative or judicial—can do so. Just as the New Jersey Supreme Court recognized in its gay marriage case: "The legal battle in this case has been waged

over one overarching issue—the right to marry." *Lewis v. Harris,* supra, 188 N.J. 433. Indeed, in light of the extensive gay rights legislation that we have in this state, the principal form of discrimination of which the plaintiffs complain, and what they seek to remedy in this case, is what they call "marriage discrimination." The plaintiffs state in their brief: "The journey of Connecticut lawmakers in confronting and eliminating aspects of discrimination against lesbian and gay people has been remarkable, but the legislature also has failed with respect to ending marriage discrimination. . . . While the legislature has addressed different manifestations of discrimination against gay people, it has consistently set aside any issue of marriage discrimination." (Citations omitted; internal quotation marks omitted.)

I also emphasize that this factor should be applied in the context of Connecticut today. It is today's Connecticut constitution that we are interpreting and applying; it is today's Connecticut marriage and civil union statutes that are under consideration; the plaintiffs are residents of Connecticut; and it is the conditions of their lives in this state now and for the foreseeable future that should inform the question of whether they have been denied the equal protection of the laws under the Connecticut constitution by being denied the right to marry. With these emphases in mind, I conclude, for two fundamental reasons, that the political power factor compels the conclusion that the plaintiffs are not denied the equal protection of the laws by our civil union and marriage statutes.

1

The Legislative Trend in Connecticut

The first reason for my conclusion is that the trajectory of Connecticut legislation over the past decades clearly indicates the extraordinarily great and growing political power of the gay community generally and

more specifically with respect to the right to marry. That extraordinary trajectory consistently has been in the direction of greater protection and recognition of the rights of gay persons, of their rightful claims to be free from intimidation and discrimination, and, finally and most important, of their claim to the right to marry.

Since 1971, when our Penal Code came into effect, noncommercial, consensual sexual relations, whether homosexual or heterosexual, in private between adults has not been the business of the criminal law. Commission to Revise the Criminal Statutes, Penal Code Comments, Conn. Gen. Stat. Ann. (West 2007) § 53a-65, comment, p. 277. Thus, the preexisting criminal prohibition against sodomy, for example, which targeted male homosexual conduct even when engaged in privately, was eliminated from our criminal laws. In addition, General Statutes §§ 53a-181j through 53a-181*l*, which have been in effect since 2000, make intimidation based on sexual orientation criminal.[15] Furthermore, since

[15] General Statutes § 53a-181j provides: "(a) A person is guilty of intimidation based on bigotry or bias in the first degree when such person maliciously, and with specific intent to intimidate or harass another person because of the actual or perceived race, religion, ethnicity, disability, sexual orientation or gender identity or expression of such other person, causes serious physical injury to such other person or to a third person.

"(b) Intimidation based on bigotry or bias in the first degree is a class C felony."

General Statutes § 53a-181k provides: "(a) A person is guilty of intimidation based on bigotry or bias in the second degree when such person maliciously, and with specific intent to intimidate or harass another person because of the actual or perceived race, religion, ethnicity, disability, sexual orientation or gender identity or expression of such other person, does any of the following: (1) Causes physical contact with such other person, (2) damages, destroys or defaces any real or personal property of such other person, or (3) threatens, by word or act, to do an act described in subdivision (1) or (2) of this subsection, if there is reasonable cause to believe that an act described in subdivision (1) or (2) of this subsection will occur.

"(b) Intimidation based on bigotry or bias in the second degree is a class D felony."

General Statutes § 53a-181*l* provides: "(a) A person is guilty of intimidation based on bigotry or bias in the third degree when such person, with specific intent to intimidate or harass another person or group of persons because of the actual or perceived race, religion, ethnicity, disability, sexual orienta-

1991, General Statutes §§ 46a-81a through 46a-81n have prohibited discrimination by both private and state actors based on sexual orientation in a broad range of human endeavors in this state, have required state agencies to take positive steps, including training and education, to remedy any such discrimination and ensure that it does not occur in the future, and have placed these prohibitions and positive obligations within the enforcement authority of the state commission on human rights and opportunities. More specifically, these statutes govern: professional or occupational licensing; General Statutes § 46a-81b; employment; General Statutes § 46a-81c; public accommodations; General Statutes § 46a-81d; housing; General Statutes § 46a-81e; credit practices; General Statutes § 46a-81f; employment practices in state agencies; General Statutes § 46a-81h; services performed by state agencies; General Statutes § 46a-81i; employment referral and placement services by state agencies; General Statutes § 46a-81j; state licensing; General Statutes § 46a-81k; state educational, counseling and vocational guidance programs; General Statutes § 46a-81m; allocation of state benefits; General Statutes § 46a-81n; and mandatory annual reporting to the governor by all state agencies of their efforts to effectuate their obligations under these sections. General Statutes § 46a-81o. Moreover, since 1991, General Statutes § 4a-60a has required all state contracts to contain a clause that the contracting party will not discriminate or permit discrimination on the grounds of sexual orientation.[16]

tion or gender identity or expression of such other person or persons: (1) Damages, destroys or defaces any real or personal property, or (2) threatens, by word or act, to do an act described in subdivision (1) of this subsection or advocates or urges another person to do an act described in subdivision (1) of this subsection, if there is reasonable cause to believe that an act described in said subdivision will occur.

"(b) Intimidation based on bigotry or bias in the third degree is a class A misdemeanor."

[16] I recognize that, as the majority points out, General Statutes § 46a-81r provides that none of the nondiscrimination statutes mentioned previously

"shall be deemed or construed (1) to mean that the state . . . condones homosexuality [as a] lifestyle, (2) to authorize the promotion of homosexuality . . . in educational institutions or require [its] teaching . . . as an acceptable lifestyle, (3) to authorize . . . affirmative action programs [based on] homosexuality . . . (4) to authorize [same sex marriage], or (5) to establish sexual orientation as a specific and separate cultural classification in society." I disagree with the majority, however, that the inclusion of this section in the gay rights act means that the legislature has declared, "as a matter of state policy, that same sex relationships are disfavored." First, § 46a-81r must be viewed in the context of the act as a whole, which represented the most significant advancement in the movement for gay rights in the history of this state. Second, the subsequent enactment of the civil union statute belies any notion that Connecticut disfavors same sex relationships. Third, as I explain later in this footnote, this assertion by the majority ignores the more recent perceptions of influential legislators about the current state of the views of the citizenry toward same sex couples. Finally, I read § 46a-81r as what it says: the state is neutral, not hostile, toward homosexuality. In other words, the inclusion of this section makes clear that, although the gay rights act was intended to remedy past discrimination against gay persons, it was not intended to *favor* the group over any other.

Indeed, the remarks of Representative Richard D. Tulisano, in explaining § 46a-81r on the floor of the House of Representatives in 1991, are consistent with that view. He indicated that "in this political document, there is no intent here to say that . . . by passing and expressing our desire to protect people . . . it is . . . necessarily [to] mean to say we affirmatively vote for that particular lifestyle, and as a political document that is left there to tell people, that is something for each individual to make up for themselves, but the state is not going to be doing it in that particular area." 34 H.R. Proc., Pt. 7, 1991 Sess., pp. 2616–17. Representative Tulisano also explained that this language was inserted to rebut "false . . . pieces of literature" that had suggested to the contrary, and that "[the act] deals with stopping acts against people, to protect people from others, to make sure people aren't held back from their rights as individuals, as humans that they should be entitled to, not to grant particular rights." Id., p. 2525.

In this connection, I also note that the majority cites, as evidence of "a development that many view as reflecting widespread opposition to equal rights for gay persons," the fact that twenty-five states have passed constitutional amendments prohibiting same sex marriage. I disagree with the majority's use of this as evidence of such opposition. It is simply unfair to conflate opposition to same sex marriage with bigotry, as the majority suggests. Persons may have deeply and conscientiously held views about the desire to retain the traditional definition of marriage without being guilty of opposing equal rights for gay persons based on their sexual orientation. "Until a few decades ago, it was an accepted truth for almost everyone who ever lived, in any society in which marriage existed, that there could be marriages only between participants of [a] different sex. A court should not lightly conclude that everyone who held [or holds] this belief was [or is] irrational, ignorant or bigoted." *Hernandez* v. *Robles*, 7 N.Y.3d 338, 361, 855 N.E.2d 1,

Then, in 2005, our state became the first state in the nation to establish by legislation the institution of civil union between persons of the same sex. We are one of only two states in the nation to establish civil unions purely by the political process, without being required to do so by a decision of the state's highest court.[17] Chapter 815f of our General Statutes, comprising General Statutes §§ 46b-38aa through 46b-38pp, entitled "Civil Union," is our comprehensive civil union statutory scheme. Although retaining the traditional definition of marriage as the union of one man and one woman; General Statutes § 46b-38nn; the statute provides that persons of the same sex may enter into a civil union. General Statutes § 46b-38bb (2). The core of that statutory scheme is § 46b-38nn, entitled "Equality of benefits, protections and responsibilities," which provides as follows: "Parties to a civil union shall have all the same benefits, protections and responsibilities under law, whether derived from the general statutes, administrative regulations or court rules, policy, common law or any other source of civil law, as are granted to spouses in a marriage, which is defined as the union of one man and one woman." Thus, there is no doubt that, for all purposes "under law"; General Statutes § 46b-38nn; parties to a civil union are the same as parties to a marriage. This means that, in the eyes of the law, the two legal relationships—marriage and civil union—are the same. There is no concrete, substantive or procedural legal right, privilege, immunity or obligation—no benefit, protection or responsibility, in the language of the statute—that differs between the two. The statute goes further. Section 46b-38oo provides in relevant part: "Wherever in the general statutes the

821 N.Y.S.2d 770 (2006). The majority's insistence that the votes of the people of twenty-five states to retain the traditional definition of marriage means that they are guilty of opposing equal rights for gay persons, calls to mind the saying: "To a hammer, everything looks like a nail."

[17] The other state is California. See footnote 9 of this opinion.

terms 'spouse', 'family', 'immediate family', 'dependent', 'next of kin' or any other term that denotes the spousal relationship are used or defined, a party to a civil union shall be included in such use or definition, and wherever in the general statutes . . . the term 'marriage' is used or defined, a civil union shall be included in such use or definition." Such a statute could not have been enacted without the very heavy political power of the gay community in 2005, just three years ago. Indeed, the civil union bill passed the House of Representatives by a vote of eighty-five to sixty-three, and passed the Senate by a vote of twenty-six to eight, with bipartisan support in both chambers. See 48 H.R. Proc., Pt. 7, 2005 Sess., p. 2181; 48 S. Proc., Pt. 5, 2005 Sess., p. 1345.

Finally, on January 31, 2007, less than two years after the enactment of the civil union statute, the joint committee on the judiciary raised on its own Raised House Bill No. 7395 (2007), entitled "An Act Concerning Marriage Equality." Raised House Bill No. 7395 defined marriage as "the legal union of two persons," and specifically provided that a person is eligible to marry if such person is "[o]f the same or opposite sex as the other party to the marriage . . . ." It specifically would have eliminated the previous statutory declarations "that the current public policy of the state of Connecticut is now limited to a marriage between a man and a woman"; General Statutes § 45a-727a (4); and that "marriage . . . is defined as the union of one man and one woman." General Statutes § 46b-38nn. Raised House Bill 7395 would do everything that the majority does by constitutional adjudication in this lawsuit.

Simultaneously with the introduction of this bill in the judiciary committee, the cochairs of the committee held a news briefing in the state capitol in support of the bill. The public access television network, CT-N Connecticut Network, video-recorded that news briefing. See Videotape: Capitol News Briefing with the

Chairs of the Judiciary Committee on the Same Sex Marriage Bill (CT-N Connecticut Network January 31, 2007) (copy contained in the file of this case with the Supreme Court Clerk's Office). That news briefing is significant in showing the extraordinary political support for the proposed legislation. In addition to the cochairs of the committee, in attendance and supporting the bill were numerous other senators and representatives, as well as a deputy comptroller of the state. In addition, other legislators could not attend but asked that their support be publicly acknowledged, and it was.

Senator Andrew J. McDonald, the Senate cochair of the committee, noted that, since the enactment of the civil union legislation, there had been no public outcry regarding, and nothing but public acceptance of, civil unions. Id. Some of the remarks at that news briefing by Representative Michael P. Lawlor, the House cochair of the committee, indicate his view that the chances of the gay marriage bill passing were very good. Id. He noted the significant shift in public opinion over the past eleven years, when apparently the issue of gay marriage had begun to be discussed.[18] Id. Representative Lawlor stated that he had "never seen an issue where public opinion shifted so quickly as this one," and he referred to public opinion polls indicating that the evolution of the public acceptance of gay marriage has been extraordinary over the past few years. Id. He put forth his view that civil union is marriage by another name, and that those couples joined in such a union "are married." Id. He stated that he believed that legislative enactment of gay marriage was "inevitable," and that even legislators and other public officials who opposed

---

[18] Indeed, in 2005, the judiciary committee had raised a gay marriage bill; Judiciary Committee Raised Bill No. 963, "An Act Concerning Marriage Equality"; but reported out of committee the civil union bill instead.

gay marriage were of the same opinion.[19] Id. He remarked that he no longer sees public officials speaking out against gay marriage. Id. In his view, the enactment of the civil union legislation had been the "big stuff." Id. Representative Lawlor said that "times have changed—this law will change with the times." Id. Referring specifically to Governor M. Jodi Rell's indication that she would veto the bill if it passed, he stated that governors change their minds as well as legislators, and that there is a political tide in the direction of gay marriage. Id.

The public legislative hearings on the bill further show the extraordinary political support for gay marriage through legislation. Speaking in support of the bill were State Comptroller Nancy Wyman; Conn. Joint Standing Committee Hearings, Judiciary Committee, Pt. 17, 2007 Sess., p. 5312; State Treasurer Denise L. Nappier; id., p. 5339; Secretary of the State Susan Bysiewicz; id., p. 5395; Senator Edith Prague; id., p. 4771; Teresa C. Younger, executive director of the Permanent Commission on the Status of Women; id., p. 5258; and the mayors of three of our largest cities, namely, Dannel P. Malloy, the mayor of Stamford; id., p. 5343; Eddie A. Perez, the mayor of Hartford; id., p. 5331; and John DeStefano, Jr., the mayor of New Haven. Id., p. 5390. In addition to these state and municipal public officials, the bill was supported by the Hartford Court of Common Council; id., p. 5331; and by two major labor unions in the state, namely, the Connecticut State United Auto Workers CAP Council; id., p. 5326; and the Connecticut AFL-CIO. Id., p. 5333. In addition, support was registered from the American Civil Liberties Union of Con-

---

[19] More specifically, when asked about this, Representative Lawlor remarked that, everyone "in the building" was of the opinion that passage of a gay marriage bill was "inevitable." Videotape: Capitol News Briefing with the Chairs of the Judiciary Committee on the Same Sex Marriage Bill, supra.

necticut; id., p. 5314; the Connecticut Chapter of the National Association of Social Workers; id., p. 5351; the National Council of Jewish Women; id., p. 5309; the Connecticut Chapter of the American Academy of Pediatrics; id., p. 5310; and the Connecticut Women's Education and Legal Fund. Id., p. 5328. Furthermore, nine religious leaders of both Christian and Jewish denominations registered their support of the bill. Not one state or local official—elected or appointed—and not one labor or professional organization opposed the bill.[20] The judiciary committee reported the bill out favorably by a bipartisan vote of twenty-seven to fifteen. See Raised House Bill No. 7395, Judiciary Committee Vote Tally Sheet, April 12, 2007.

Subsequently, the cochairs of the judiciary committee decided not to ask for a floor vote on the bill. Their reasons for doing so, however, are extremely significant, because they underscore the extraordinary growing political support for the bill. In a press release announcing their decision, Senator McDonald and Representative Lawlor stated that "several vote counts of legislators show the results to be encouragingly close," but that "many lawmakers have requested more time before voting for the bill." Press Release, Judiciary Chairman Will Not Seek Vote on Marriage Equality, but Are Encouraged by Increasing Public Support (May 11, 2007) (copy contained in the file of this case with the Supreme Court Clerk's Office). Senator McDonald

---

[20] In listing this demonstration of political support for the bill, I have attempted to confine myself to public officials and to groups that would not ordinarily be considered to be partisan on the issue of gay marriage. In addition, however, support was registered by three groups that could be considered to be partisan, namely, Love Makes A Family, the Hartford Gay and Lesbian Health Collaboration, and Parents, Families, Friends of Lesbians and Gays, as well as twenty named individuals. Registering opposition were two partisan groups, namely, The Institute for Marriage and Public Policy, and the Hartford Chapter of the Family Institute of Connecticut, as well as two members of the clergy and seventeen named individuals.

stated that "[t]he number of legislators backing this proposal has more than doubled in just the past two years since the bill was last introduced . . . . Support toward gay marriage equality is growing. We achieved an incredible benchmark this year by passing the bill out of committee—a step that many believed we would not be able to accomplish." Id. Representative Lawlor stated: "I thought passing the bill out of committee was a possibility. However, following the public hearing, at least five more committee members changed their minds and decided to vote for the bill . . . ." Id. He stated that numerous colleagues on both sides of the aisle had approached him privately and said that while they were personally in favor of same sex marriage, they were hesitant at that time to announce publicly their support for the bill. In due time, they told him, they will be comfortable voting for it as public opinion continues to shift in that direction. Id. Representative Lawlor stated: "A significant number of legislators have told us that they are currently in favor of same sex marriage personally, but feel that the state will be ready for it in another year or two. With time, these are the people that will create a majority . . . . This doesn't surprise me because we've been seeing the same trends happening in the general public, too, with more people gradually coming out in support for same-sex marriage. *When [not if] it passes,* I hope it is a strong bipartisan vote as was the case with civil unions in 2005." (Emphasis added.) Id.

The press release reported that a poll conducted in April, 2007, for the Hartford Courant by the Center for Survey Research and Analysis at the University of Connecticut showed that 49 percent of Connecticut residents favor same sex marriage, while 46 percent oppose it. Id. Senator McDonald stated that "[l]ike most people in Connecticut, I think that the governor has demonstrated an increased willingness to be open-

minded and she understands that peoples' views are changing rapidly on the topic . . . ." Id. Noting the public testimony in favor of the bill by the state comptroller, treasurer and secretary of the state, as well as the three mayors, Senator McDonald stated: "An increasing number of elected officials will support marriage equality as time progresses. The trend is undoubtedly moving in that direction." Id.

Other legislators were quoted in the press release as being in favor of the bill, acknowledging the rapid shift in public opinion, and expressing their belief that the bill would soon pass. Senator Mary Ann Handley stated: "I've long believed that gay and lesbian couples should have the same rights to marriage that heterosexual couples have and should not be treated differently by the government. I'm very encouraged that we have come closer this year to achieving this . . . . *Full equality is definitely in reach.*" (Emphasis added.) Id. Representative Beth Bye said that the great majority of feedback has been positive, stating: "The support shown has been immense . . . I've received numerous e-mails and phone calls of encouragement from my constituents, and even words of support from other legislators who actually oppose the legislation. *It's clear to me that opinions are moving in this direction.*" (Emphasis added.) Id. Representative Toni Walker said that throughout her time in the legislature, she has seen a growing number of legislators switch their positions into the direction of equal marriage rights for same sex couples. Id. Representative Walker stated: "I've seen it for myself. Increasingly, as I sit down and talk with my colleagues, *I've found that they are changing their views toward the direction of marriage equality.*" (Emphasis added.) Id.

It is to blink at political reality to ignore or to dismiss, as the majority does, this extraordinary and unprecedented public record. No other court that considers the

political power factor as relevant has been presented with this unique demonstration of political power. Moreover, I note that it is influential elected politicians—not appointed judges—who think that gay marriage through legislation is inevitable in Connecticut; who have discussed the issue with their elected colleagues and their constituents; who have read the public opinion polls, and have concluded that gay marriage will be enacted legislatively in Connecticut sooner rather than later; and who determined, in April, 2007, more than one year ago, that within one or two years from then a strong, bipartisan majority likely would pass a gay marriage bill, and that such a majority, as well as the growing public support for gay marriage in the state, might well persuade the governor to sign the bill. The majority dismisses this extraordinary public record of political support for gay marriage through legislation, and substitutes its uninformed view of the political landscape for that of those who shape it and work in it day after day.[21]

As a result, the majority joins only two other states, namely, California and Massachusetts, in mandating same sex marriage as a matter of state constitutional law. See *In re Marriage Cases*, 43 Cal. 4th 757, 785, 183 P.3d 384, 76 Cal. Rptr. 3d 683 (2008); *Goodridge* v. *Dept. of Public Health*, 440 Mass. 309, 344, 798 N.E.2d 941 (2003).[22] The other five state courts of final appeal

---

[21] The majority criticizes me for citing both the news conference accompanying the introduction of the 2007 gay marriage bill and the press release of the cochairs of the judiciary committee following the favorable action on it by the committee. I acknowledge that my use of these materials is unusual, but I see nothing in them that seems to be the stuff of factual controversy. As the majority states, in quoting Justice Felix Frankfurter in *Watts* v. *Indiana*, 338 U.S. 49, 52, 69 S. Ct. 1347, 93 L. Ed. 1801 (1949), "we 'should not be ignorant as judges of what we know as men [and women].'" Furthermore, the majority feels no similar compunction about citing numerous websites for factual assertions in support of its argument.

[22] The decision of the Hawaii Supreme Court in 1993, which was subsequently rendered ineffectual by virtue of a state constitutional amendment, does not belong in this category. See *Baehr* v. *Lewin*, 74 Haw. 530, 852 P.2d

that have considered the issue have concluded to the contrary. See *Conaway* v. *Deane*, 401 Md. 219, 312, 932 A.2d 571 (2007); *Lewis* v. *Harris*, supra, 188 N.J. 441; *Hernandez* v. *Robles*, 7 N.Y.3d 338, 362–63, 855 N.E.2d 1, 821 N.Y.S.2d 770 (2006); *Baker* v. *State*, supra, 170 Vt. 224–25; *Andersen* v. *King County*, 158 Wash. 2d 1, 53, 138 P.3d 963 (2006). California is the only one of these states that has what could be called a civil union statute, but in the California constitutional jurisprudence there is no political power factor analysis. See *In re Marriage Cases*, supra, 843 ("[O]ur cases have not identified a group's *current* political powerlessness as a necessary *prerequisite* for treatment as a suspect class. . . . Instead, our decisions make clear that the most important factors in deciding whether a characteristic should be considered a constitutionally suspect basis for classification are whether the class of persons who exhibit a certain characteristic historically has been subjected to invidious and prejudicial treatment, and whether society now recognizes that the characteristic in question generally bears no relationship to the individual's ability to perform or contribute to society." [Emphasis in original.]). Although the Massachusetts Supreme Judicial Court stated, in a subsequent proceeding, that a civil union statute would not be sufficient; *Opinions of the Justices to the Senate*, 440 Mass. 1201, 1207–1208, 802 N.E.2d 565 (2004); it did so by way of an advisory opinion in the absence of an operating civil union statutory scheme. Thus, the majority in the present case stands alone in mandating gay marriage as a matter of state constitutional law in the presence of both a fully functioning civil union statute and a highly relevant[23] and revealing public record of extraor-

44, reconsideration granted in part, 74 Haw. 650, 875 P.2d 225 (1993). That case was decided on the ground of the state's prohibition against sex discrimination. Id., 561. I discuss in part III of this opinion why our state's corresponding provision does not apply in the present case.

[23] Thus, the majority's reference to the passage of gay rights legislation in California is irrelevant, because under California constitutional law, the

dinary political support for gay marriage through legis-
lation.

I disagree with the cramped notion of political power
applied by the majority. The majority, relying on the
plurality opinion in *Frontiero* v. *Richardson*, 411 U.S.
677, 686 n.17, 93 S. Ct. 1764, 36 L. Ed. 2d 583 (1973),
asserts that, because there has never been, in Connecti-
cut, an openly gay person elected to statewide office
or appointed to our higher courts, gay persons " 'remain
a political underclass' " in our state. I agree that election
or appointment to high office is one aspect of a group's
political power, and that the plurality opinion in *Fron-
tiero* supports that view. I also believe, however, that
the legislative record regarding a particular group is
another measure of the group's political power, and
that *Cleburne* supports that view.[24]

political power factor is irrelevant. Indeed, that point is underscored by the
fact that the California Supreme Court did not even mention the passage
of that legislation in its state equal protection analysis. See *In re Marriage
Cases*, supra, 43 Cal. 4th 831–56.

[24] Other courts have registered their understanding that the legislative
record is highly relevant evidence of the political power of gay persons in
determining that gay persons should not be accorded protected status for
purposes of equal protection analysis. See, e.g., *Conaway* v. *Deane*, supra,
401 Md. 286 (Rejecting the plaintiffs' argument that they were so "politically
powerless" that they required "protection from the majoritarian political
process. To the contrary, it appears that, at least in Maryland, advocacy to
eliminate discrimination against gay, lesbian, and bisexual persons based
on their sexual orientation has met with growing successes in the legislative
and executive branches of government. Maryland statutes protect against
discrimination based on sexual orientation in several areas of the law,
including public accommodation, employment, housing, and education."
[Internal quotation marks omitted.]); *Andersen* v. *King County*, supra, 158
Wash. 2d 21 (rejecting, based on recent legislative developments, claim that
plaintiffs were politically powerless, noting: "[t]he enactment of provisions
providing increased protections to gay and lesbian individuals in Washington
shows that as a class gay and lesbian persons are not powerless, but, instead,
exercise increasing political power"); *High Tech Gays* v. *Defense Industrial
Security Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990) (citing to antidis-
crimination legislation passed by numerous states, and regulations enacted
by many cities and counties, as basis for conclusion that gay persons are
not politically powerless).

Consequently, the political power of a group is not measured solely by whether one who is a member of the group has been elected or appointed to high office. It is also measured by whether the group has been and is able to secure the passage of important and beneficial legislation on its behalf. One does not measure the political power in this state of organized labor, for example, solely by examining the number of labor union officers or members elected or appointed to high public office; or the political power of the business community solely by examining the number of chief executive officers of major corporations, or the number of officers of the Connecticut Business and Industry Association, so elected or appointed; or the political power of the plaintiffs' trial bar solely by examining the number of the plaintiffs' lawyers, or officers of the Connecticut Trial Lawyers Association, so elected or appointed. On the contrary, one measures the political power of those powerful groups also—indeed, often primarily—by examining the success they have achieved in enacting legislation that affects their interests.

Thus, the legislative history in our state for the past thirty-seven years, beginning with the passage of the Penal Code in 1971, and the public record discussed previously, are proof of the political power of gay persons in this state. Simply put, one cannot read the record of legislation over the past thirty-seven years, including the passage of the civil union legislation in 2005, watch the video of the press briefing following the introduction of the gay marriage bill in early 2007, read the

Furthermore, the majority's insistence that a *Frontiero* analysis of the political power factor controls the analysis of that factor in the present case suggests that the plaintiffs would have been granted suspect or quasi-suspect class status under the federal constitution. That suggestion is belied by the fact that the plaintiffs asserted no claim under the federal constitution whatsoever. If the plaintiffs believed that they were entitled to elevated status under federal constitutional law, we would have expected them to have raised such a claim.

outpouring of political support for that bill and the vote of the judiciary committee in favorably reporting out the bill, and read the press release of the cochairs of the judiciary committee, including the comments of other influential legislators, regarding the bill, and reasonably conclude that gay persons are a political underclass in today's Connecticut. Rather, the only reasonable conclusion from this extraordinary public record is that gay persons as a class now have in Connecticut the political power to enact gay marriage legislation—sooner rather than later.

Consequently, I also disagree with the majority's characterization of our state's admirable record of legislation described previously as "*supporting* the conclusion that the subject group is in need of heightened constitutional protection." (Emphasis in original.) In the context of equal protection jurisprudence, this characterization renders a group's political power, as demonstrated by its ability to secure beneficial and protective legislation, essentially irrelevant.

Under the majority's view, if the state *has* enacted a large body of legislation beneficial to or protective of a particular group—as this state has done with respect to gay persons—that means that the group lacks political power because the legislation is evidence of the group's need for protection. But if the state has *not* enacted such legislation, that also undoubtedly would mean that the group lacks political power because of that lack of legislation. Indeed, that lack of such legislation is precisely what Chief Judge Kaye cited, in her dissent in *Hernandez* v. *Robles*, supra, 7 N.Y.3d 388, as evidence of a lack of political power of gay persons in New York: "The simple fact is that New York has not enacted anything approaching comprehensive statewide domestic partnership protections for same sex couples, much less marriage or even civil unions."

In this way, the political power of the group, as demonstrated by the state's record of legislation, is rendered irrelevant to the equal protection analysis, because either way—if there is or is not a body of beneficial legislation—it supports the view that the group lacks political power. This simply cannot be.

It is true that our long history, beginning in 1971, and running through 2005, of enacting legislation protective of the rights of gay persons demonstrates their need for protection. Of course the legislation was aimed at rectifying historic and ongoing wrongs. That is always what civil rights legislation aims to do. But it is a strangely narrow view of such legislation to say that it *supports* heightened scrutiny because it demonstrates the group's need for protection. This view ignores the fact that the body of legislation obviously has another, equally important aspect: it also clearly demonstrates the political power of the group to bring about beneficial and protective legislation for the precise purpose of rectifying those wrongs. In my view, it is untenable to dismiss, as the majority does, this other important aspect of such legislation. Moreover, were there *no* record of such legislation in this state, the majority would undoubtedly—and justifiably—cite that as evidence of a *lack* of political power.

It is also true, as the majority notes, that, despite the growing political power of both women and African-Americans, neither gender nor race has since been questioned as a class entitled to strict scrutiny. That does not compel the conclusion, however, that political power must be relegated to secondary status in our own state constitutional protection jurisprudence. As I indicate in part II of this opinion, our state constitution already specifically protects both gender and race, among other classes, as entitled to strict scrutiny. Thus, there is no need to consider even the possibility of a reclassification of those two classes under our constitu-

tion, and I would not attempt to answer the academic question asked by the majority, namely: why, if the political factor is important, do both gender and race still retain their heightened scrutiny status? No one has ever suggested—nor do I—that, once established, a class entitled to heightened scrutiny protection may subsequently lose that status if its political power grows substantially.[25] No court has ever been presented with such a question, and this court certainly never will be. But the answer to that academic question should not be that, when considering whether as a matter of first impression under our own state constitution a new, unspecified group is entitled to heightened scrutiny, we must, as the majority does, nevertheless ignore the root of the entire heightened scrutiny analysis, namely, the need of a burdened class for judicial intervention because of its likely inability to invoke the political process on its own, and blind ourselves to the powerful record of political support for gay marriage in the pres-

---

[25] The majority presents as support for its dismissal of the political power factor the fact that, despite the increased political power of women since *Frontiero*, that case has not been overruled. As I indicate in the accompanying text of this opinion, no one has ever suggested that it should be, and neither do I. Its holding that courts should accord heightened scrutiny to equal protection claims based on gender discrimination was correct, and remains correct. It is also true, however, that the court relied on *Frontiero* to apply heightened scrutiny to an equal protection claim based on gender discrimination, where the group claiming discrimination consisted of men; see *Craig* v. *Boren*, 429 U.S. 190, 97 S. Ct. 451, 50 L. Ed. 2d 397 (1976); despite the fact that men share none of the factors of discrimination that motivated the court to decide *Frontiero*. The most plausible explanation for this is that, once a court grants heightened protection to a particular class—e.g., gender—it must logically extend that protection to any subgroup of that class even if that subgroup has never been the subject of discrimination. Similarly, once a court has granted heightened protection to a class, it simply will not go back and revisit that protection based on the notion that one or more of the factors that motivated the grant in the first place might no longer be present. Moreover, I emphasize that we are deciding this case under the *state* constitution, and gender discrimination is already afforded strict scrutiny thereunder. Thus, the question of why, if the political power factor is important, the court has never considered overruling *Frontiero*, is purely academic under our state constitution.

ent case that clearly indicates that the legislature is about to do by legislation what the majority does by adjudication.

## 2

## Marriage Is a Fundamental Social Institution

The second reason why I conclude that the political power factor is particularly significant in the context of the present case is that marriage is a fundamental social institution. That being so, if it is to be changed, as the majority acknowledges that its decision does, it is appropriate that it be done by the democratic process, rather than by judicial fiat.[26]

Marriage is more than a relationship sanctioned by our laws. It is a fundamental and ancient social institution that has existed in our state from before its found-

---

[26] I also disagree with the majority that "removing the barrier to same sex marriage is no different than the action taken by the United States Supreme Court in *Loving* v. *Virginia*, [388 U.S. 1, 87 S. Ct. 1817, 18 L. Ed. 2d 1010 (1967)], when it invalidated laws barring marriage between persons of different races." The two cases are in no way similar. First, it is clear from the court's reasoning in *Loving* that the right to marry that it was considering was that between a man and a woman; hence the court's reliance on the institution of marriage as necessary to the survival of the human race. Id., 12. Second, the court in *Loving* correctly determined that the antimiscegenation statute in question there was clearly aimed at the perpetuation of white supremacy. It cannot reasonably be contended that our marriage statutes, which have existed for centuries along with those of every other state, were aimed at perpetuating heterosexual, rather than homosexual, supremacy. See *Baker* v. *State*, supra, 170 Vt. 226–27 ("[p]laintiffs have not demonstrated that the exclusion of same-sex couples from the definition of marriage was intended to discriminate against . . . lesbians and gay men, as racial segregation was designed to maintain the pernicious doctrine of white supremacy"). Third, the statute in *Loving* excluded mixed race opposite sex couples from entering a social institution that, by all other traditional criteria, they were entitled to enter. Thus, the decision in *Loving* did not expand the preexisting institution of marriage; it merely removed a racial barrier to entry. Our marriage and civil union statutes do no such thing. They simply retain the traditional definition of marriage, and reflect the fact that the state has not yet chosen to expand the right to enter into it to same sex couples.

ing and throughout the world for millennia. It cannot be disputed that its meaning has always been limited to the union of a man and a woman. And it cannot be disputed that, by mandating same sex marriages, the majority has wrought a significant change in that fundamental social institution. To change the law of marriage by expanding it to include same sex couples is to change the institution that the law reflects.

Furthermore, that change is contrary to the public policy of the state as specifically declared by the legislature. The same section of the civil union statutory scheme that grants equal rights of marriage to civil unions specifically defines "marriage . . . as the union of one man and one woman." General Statutes § 46b-38nn; see also General Statutes § 45a-727a ("The General Assembly finds that . . . [4] It is further found that the current public policy of the state of Connecticut is now limited to a marriage between a man and a woman.").

It is an extreme act of judicial power to declare a statute unconstitutional. It should be done with great caution and only when the case for invalidity is established beyond a reasonable doubt. *Kinney* v. *State*, 285 Conn. 700, 710, 941 A.2d 907 (2008). That principle applies with even more force when the judicial act of invalidation constitutes the alteration of a fundamental social institution, such as marriage.

Fundamental social institutions are the product of a web of history, tradition, custom, culture, widely shared expectations and law. But they are not static. They change. In my view, there are three ways in which such social institutions change, and sometimes the three ways will, to one extent or the other, overlap or combine with each other.

The first, and probably the most common, is by a process of gradual change over time, as a society's

(or a state's) customs, culture and shared expectations change with changed conditions, without the prompting of law, legislative or judicial. An example of this is the change over the past decades in the fundamental social institution of the family. It cannot be disputed that our conception of the family has broadened from what it previously was. That broadened reach is reflected in § 45a-727a (3), which, in addressing the best interest of a child who is the subject of an adoption, refers to "a loving, supportive and stable family, whether that family is *a nuclear, extended, split, blended, single parent, adoptive or foster family* . . . ." (Emphasis added.) This list of different types of families is not a legislative prescription; it is, instead, a legislative recognition of what has already happened in society. This court has also recognized the changing nature of the institution of the family. See *Michaud* v. *Wawruck*, 209 Conn. 407, 415, 551 A.2d 738 (1988) ("[t]raditional models of the nuclear family have come, in recent years, to be replaced by various configurations of parents, stepparents, adoptive parents and grandparents").

The second way in which a fundamental social institution may change is by legislation. Thus, the legislature may say, as a matter of public policy, that for a *particular* purpose or purposes, but not necessarily *all* purposes, a particular social institution will be recognized in a context in which it may not have been recognized previously. Our civil union statute is a good example of this kind of legislative change of a social institution. The legislature has said that all of the legal rights and obligations of the fundamental social institution of marriage will be extended beyond opposite sex couples to same sex couples, in a new and differently named social institution of civil union. In fact, by virtue of § 46b-38oo, the legislature specifically has provided that, except for certain purposes,[27] "[w]herever in the general statutes

---

[27] Most of the exceptions are simply to avoid duplication of terminology where the statutes already include a reference to civil union as well as

. . . the term 'marriage' is used or defined, a civil union shall be included in such use or definition." Thus, it may fairly be said that, except for the particular specified purposes of the name of the institution and the corresponding statement of the "current" public policy of the state, the legislature has changed the fundamental institution of marriage to include civil unions.

The virtue of these first two ways of changing a fundamental social institution is that each has the general support—either explicit or implicit—of the people. In the first way—by a natural process of social change—the people have voted for the change by their patterns of behavior over time. In the second way—by legislation—the people have voted through their duly elected representatives.

The third way is by judicial decision. In my view, this is the least desirable method of change of a fundamental social institution because it is effected, not through the people's behavioral patterns or the votes of their elected representatives, but through the reasoning and analysis of judges, who are accountable to the people only through their oaths and consciences. In this way, a fundamental social institution, which is the product of a state's history, tradition, custom, widely shared expectations and law, is changed by the decision of judges, who need not necessarily give deference to that history, tradition, custom and widely shared expectations. This is an extreme action for a court to take. Therefore, the court ought to be very cautious before

---

marriage. These are: General Statutes § 7-45 (certificate of marriage or civil union); General Statutes § 17b-137a (requiring social security number on marriage or civil union license); General Statutes §§ 46b-20 to 46b-34, inclusive (marriage license provisions); and General Statutes § 46b-150d (permitting emancipated minor to marry or enter civil union). The other exceptions are: General Statutes § 45a-727a (4) (current public policy of state now limited to marriage between man and woman); and General Statutes § 46b-38nn (marriage defined as union of man and woman).

doing so, and be very sure that it is constitutionally necessary. The majority opinion fails this test.

This is not to say, however, that a court should not, in engaging in the process of constitutional adjudication, change a fundamental social institution. When it is necessary to vindicate constitutional rights, it is the court's obligation to do so, irrespective of the fact that the decision will change a fundamental social institution. See, e.g., *Brown* v. *Board of Education*, 347 U.S. 483, 74 S. Ct. 686, 98 L. Ed. 873 (1954) (striking down system of legally segregated schools as violative of equal protection of laws, irrespective of fact that such systems could be considered as fundamental social institutions in southern states). The present case, however, is not that kind of case.

Instead, this is a case in which the majority has given an answer that is not constitutionally compelled. The public record clearly indicates that the legislature is poised to consider and, in all likelihood, to enact gay marriage legislation. The majority in this case has, unfortunately, unnecessarily short-circuited this socially exemplary—and, in my view, superior—method of changing the nature of the fundamental institution of marriage in this state.

"We cannot escape the reality that the shared societal meaning of marriage—passed down through the common law into our statutory law—has always been the union of a man and a woman. To alter that meaning would render a profound change in the public consciousness of a social institution of ancient origin. When such change is not compelled by a constitutional imperative, it must come about through civil dialogue and reasoned discourse, and the considered judgment of the people in whom we place ultimate trust in our republican form of government. Whether an issue with such far-reaching social implications as how to define

marriage falls within the judicial or the democratic realm, to many, is debatable. [The majority of this court] think[s] that this [c]ourt should settle the matter, insulating it from public discussion and the political process. Nevertheless, a court must discern not only the limits of its own authority, but also when to exercise forbearance, recognizing that the legitimacy of its decisions rests on reason, not power. We [should] not short-circuit the democratic process from running its course." *Lewis* v. *Harris*, supra, 188 N.J. 460–61.

## II

## SEXUAL ORIENTATION IS NOT A SUSPECT CLASS UNDER ARTICLE FIRST, §§ 1 AND 20, OF THE CONSTITUTION OF CONNECTICUT

For all of the reasons that I have explained in part I of this dissenting opinion, I also conclude that sexual orientation is not a suspect class under article first, § 1, and article first, § 20, of the constitution of Connecticut, as amended by articles five and twenty-one of the amendments. Put another way, if it is not a quasi-suspect class, a fortiori it is not a suspect class.

There is, however, another, more fundamental reason why sexual orientation is not a suspect class under our state constitution, and that reason is rooted in the language and history of the constitution itself. Article first, § 20, of the constitution of Connecticut already explicitly affords the equal protection of the law to eight specific characteristics—namely, "religion, race, color, ancestry, national origin, sex or physical or mental disability." We consistently have held that any of these enumerated classes invokes strict scrutiny analysis. See *Daly* v. *DelPonte*, 225 Conn. 499, 512–15, 624 A.2d 876 (1993). Furthermore, this list of specifically protected classes has grown over time, by virtue of the democratic process of constitutional amendment. As originally adopted in the 1965 constitution, the list was

limited to religion, race, color, ancestry and national origin. See Conn. Const. (1965), art. I, § 20. In 1974, the constitution was amended to include sex; see Conn. Const., amend. V (November 27, 1974); and in 1984, to include physical and mental disability. See Conn. Const., amend. XXI (November 28, 1984). I conclude, from this language and history, that these democratically selected groups are those that command the most demanding form of judicial intervention, namely, strict scrutiny. The constitutional framework embodies a balancing of the necessity of respect for the democratic process—including the most significant part of that process, namely, amending our constitution—and the need for judicial intervention to protect those who cannot effectively use the political process to protect themselves. The list of specifically protected classes is the people's answer to the question of which groups are entitled to the most demanding level of judicial oversight. I would, therefore, reserve other groups' claims to protection for intermediate scrutiny, rather than the most demanding form of judicial intervention, namely, strict scrutiny.

Our caution in *Moore* v. *Ganim*, 233 Conn. 557, 597, 660 A.2d 742 (1995), that the list of protected classes in article first, § 20, of the constitution of Connecticut is "not dispositive," is not inconsistent with this conclusion. First, *Moore* dealt with a claim of a fundamental obligation to provide subsistence to the indigent; it was not an equal protection case. Second, we already have recognized intermediate level scrutiny for unenumerated groups, and I would continue that line of jurisprudence. See *Carofano* v. *Bridgeport*, 196 Conn. 623, 641, 495 A.2d 1011 (1985). Thus, the fact that a group is not enumerated in article first, § 20, would not mean that it had no claim to intermediate scrutiny. In this regard, I agree with the majority.

Having concluded that the plaintiffs' claim to the right to marry under the equal protection provisions of the state constitution is not subject to either strict or intermediate scrutiny, I next turn to the plaintiffs' remaining claims, which the majority did not reach. Those claims are that: (1) the civil union statute creates an impermissible gender based classification in violation of their right to equal protection under article first, § 20, of the constitution of Connecticut, as amended by articles five and twenty-one of the amendments; and (2) the state's definition of marriage as limited to opposite sex couples violates the plaintiffs' fundamental right to marry in violation of their right to due process of law under article first, §§ 8 and 10, and their right to equal protection under article first, § 1, of the constitution of Connecticut. I reject both claims.

III

THE STATUTORY DEFINITION OF MARRIAGE DOES NOT DISCRIMINATE ON THE BASIS OF GENDER

The plaintiffs claim that the civil union statute, which defines marriage as the union of a man and woman, creates an impermissible, gender based classification in violation of their right to equal protection under article first, § 20, of the constitution of Connecticut, as amended by articles five and twenty-one of the amendments.[28] Specifically, the plaintiffs claim that the statute

---

[28] The plaintiffs also rely on article first, § 10, of the constitution of Connecticut, which provides: "All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay." That constitutional provision, however, does not provide support for the plaintiffs' claim. "We have interpreted article first, § 10, as a provision protecting access to our state's courts, which does not itself create new substantive rights." *Moore* v. *Ganim*, supra, 233 Conn. 573. "We generally have held that article first, § 10, prohibits the legislature from abolishing or significantly limiting common law and certain statutory rights that were redressable in court as of 1818, when the constitution was first adopted, and which were incorporated in that provision by virtue of being established by law as rights the breach of which precipitates a recognized

discriminates on the basis of gender because it prohibits a man from marrying a man, but allows a woman to do so, and it prohibits a woman from marrying a woman, but allows a man to do so. The state contends, however, that the civil union statute does not create gender based classifications, and instead bars men and women equally from marrying a person of the same sex. I agree with the defendants.

Article first, § 20, of the constitution of Connecticut, as amended by articles five and twenty-one of the amendments, provides: "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights *because of* religion, race, color, ancestry, national origin, *sex* or physical or mental disability." (Emphasis added.) Section 46b-38nn provides: "Parties to a civil union shall have all the same benefits, protections and responsibilities under law, whether derived from the general statutes, administrative regulations or court rules, policy, common law or any other source of civil law, as are granted to spouses in a marriage, *which is defined as the union of one man and one woman.*" (Emphasis added.) This statute does not differentiate between the genders because both men and women are equally barred from marrying a person of the same sex. Thus, so long as the civil union statute treats both genders equally in prohibiting both from entering a same sex marriage, it does not run afoul of the constitutional provision barring discrimination on the basis of sex.

Linguistically, the plaintiffs' claim fails. They are not prohibited from marrying "because of [their] . . . sex . . . ." They are prohibited from marrying because of their sexual orientation.

injury . . . ." (Internal quotation marks omitted.) Id., 573–74. In sum, this constitutional provision provides no support for the plaintiffs' claim that the fundamental right to marry includes the right to same sex marriage.

This conclusion is supported by the purpose of the constitutional provision at issue. The pertinent language of the constitutional provision must be understood in light of its purpose. See *Cologne* v. *Westfarms Associates*, 192 Conn. 48, 62, 469 A.2d 1201 (1984). The history of this provision makes clear that it was designed, like its federal counterpart, namely, the equal rights amendment that failed ratification by the states, to equalize treatment of the two genders—male and female. Although worded to include both genders, it was prompted by the need to equalize the treatment of women with that of men before the law. It was not designed to equalize treatment between same sex couples and opposite sex couples, with respect to the right to marry or other rights. There is no evidence that the framers of the resolution that became the constitutional amendment had any such treatment of rights in mind.

The state provision was adopted by referendum in 1974, while the proposed equal rights amendment to the federal constitution was circulating among the states for possible ratification. See Conn. Const., amend. V. The legislative history of amendment V makes it clear that the intent of the legislature was to remedy the past unequal treatment of women, as compared to men, in many situations. See, e.g., 15 H.R. Proc., Pt. 2, 1972 Sess., pp. 872–73 (Representative David H. Neiditz, describing the types of discriminatory laws to be invalidated by the proposed amendment, stated: "[Laws] to safeguard the health and morals of women, our laws limiting the number of hours which women may work, [restricting] women to certain kinds of employment and requir[ing] employers of women to give them special benefits, such as seats in factories. Instead of protecting women, these laws have served only to hinder this economic advancement, to [channeling] most women into the lowest paying and the least rewarding of jobs."); id., p. 877 (Representative Francis J. Collins, remarking

that purpose of amendment was to eliminate "discrimination purely on the basis of sex and for no other reason"); 15 S. Proc., Pt. 4, 1972 Sess., p. 1526 (Senator Joseph I. Lieberman, remarking that the amendment was intended to address existing gender inequalities under the law, and the results of that unequal treatment, stated: "[M]en and women of equal age having worked an equal period of years, showed tremendous discrepancy between the amount of income actually being enjoyed by men and that being enjoyed by women. Namely, men are making much more money for the same kind of work over [a] similar period of time."); Conn. Joint Standing Committee Hearings, Government Administration and Policy, 1972 Sess., p. 34 (Barbara Lifton, Connecticut State Women's Political Caucus, testifying at the committee hearing in support of the amendment, stated: "I will not spend time listing the many laws now on the books which, under the guise of 'protecting' women, really serve to deny them the opportunities for career advancement or financial security now enjoyed only by men."). It is clear from these excerpts of the legislative history that the intent of the legislature in passing the state equal rights amendment was to make it unconstitutional for the state to favor one gender over another.

The plaintiffs rely on *McLaughlin* v. *Florida*, 379 U.S. 184, 85 S. Ct. 283, 13 L. Ed. 2d 222 (1964), and *Loving* v. *Virginia*, 388 U.S. 1, 87 S. Ct. 1817, 18 L. Ed. 2d 1010 (1967), for the proposition that the mere equal application of a law containing gender classifications does not render the statute valid for equal protection purposes. This reliance is misplaced.

*McLaughlin* and *Loving* involved similar statutes. The statute at issue in *McLaughlin* criminalized the cohabitation of a white man and an African-American woman, or an African-American man and a white woman. *McLaughlin* v. *Florida*, supra, 379 U.S. 184–85.

The law was part of a statutory scheme that prohibited "living in adultery" in general and required proof of intercourse as one of its elements. Id., 185. A separate provision, the one at issue in *McLaughlin*, barred the mere cohabitation of a white person and a person of African-American descent; intercourse was not an element of the offense. Id., 186–87. The statutory scheme declared unconstitutional in *Loving* prohibited the intermarriage of a white person and a "colored person." *Loving* v. *Virginia*, supra, 388 U.S. 4. In both cases, the court invalidated the statutes at issue, despite the fact that each punished the participants equally, on the basis of its conclusion that each had the purpose of furthering and endorsing the doctrine of white supremacy; id., 7; and constituted an invidious official discrimination based on race. *McLaughlin* v. *Florida*, supra, 196.

The present case is distinguishable from *Loving* and *McLaughlin*. There has been no showing that the state's civil union statute was passed with the purpose of discriminating based on gender. The absence of such evidence, or even a credible argument in support of the claim of gender discrimination, is highlighted by the contrast with both *Loving* and *McLaughlin*. In both of those cases, despite the fact that the law was applied equally to both races, it was clear which racial group was being favored and which disfavored.

IV

THE STATUTORY DEFINITION OF MARRIAGE DOES NOT DEPRIVE THE PLAINTIFFS OF THE FUNDAMENTAL CONSTITUTIONAL RIGHT TO MARRY

Finally, I address the plaintiffs' claim that the civil union statute's exclusion of same sex couples from marriage violates their right to due process under article

first, §§ 8 and 10,[29] of the constitution of Connecticut, and their right to equal protection under article first, § 1, of the constitution of Connecticut, because it infringes on the fundamental right to marry. I reject this claim. I conclude that the fundamental right to marry under our state constitution is the right to marry someone of the opposite sex and does not include the right to marry someone of the same sex.

Ordinarily, in determining whether our state constitution affords a particular fundamental right, we would employ the familiar test articulated in *State* v. *Geisler*, 222 Conn. 672, 685, 610 A.2d 1225 (1992). That test focuses on an analysis of six factors, namely: "(1) the text of the constitutional provisions at issue; (2) holdings and dicta of this court, and the Appellate Court; (3) federal precedent; (4) sister state decisions; (5) the historical approach; and (6) contemporary economic and sociological, or public policy, considerations." *Moore* v. *Ganim*, supra, 233 Conn. 581.[30]

In the present case, however, I conclude that a full *Geisler* analysis is not necessary, because in my view the dispositive issue is the scope of the right at issue. There is no doubt that, as I explain in the following discussion, there is a fundamental right to marry under our state constitution. The question is how to define that right for constitutional purposes. The plaintiffs claim that the fundamental right is the right to marry a person of one's choice and, therefore, it should be construed to include a person of the same sex. The state maintains, to the contrary, that the fundamental

---

[29] See footnote 28 of this opinion for the text of article first, § 10, of the constitution of Connecticut.

Article first, § 8, of the constitution of Connecticut provides in relevant part: "No person shall . . . be deprived of life, liberty or property without due process of law . . . ."

[30] In this connection, I note my agreement with Justice Zarella's trenchant criticism of the majority's *Geisler* analysis in part IV of his dissenting opinion.

right is the right to marry as traditionally understood, namely, the right to marry a person of the opposite sex of one's choice and, therefore, it does not include the right to marry someone of the same sex.

If the plaintiffs are correct that the fundamental right to marry is defined, for constitutional purposes, broadly enough to include the right to marry a person of one's choice, then they would have a viable claim that it includes the right to marry a person of the same sex. If the state is correct, however, that the fundamental right to marry is not defined that broadly and that it is defined, instead, as the right to marry a person of the opposite sex, then the plaintiffs' claim necessarily fails. I conclude that the fundamental right to marry, under our state constitution, is properly defined as the right to marry a person of the opposite sex and, therefore, does not include the right to marry a person of the same sex.[31]

It is well established that the right to marry is guaranteed by our state constitution. *Gould* v. *Gould*, 78 Conn. 242, 244, 61 A. 604 (1905). It is also "part of the fundamental 'right of privacy' implicit in the [f]ourteenth [a]mendment's [d]ue [p]rocess [c]lause." *Zablocki* v. *Redhail*, 434 U.S. 374, 384, 98 S. Ct. 673, 54 L. Ed. 2d 618 (1978); *Zapata* v. *Burns*, 207 Conn. 496, 506, 542 A.2d 700 (1988).

The United States Supreme Court has given wise guidance to the judicial process of defining fundamental rights for constitutional purposes. "[W]e ha[ve] always been reluctant to expand the concept of substantive due process because guideposts for responsible deci-

---

[31] I emphasize here that this conclusion means only that the civil union statute, which defines marriage as the union of a man and woman; General Statutes § 46b-38nn; does not deprive the plaintiffs of a fundamental right. The legislature is free, of course, to expand the legal definition of marriage to include persons of the same sex.

sionmaking in this unchart[ed] area are scarce and open-ended. . . . By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action. We must therefore exercise the utmost care whenever we are asked to break new ground in this field . . . lest the liberty protected by the [d]ue [p]rocess [c]lause be subtly transformed into the policy preferences of the [m]embers of this [c]ourt . . . .

"Our established method of substantive-due-process analysis has two primary features: First, we have regularly observed that the [d]ue [p]rocess [c]lause specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this [n]ation's history and tradition . . . and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed . . . . Second, we have required in substantive-due-process cases a careful description of the asserted fundamental liberty interest. . . . Our [n]ation's history, legal traditions, and practices thus provide the crucial guideposts for responsible decisionmaking . . . that direct and restrain our exposition of the [d]ue [p]rocess [c]lause." (Citations omitted; internal quotation marks omitted.) *Washington* v. *Glucksberg*, 521 U.S. 702, 720–21, 117 S. Ct. 2258, 138 L. Ed. 2d 772 (1997). Our own state precedent is consistent with these principles. "In construing the contours of our state constitution, we must exercise our authority with great restraint in pursuit of reaching reasoned and principled results. . . . We must be convinced, therefore, on the basis of a complete review of the evidence, that the recognition of a constitutional right or duty is warranted." (Citation omitted; internal quotation marks omitted.) *Moore* v. *Ganim*, supra, 233 Conn. 581.

Thus, in defining the scope of the fundamental right to marry under our state constitution, we are cautioned to exercise our authority with great restraint; to be reluctant to recognize new claims to fundamental rights because of the lack of reliable guideposts for responsible decision making; to look to those fundamental rights and liberties that are deeply rooted in our nation's history and tradition; to be careful in describing the right at issue; and to exercise the utmost care when asked to break new ground. The overarching reason for this judicial caution is that, by declaring a right as fundamental, we to a large extent place it outside the area of public debate and legislative action. These cautionary principles lead me to conclude that the fundamental right to marry under our state constitution cannot be so broadly defined in its scope to include the right to same sex marriage.

First, as I explained previously in this opinion, marriage is a fundamental institution in our state, as well as our nation, and recognizing it to include same sex marriage would be to change its nature. That is a change that should be left to the realm of public debate and legislative action, particularly because, as I also explain in part I of this opinion, the legislature is poised to consider doing so.

Second, to define the fundamental right to marry so broadly as to include the right to marry a person of the same sex would be inconsistent with the notion that we should be careful in describing the right at issue, with the notion that we should exercise our authority with great restraint, and with the notion that we should exercise the utmost care when asked to break new ground. To define it as the plaintiffs suggest would, on the contrary, display a lack of the utmost care in breaking new ground and in defining the right at issue, and would be to substitute a personal policy choice for sound constitutional analysis.

Third, same sex marriage cannot reasonably be regarded as deeply rooted in our state's history and traditions. "We cannot escape the reality that the shared societal meaning of marriage—passed down through the common law into our statutory law—has always been the union of a man and a woman." *Lewis* v. *Harris*, supra, 188 N.J. 460. It cannot be disputed that, until recent years when the issue of same sex marriage has been presented to both our legislature and our courts, the notion of marriage was uniformly understood as the union of a man and a woman. Thus, to declare that the fundamental right to marry under our state constitution is defined so broadly as to include same sex marriage would be counter to that history and tradition.

The plaintiffs rely on *Loving* v. *Virginia*, supra, 388 U.S. 2, in which the court concluded that Virginia's antimiscegenation laws violated the right to equal protection, for the proposition that the fundamental right to marry is broadly defined. That reliance is misplaced. Although the court in *Loving* referred to the right to marry in general terms, it is clear that it contemplated the traditional notion of marriage as between a man and woman. The court stated: "Marriage is one of the basic civil rights of man, fundamental *to our very existence and survival.*" (Emphasis added; internal quotation marks omitted.) Id., 12. Thus, its reference to marriage as fundamental to our survival must be taken as a reference to marriage as linked to procreation.

The court made a similar connection in one of the primary decisions on which it relied in *Loving*. In *Skinner* v. *Oklahoma*, 316 U.S. 535, 536, 62 S. Ct. 1110, 86 L. Ed. 1655 (1942), the court concluded that a state law that had provided for the sterilization of persons convicted of two or more felonies "involving moral turpitude" unconstitutionally infringed upon the fundamental right to procreation. The court emphasized that the issue implicated a "basic liberty"; id., 541; and in

the course of its discussion of the importance of the right of procreation, the court stated: *"Marriage and procreation* are fundamental to the very existence and survival of the race." (Emphasis added.) Id.

The plaintiffs also claim that the court's decision in *Griswold* v. *Connecticut*, 381 U.S. 479, 85 S. Ct. 1678, 14 L. Ed. 2d 510 (1965), conclusively severed any link between marriage and procreation. That claim relies on an incorrect reading of *Griswold*. Although *Griswold* relied on the nature of the marital relationship in arriving at its conclusion that the state statute at issue, proscribing the use of contraceptives, was unconstitutional, the court's primary concern in that decision was the right to marital privacy, not the right to marry. Id., 485–86. This link between marriage and procreation was not severed simply because the court recognized that the state cannot *compel* a married couple to have children. Instead, the court recognized that married couples have a fundamental right to privacy in deciding whether to procreate. Recognizing that married couples have such a choice, however, does not alter the fact that the fundamental nature of the right to marry, for constitutional purposes, always has been linked to its procreative aspect.

Similarly, the plaintiffs' reliance on *Turner* v. *Safley*, 482 U.S. 78, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987), also for the proposition that the link between marriage and procreation has been severed, is unpersuasive. In *Turner*, the Supreme Court invalidated a prison regulation that required inmates to seek the permission of the superintendent of the prison in order to get married, and authorized the granting of that permission only when there were "compelling reasons" for doing so. Id., 82. The court struck down the regulation because it did not pass rational basis scrutiny, the applicable level of review of a prison regulation that impinges on prisoners' constitutional rights. Id., 89–91. The plaintiffs

claim that the court's decision, in light of the fact that, as the plaintiffs claim, prisoners had no expectation of the possibility of procreating, demonstrates that the link between marriage and procreation had been severed. On the contrary, the reasoning of *Turner* provides further support for the conclusion that one of the primary reasons for the status of marriage as a fundamental right is its implicit link to procreation. Specifically, in striking down the regulation, the court noted particularly that "most inmates eventually will be released by parole or commutation, and therefore most inmate marriages are formed in the expectation that they ultimately will be fully consummated." Id., 96.

The plaintiffs also rely on *Lawrence* v. *Texas*, 539 U.S. 558, 123 S. Ct. 2472, 156 L. Ed. 2d 508 (2003), in support of their claim that the right to marry includes the right to marry a person of the same sex. In overruling *Bowers* v. *Hardwick*, 478 U.S. 186, 106 S. Ct. 2841, 92 L. Ed. 2d 140 (1986), and declaring unconstitutional in violation of federal due process a state statute criminalizing private homosexual conduct between consenting adults; *Lawrence* v. *Texas*, supra, 578; *Lawrence* represented a significant development in the court's thinking about sexual orientation. That development, however, is not as radical as the plaintiffs make it out to be. The court, in fact, was careful to craft its decision very narrowly, noting that the case did "not involve *whether the government must give formal recognition to any relationship that homosexual persons seek to enter.*" (Emphasis added.) Id. In so limiting the scope of its decision, the court in *Lawrence* implicitly recognized that it is one thing to conclude that criminalizing private, consensual homosexual conduct between adults violates due process; it is entirely another matter to conclude that the constitution requires the redefinition of the institution of marriage to include same sex couples. Id., 567.

The plaintiffs also rely on *Lawrence* in urging this court to eschew the caution of *Glucksberg* to provide a "careful description of the asserted fundamental liberty interest"; (internal quotation marks omitted) *Washington* v. *Glucksberg*, supra, 521 U.S. 721; and define the right at issue in the present case more broadly, as the right to marry a person of one's choice, rather than as the right to marry a person of the same sex. In *Lawrence*, the court concluded that it had framed the fundamental right at issue too narrowly in *Bowers*, as the "right [of] homosexuals to engage in sodomy . . . ." (Internal quotation marks omitted.) *Lawrence* v. *Texas*, supra, 539 U.S. 566. The court in *Lawrence* defined the right more broadly, stating that the right involved more than sexual conduct. Although the statutes at issue purported merely to prohibit certain sexual conduct, the court observed, "[t]heir penalties and purposes . . . have more far-reaching consequences, touching upon the most private human conduct, sexual behavior, and in the most private of places, the home. The statutes . . . seek to control a personal relationship that, whether or not entitled to formal recognition in the law, is within the liberty of persons to choose without being punished as criminals." Id., 567. In perhaps the most succinct statement of the right at issue, the court stated that the case involved the right of "adult persons in deciding how to conduct their private lives in matters pertaining to sex." Id., 572.

The plaintiffs argue that the Supreme Court's repudiation in *Lawrence* of the narrow definition of the right at issue in *Bowers* requires the conclusion that the right at issue in the present case also must be defined broadly. That argument ignores the significant context of *Lawrence* as opposed to the present case.

In tracing the developments in its case law following *Bowers* and explaining why those subsequent developments required the overruling of *Bowers*, the court in

*Lawrence* emphasized two principles: the law at issue impermissibly infringed upon the right to privacy; and the law stigmatized homosexuals. Id., 573–75. Regarding the right to privacy, the court remarked: "The . . . decision [in *Planned Parenthood of Southeastern Pennsylvania* v. *Casey*, 505 U.S. 833, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992)] again confirmed that our laws and tradition afford constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education." *Lawrence* v. *Texas*, supra, 573–74. Thus, the court characterized the right at issue in *Lawrence* as a right of privacy and freedom from government intrusion. Next, the court grounded its decision on the stigma that the Texas statute imposed upon homosexuals as a group, stating that "[w]hen homosexual conduct is made criminal by the law of the [s]tate, that declaration in and of itself is an invitation to subject homosexual persons to discrimination both in the public and in the private spheres. . . . Its continuance as precedent demeans the lives of homosexual persons." Id., 575. Connecticut's civil union statute was not enacted, as was the Texas criminal statute, for the purpose of stigmatizing homosexuals.

Thus, the two concerns that informed the court's decision in *Lawrence*, protecting citizens from government intrusion in their right to privacy, and protecting a specific group from stigmatization, are not present in our case. First, the right at issue in the present case is drastically different from that at issue in *Lawrence*. The plaintiffs do not seek protection from governmental intrusion of their privacy; instead, they seek affirmative action on the part of the government—they seek official recognition of the status of a relationship that would require a significant change in a fundamental societal institution. Second, the civil union statute does not stigmatize homosexuals. As I set forth in part I of this

dissent, the development of the law in this state dealing with sexual orientation demonstrates that the legislature had no intention, in passing the civil union statute, to encourage discrimination against or to stigmatize homosexuals. On the contrary, that history supports the conclusion that the legislature has been working toward the eventual passage of a gay marriage bill, and that the civil union statute was an important step in that process.

V

APPLICATION OF THE RATIONAL BASIS STANDARD

Having concluded that Connecticut's statutory definition of marriage "does not touch upon either a fundamental right or a suspect [or quasi-suspect] class"; (internal quotation marks omitted) *Contractor's Supply of Waterbury, LLC* v. *Commissioner of Environmental Protection*, 283 Conn. 86, 93, 925 A.2d 1071 (2007); I also conclude that our marriage statutes survive rational basis review.

The paradigm of a rational basis upon which challenged legislation may be sustained is that the legislature is not required to solve all aspects of a social problem, or address all aspects of a social issue, at once. It is entitled to take things one step at a time. Id., 105 ("the legislature has the freedom to craft legislation to accomplish its purpose in gradual steps"). That is precisely the basis on which our marriage and civil union statutes are premised. The legislature has, since 1971, consistently been enacting legislation beneficial to and protective of gay persons. It has been considering the claims of gay persons to secure the right to marry for eleven years, according to Representative Lawlor, who should know. It took a major step, in 2005, by enacting the civil union law, which afforded parties to civil unions all of the rights and obligations of marriage, except the name of the institution. It then had before

it a gay marriage bill in 2007, with great political support, on which it deferred action solely to permit public opinion to continue to mount in its favor until, in the opinion of its sponsors, it *would* pass within one year or two, with even greater political support. It is entirely rational for the legislature to address the issue of gay marriage step-by-step, rather than all at once.

I therefore dissent, and would affirm the judgment of the trial court.

VERTEFEUILLE, J., dissenting. I respectfully disagree with the conclusion of the majority that sexual orientation is a quasi-suspect classification for equal protection purposes under our state constitution and that our marriage statute barring same sex marriage therefore is subject to heightened or intermediate scrutiny. I agree, instead, with the dissenting opinion of Justice Borden and join in that opinion. In a highly persuasive opinion, Justice Borden concludes, in pertinent part, that sexual orientation does not constitute either a quasi-suspect or suspect classification under our state constitution, and that our marriage and civil union statutes satisfy the state constitution when analyzed under the traditional rational basis test. I cannot improve upon Justice Borden's analysis, and I therefore write separately simply to emphasize two points.

First, "[i]t is well established that a validly enacted statute carries with it a strong presumption of constitutionality . . . . The court will indulge in every presumption in favor of the statute's constitutionality . . . . Therefore, [w]hen a question of constitutionality is raised, courts must approach it with caution, examine it with care, and sustain the legislation unless its invalidity is clear." (Internal quotation marks omitted.) *State* v. *McKenzie-Adams*, 281 Conn. 486, 500, 915 A.2d 822,

cert. denied, 552 U.S. 888, 128 S. Ct. 248, 169 L. Ed. 2d 148 (2007).

Moreover, because of this strong presumption favoring a statute's constitutionality, "those who challenge its constitutionality must sustain the heavy burden of proving its unconstitutionality *beyond a reasonable doubt*." (Emphasis added; internal quotation marks omitted.) Id. Our jurisprudence thus requires the highest possible standard of proof in order to sustain a challenge to the constitutionality of a statute validly enacted by our legislature. In my view, Justice Borden's compelling opinion respects both of these fundamental, time-honored principles.

Accordingly, I respectfully dissent.

ZARELLA, J., dissenting. The majority concludes that the marriage laws,[1] which define marriage as the union of one man and one woman,[2] classify on the basis of sexual orientation, that this classification is subject to intermediate scrutiny under article first, §§ 1 and 20, of the Connecticut constitution, as amended by articles five and twenty-one of the amendments,[3] and that, under this heightened level of review, the state has failed to provide sufficient justification for limiting marriage to one man and one woman. The latter conclusion is based primarily on the majority's unsupported *assumptions* that the essence of marriage is a loving, committed

[1] In their complaint, the plaintiffs seek a judgment declaring that, "[t]o the extent that any statute, regulation, or common-law rule . . . is applied to deny otherwise qualified individuals from marrying because they wish to marry someone of the same sex or are gay or lesbian couples, such statutes, regulations, and common-law rules violate the equal protection provisions . . . of the Connecticut [c]onstitution." There is no dispute in this case that, under this state's common law and statutes governing marriage, same sex couples are barred from marriage. For convenience, we refer to these laws collectively as "marriage laws."

[2] See General Statutes § 46b-38nn.

[3] See footnotes 5 and 6 of the majority opinion for the relevant text of these constitutional provisions.

relationship between two adults and that the sole reason that marriage has been limited to one man and one woman is society's moral disapproval of or irrational animus toward gay persons. Indeed, the majority fails, during the entire course of its 129 page opinion, even to identify, much less to discuss, the actual *purpose* of the marriage laws, even though this is the first, critical step in any equal protection analysis. I conclude, to the contrary, that, because the long-standing, fundamental purpose of our marriage laws is to privilege and regulate procreative conduct, those laws do not classify on the basis of sexual orientation and that persons who wish to enter into a same sex marriage are not similarly situated to persons who wish to enter into a traditional marriage. The ancient definition of marriage as the union of one man and one woman has its basis in biology, not bigotry. If the state no longer has an interest in the regulation of procreation, then that is a decision for the legislature or the people of the state and not this court. Therefore, I conclude that the equal protection provisions of the state constitution are not triggered. I further conclude that there is no fundamental right to same sex marriage. Accordingly, I dissent.

I

At the outset, I note that I agree with the majority that the trial court improperly concluded that the plaintiffs[4] had failed to demonstrate a legally cognizable or actionable harm because they are entitled to enter into a legal relationship, i.e., a civil union, that confers the same legal rights as marriage. I reach this conclusion, however, for a different reason than the majority. The institution of civil union is purely a creature of statute, subject to change or repeal at the pleasure of the legislature. Marriage, on the other hand, is a fundamental

[4] The plaintiffs are identified in footnote 2 of the majority opinion.

civil right protected by the constitution.[5] Although the legislature has the authority to alter the legal incidents of marriage, it presumably could not abolish the institution altogether, and would be required to apply any statutory changes uniformly to all married couples.[6] Thus, contrary to the trial court's conclusion, the difference between the two institutions is not merely one of nomenclature but has specific legal consequences for the plaintiffs. Accordingly, I conclude that the plaintiffs have raised a cognizable legal claim.

## II

I turn, therefore, to the plaintiffs' claim under the equal protection provisions of our state constitution. As the majority correctly states, "[t]he concept of equal protection [under both the state and federal constitutions] has been traditionally viewed as requiring the uniform treatment of persons standing in the same relation to the governmental action questioned or challenged. . . . Conversely, the equal protection clause places no restrictions on the state's authority to treat dissimilar persons in a dissimilar manner. . . . Thus, [t]o implicate the equal protection [clause] . . . it is necessary that the state statute . . . in question, either on its face or in practice, treat persons standing *in the*

---

[5] E.g., *Zablocki* v. *Redhail*, 434 U.S. 374, 384, 98 S. Ct. 673, 54 L. Ed. 2d 618 (1978); *Loving* v. *Virginia*, 388 U.S. 1, 12, 87 S. Ct. 1817, 18 L. Ed. 2d 1010 (1967); see also *Skinner* v. *Oklahoma ex rel. Williamson*, 316 U.S. 535, 541, 62 S. Ct. 1110, 86 L. Ed. 1655 (1942).

[6] See *In re Marriage Cases*, 43 Cal. 4th 757, 818–20, 183 P.3d 384, 76 Cal. Rptr. 3d 683 (2008). I also believe that the fundamental right to marriage is protected by the preamble to the state constitution, which provides in relevant part: "The People of Connecticut . . . do, *in order more effectually to define, secure, and perpetuate the liberties, rights and privileges which they have derived from their ancestors*; hereby, after a careful consideration and revision, ordain and establish the . . . constitution and form of civil government." (Emphasis added.) It is arguable that this provision would prevent the legislature from redefining marriage to include same sex couples. See footnote 19 of this opinion. A fortiori, it would prevent the legislature from abolishing the institution altogether.

*same relation to it differently. . . .* [Accordingly], the analytical predicate [of an equal protection claim] is a determination of who are the persons [purporting to be] similarly situated. . . . The similarly situated inquiry focuses on whether the [plaintiff is] similarly situated to another group *for purposes of the challenged government action. . . .* Thus, [t]his initial inquiry is not whether persons are similarly situated for all purposes, but whether they are similarly situated *for purposes of the law challenged.*" (Citations omitted; emphasis added; internal quotation marks omitted.) Part III of the majority opinion; see also *Eielson* v. *Parker,* 179 Conn. 552, 566, 427 A.2d 814 (1980) ("[T]he constitution does not, of course, prevent the legislature from dealing differently with different classes of people. It means only that classifications must be based on natural and substantial differences, *germane to the subject and purpose of the legislation,* between those within the class included and those whom it leaves untouched." [Emphasis added; internal quotation marks omitted.]). Moreover, the equal protection clause "is implicated only when a state legislatur[e] select[s] or reaffirm[s] a particular course of action at least in part because of, not merely in spite of, its adverse effects upon *an identifiable group* . . . ." (Citations omitted; emphasis added; internal quotation marks omitted.) *Hunt* v. *Cromartie,* 526 U.S. 541, 558, 119 S. Ct. 1545, 143 L. Ed. 2d 731 (1999) (Stevens, J., concurring), quoting *Personnel Administrator* v. *Feeney,* 442 U.S. 256, 279, 99 S. Ct. 2282, 60 L. Ed. 2d 870 (1979). It is clear, therefore, that, in performing its equal protection analysis, the court must identify, at the outset, the group that is adversely affected by the challenged legislation and determine whether that group is similarly situated to another, differently treated group *with respect to the purpose of the challenged legislation.*

Without any analysis, the majority simply accepts the plaintiffs' assertion that our state's marriage laws

classify persons on the basis of sexual orientation even though nothing in those laws expressly does so. It then concludes, without considering the fundamental purpose of the marriage laws, that gay persons are similarly situated to heterosexual persons with respect to those laws because they "share the same interest in a committed and loving relationship as heterosexual persons who wish to marry . . . ." Part III of the majority opinion. I cannot agree.

Because it is central to a proper equal protection analysis, I begin with the fundamental subject and purpose of our laws limiting marriage to the union of one man and one woman. As many courts have recognized, the primary societal good advanced by this ancient institution is responsible procreation.[7] See *Citizens for Equal Protection* v. *Bruning*, 455 F.3d 859, 867 (8th Cir. 2006); *Standhardt* v. *Superior Court*, 206 Ariz. 276, 287, 77 P.3d 451 (App. 2003), review denied sub nom. *Standhardt* v. *MCSC*, Docket No. CV-03-0422-PR, 2004 Ariz. LEXIS 62 (Ariz. May 25, 2004); *Morrison* v. *Sadler*, 821 N.E.2d 15, 25 (Ind. App. 2005); *Conaway* v. *Deane*, 401 Md. 219, 299–300, 932 A.2d 571 (2007); *Baker* v. *Nelson*, 291 Minn. 310, 312, 191 N.W.2d 185 (1971), appeal dismissed, 409 U.S. 810, 93 S. Ct. 37, 34 L. Ed. 2d 65 (1972); *Lewis* v. *Harris*, 378 N.J. Super. 168, 185, 875 A.2d 259 (App. Div. 2005), aff'd in part and modified in part, 188 N.J. 415, 908 A.2d 196 (2006); *Andersen* v.

---

[7] The plaintiffs state baldly that procreation "[n]ever" has been the purpose of marriage. (Emphasis added.) In support of this statement, they point to the civil union law enacted in 2005, which grants the same rights and privileges as marriage, and to the fact that proof of the ability to procreate never has been a requirement of marriage. I address these arguments in part III of this dissenting opinion. It is sufficient at this point in my analysis to state that it is impossible to contemplate the development of the institution of traditional marriage between one man and one woman without recognizing that responsible procreation and the rearing of children were central to that development. If the purpose of marriage was not to promote and regulate procreative conduct, what was its purpose?

*King County,* 158 Wash. 2d 1, 37, 138 P.3d 963 (2006); see also *Goodridge* v. *Dept. of Public Health,* 440 Mass. 309, 381, 798 N.E.2d 941 (2003) (Cordy, J., dissenting); cf. *Hernandez* v. *Robles,* 7 N.Y.3d 338, 359, 855 N.E.2d 1, 821 N.Y.S.2d 770 (2006). "Paramount among its many important functions, the institution of marriage has systematically provided for the regulation of heterosexual behavior, brought order to the resulting procreation, and ensured a stable family structure in which children will be reared, educated, and socialized." (Internal quotation marks omitted.) *Morrison* v. *Sadler,* supra, 25. "The institution of marriage provides the important legal and normative link between heterosexual intercourse and procreation on the one hand and family responsibilities on the other. The partners in a marriage are expected to engage in exclusive sexual relations, with children the probable result and paternity presumed." (Internal quotation marks omitted.) Id., 26; see also J. Root, Introduction, 1 Root (Conn.) xxvii (1789– 93) (observing, with respect to laws of Connecticut, "[t]hat one man should be joined to one woman in a constant society of cohabiting together . . . is necessary for the propagation of the species, and for the preservation and education of their offspring").

It also is clear that the link between traditional marriage and procreation forms the basis of the institution's status as a fundamental civil right under the federal constitution. See *Zablocki* v. *Redhail,* 434 U.S. 374, 384, 98 S. Ct. 673, 54 L. Ed. 2d 618 (1978) ("the right to marry, establish a home and bring up children is a central part of the liberty protected by the [d]ue [p]rocess [c]lause" [internal quotation marks omitted]); id., 386 ("if [the] right to procreate means anything at all, it must imply some right to enter the only relationship in which the [s]tate . . . allows sexual relations legally to take place"); *Loving* v. *Virginia,* 388 U.S. 1, 12, 87 S. Ct. 1817, 18 L. Ed. 2d 1010 (1967) ("[m]arriage is one

of the basic civil rights of man, fundamental to our very existence and survival" [internal quotation marks omitted]); *Skinner* v. *Oklahoma ex rel. Williamson*, 316 U.S. 535, 541, 62 S. Ct. 1110, 86 L. Ed. 1655 (1942) ("[m]arriage and procreation are fundamental to the very existence and survival of the race"); see also *Dean* v. *District of Columbia*, 653 A.2d 307, 332–33 (D.C. 1995) (Ferren, J., concurring in part and dissenting in part); *Andersen* v. *King County*, supra, 158 Wash. 2d 30. To remove the procreative link from marriage, "which long predates the constitutions of this country and [s]tate . . . would, to a certain extent, extract some of the deep . . . root[s] that support its elevation to a fundamental right." (Citation omitted; internal quotation marks omitted.) *Samuels* v. *Dept. of Health*, 29 App. Div. 3d 9, 15, 811 N.Y.S.2d 136 (2006).

Thus, the United States Supreme Court and many of our sister state courts have recognized that traditional marriage serves two separate but closely related functions, both deriving from the capacity of a couple comprised of one man and one woman to propagate children. First, in order to advance society's interest in the survival of the human race, the institution of marriage honors and privileges the only sexual relationship—that between one man and one woman—that can result in the birth of a child.[8] Second, in order to protect the offspring of that relationship and to ensure that society is not unduly burdened by irresponsible procreation, marriage imposes obligations on the couple to

[8] The plaintiffs argue that the states are precluded from recognizing a privileged status for heterosexual conduct by virtue of the United States Supreme Court's decision in *Lawrence* v. *Texas*, 539 U.S. 558, 578, 123 S. Ct. 2472, 156 L. Ed. 2d 508 (2003), in which the court concluded that a state constitutionally cannot criminalize homosexual conduct between two consenting adults. The plaintiffs' reading of *Lawrence* is overly broad. The fact that states constitutionally cannot criminalize private sexual conduct between two consenting adults does not mean that they are precluded from promoting the public interest in responsible procreation.

care for each other and for any resulting children. See *Standhardt* v. *Superior Court*, supra, 206 Ariz. 286 ("by legally sanctioning a heterosexual relationship through marriage, thereby imposing both obligations and benefits on the couple and inserting the [s]tate in the relationship, the [s]tate communicates to parents and prospective parents that their long-term, committed relationships are *uniquely* important as a public concern" [emphasis added]); *Lewis* v. *Harris*, supra, 378 N.J. Super. 197 (Parrillo, J., concurring) ("[p]rocreative heterosexual intercourse is and has been historically through all times and cultures an important feature of [the] privileged status [of marriage], and that characteristic is a fundamental originating reason why the [s]tate privileges marriage").

It is obvious to me, therefore, that limiting the institution of marriage to one man and one woman does not create a classification based on sexual orientation. Rather, the limitation creates a classification based on a couple's ability to engage in sexual conduct of a type that may result in the birth of a child. See *Morrison* v. *Sadler*, supra, 821 N.E.2d 25 (legislative classification created by marriage laws is based on "a clearly identifiable, inherent characteristic that distinguishes the two classes: the ability or inability to procreate by 'natural' means"); *Hernandez* v. *Robles*, supra, 7 N.Y.3d 376 (Graffeo, J., concurring) ("[T]he statutory scheme [does not] create a classification based on sexual orientation. . . . [Rather], the marriage laws create a classification that distinguishes between opposite-sex and same-sex couples . . . ."); *Andersen* v. *King County*, supra, 158 Wash. 2d 65 (law limiting marriage to marriage between one man and one woman "does not distinguish between persons of heterosexual orientation and homosexual orientation"); see also *Goodridge* v. *Dept. of Public Health*, supra, 440 Mass. 380 (Cordy, J., dissenting) ("[t]he classification is not drawn between men and

women or between heterosexuals and homosexuals, any of whom can obtain a license to marry a member of the opposite sex; rather, it is drawn between same-sex couples and opposite-sex couples").

It also is obvious that a couple that is incapable of engaging in the type of sexual conduct that can result in children is not similarly situated to a couple that is capable of engaging in such conduct with respect to legislation that is intended to privilege and regulate that conduct. Cf. *Michael M.* v. *Superior Court*, 450 U.S. 464, 469, 101 S. Ct. 1200, 67 L. Ed. 2d 437 (1981) (although classifications based on gender are subject to heightened scrutiny, United States Supreme Court "has consistently upheld statutes [when] the gender classification is not invidious, but rather realistically reflects the fact that the sexes are not similarly situated in certain circumstances"); id., 471 (state had sufficiently strong justification to criminalize sex with underage females, but not with underage males, because "young men and young women are not similarly situated with respect to the problems and the risks of sexual intercourse").[9] I fully agree with the majority that same sex

[9] In addition, see *Rostker* v. *Goldberg*, 453 U.S. 57, 79, 101 S. Ct. 2646, 69 L. Ed. 2d 478 (1981) (requirement that men, but not women, register for draft did not create invidious gender classification "but rather realistically reflects the fact that the sexes are not similarly situated" [internal quotation marks omitted]); *Ramos* v. *Vernon*, 353 F.3d 171, 179 (2d Cir. 2003) ("in the context of the class-based equal protection framework, the [United States Supreme] Court has explicitly repudiated complete blindness with regard to gender-based laws, reasoning that, although such laws elicit some suspicion, the physical differences between the sexes are relevant and enduring"); *McNamara* v. *Lantz*, United States District Court, Docket No. 3:06-CV-93 (D. Conn. September 16, 2008) (male inmate is not similarly situated to female inmates for purposes of prison's medical protocol of providing methadone to female inmates but not male inmates because he cannot become pregnant); *J&B Social Club #1, Inc.* v. *Mobile*, 966 F. Sup. 1131, 1139 (S.D. Ala. 1996) (men and women are not similarly situated with respect to prohibition on topless dancing); *Betts* v. *McCaughtry*, 827 F. Sup. 1400, 1405–1406 (W.D. Wis. 1993) (because equal protection clause does not prevent different treatment of men and women when their situations are different in fact, prison rules that accorded certain privileges to female inmates but not to

couples and opposite sex couples are similar in many respects. Specifically, I agree that gay *individuals* are as capable of contributing to society, as desirous and capable of entering into loving and committed relationships with each other and as capable of caring for children as heterosexual persons. For purposes of an equal protection analysis, however, groups that are treated differently by a statute are not similarly situated unless they "are in *all* relevant respects alike." (Emphasis added.) *Nordlinger* v. *Hahn*, 505 U.S. 1, 10, 112 S. Ct. 2326, 120 L. Ed. 2d 1 (1992). The fact that same sex couples cannot engage in sexual conduct of a type that can result in the birth of a child is a critical difference in this context.[10]

male inmates were not unconstitutional), aff'd, 19 F.3d 21 (7th Cir. 1994); *Jane L.* v. *Bangerter*, 794 F. Sup. 1537, 1549 (D. Utah 1992) (sexes are not biologically similarly situated with respect to abortion statutes); *State* v. *Wright*, 349 S.C. 310, 313, 563 S.E.2d 311 (2002) ("[a] law will be upheld [when] the gender classification realistically reflects the fact that the sexes are not similarly situated in certain circumstances").

[10] Contrary to the majority's assertion that, "[a]lthough it may be argued that the state's interest in regulating procreative conduct constitutes a rational basis for limiting marriage to opposite sex couples . . . that rationale does not answer the entirely different question of whether same sex and opposite sex couples are similarly situated"; footnote 19 of the majority opinion; the purpose of the marriage statutes is dispositive of the question of whether same sex couples are similarly situated to opposite sex couples. See part III of the majority opinion ("[t]he similarly situated inquiry focuses on whether the [plaintiff is] similarly situated to another group *for purposes of the challenged government action*" [emphasis added; internal quotation marks omitted]). Courts do not make a generalized determination that classes are similarly situated with respect to *all* state action, regardless of its purpose. Compare *Michael M.* v. *Superior Court*, supra, 450 U.S. 469 (men and women are not similarly situated with respect to legislation intended to reduce risk of teenage pregnancy) with *United States* v. *Virginia*, 518 U.S. 515, 545, 546–54, 116 S. Ct. 2264, 135 L. Ed. 2d 735 (1996) (women and men are similarly situated with respect to state's provision of " 'citizen-soldier' " training when some women are qualified for such training). As I discuss more fully in the text of this opinion, the majority's belief that the ability of a couple to conceive children is an insignificant distinction in the marriage context simply begs the central question in this case by *assuming* that the essence of marriage is a loving and committed relationship. That assumption is unfounded.

In reaching a contrary conclusion, the majority apparently relies on the notion that the *disparate impact* of the marriage laws on gay persons who wish to enter into marriage creates a classification on the basis of sexual orientation. It is well settled, however, that the constitutional guarantee of equal protection is implicated only when "a state legislatur[e] . . . selected or reaffirmed a particular course of action *at least in part because of, not merely in spite of,* its adverse effects [on] an identifiable group."[11] (Emphasis added; internal

I recognize that no court expressly has held that same sex couples are not similarly situated to opposite sex couples in this context. As I have indicated in the text of this opinion, however, the majority of courts that have considered the issue have concluded that promoting and regulating procreation is the central concern of marriage. See, e.g., *Citizens for Equal Protection* v. *Bruning,* supra, 455 F.3d 867; *Standhardt* v. *Superior Court,* supra, 206 Ariz. 287; *Morrison* v. *Sadler,* supra, 821 N.E.2d 25; *Conaway* v. *Deane,* supra, 401 Md. 299–300; *Baker* v. *Nelson,* supra, 291 Minn. 312; *Lewis* v. *Harris,* supra, 378 N.J. Super. 185; *Andersen* v. *King County,* supra, 158 Wash. 2d 37. The sole basis for the majority's disagreement with my conclusion that same sex couples and opposite sex couples are not similarly situated in this context is its belief that that procreation does not "[define] the institution of marriage"; footnote 19 of the majority opinion; although it concedes that "procreative conduct plays an important role in many marriages . . . ." Id. Thus, the majority implicitly concedes that, if promoting and regulating procreation *were* the purpose of marriage, then same sex couples and opposite sex couples would *not* be similarly situated. It is clear, therefore, that my conclusion is squarely supported by these cases.

[11] The majority states that "this state's bar against same sex marriage *effectively* precludes gay persons from marrying"; (emphasis in original) footnote 24 of the majority opinion; and that "[i]f . . . the intended *effect* of a law is to treat politically unpopular or historically disfavored minorities differently than persons in the majority or favored class . . . the very existence of the classification gives credence to the perception that separate treatment is warranted for the same illegitimate reasons that gave rise to the past discrimination in the first place." (Citations omitted; emphasis added.) Part I of the majority opinion. The fact that gay persons have been subject to discriminatory conduct in some contexts does not prove, or even imply, however, that same sex couples have been barred from marriage *because* they are gay. Indeed, gay *individuals* never have been barred from marriage. Moreover, the existence of a classification based on the ability of a couple to engage in the type of sexual conduct that can result in the birth of a child cannot give credence to the notion that another, invidious classification, i.e., one based on sexual orientation, is justified.

quotation marks omitted.) *Personnel Administrator* v. *Feeney*, supra, 442 U.S. 279; see also *Harris* v. *McRae*, 448 U.S. 297, 324 n.26, 100 S. Ct. 2671, 65 L. Ed. 2d 784 (1980) (constitutional equal protection principles prohibit "only purposeful discrimination . . . and when a facially neutral . . . statute is challenged on equal protection grounds, it is incumbent [on] the challenger to prove that [the legislature] selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects [on] an identifiable group" [citation omitted; internal quotation marks omitted]); *Pasquariello* v. *Stop & Shop Cos.*, 281 Conn. 656, 673, 916 A.2d 803 (2007) ("[d]isparate impact . . . is only a starting point in analyzing an equal protection claim"). Even if the existence of a history of societal disapproval of homosexual conduct is assumed, the majority has not pointed, and cannot

I agree with the majority, of course, that our civil union law, like our preexisting marriage laws, "purposefully and intentionally distinguishes between same sex and opposite sex couples." Footnote 24 of the majority opinion. Unlike the majority, however, I have explained the reasons why the laws draw this distinction. Those reasons have nothing to do with intentional discrimination against the class of gay individuals.

The reasoning of the court in *In re Marriage Cases*, 43 Cal. 4th 757, 839–40, 183 P.3d 384, 76 Cal. Rptr. 3d 683 (2008), in support of its conclusion to the contrary is entirely conclusory. Like the majority in the present case, the California court confuses an incidental effect of the marriage laws with their purpose. There simply is no evidence that the institution of marriage ever was *intended* to affect gay persons in any manner whatsoever. Indeed, the majority summarizes the California case by stating that "this state's bar against same sex marriage *effectively* precludes gay persons from marrying." (Emphasis in original.) Footnote 24 of the majority opinion.

The majority appears to suggest that this court's statement in *State* v. *Long*, 268 Conn. 508, 847 A.2d 862, cert. denied, 543 U.S. 969, 125 S. Ct. 424, 160 L. Ed. 2d 340 (2004), that, "[t]o implicate the equal protection [clause] . . . it is necessary that the state statute [or statutory scheme] in question, *either on its face or in practice*, treat persons standing in the same relation to it differently"; (emphasis added; internal quotation marks omitted) id., 534; means that a person challenging the statute is not required to prove discriminatory intent. See part IV of the majority opinion. To the contrary, the emphasized language merely distinguishes facial equal protection challenges from as applied challenges. It does not dispense with the intent requirement.

point, to any evidence that the driving force behind the development of traditional marriage between one man and one woman has been irrational, discriminatory animus toward gay persons.[12] Indeed, even the laws criminalizing homosexual conduct were not originally driven by such animus. See, e.g., *Lawrence* v. *Texas*, 539 U.S. 558, 568, 123 S. Ct. 2472, 156 L. Ed. 2d 508 (2003) ("early American sodomy laws were not directed at homosexuals as such but instead sought to prohibit nonprocreative sexual activity more generally"); id., 570 ("American laws targeting same-sex couples did not develop until the last third of the [twentieth] century"). It is also worth noting that even societies in which homosexual conduct was the norm and was well accepted have not recognized same sex marriage.[13] See

---

[12] To the extent that the majority suggests that anyone who opposes same sex marriage must harbor animus toward gay persons—an impression conveyed by the prevailing tone of the majority opinion—I strongly disagree. For all of the reasons set forth in this opinion, persons of good will can disagree about this matter of great public importance. To suggest otherwise is unwarranted.

The majority denies suggesting that opposition to same sex marriage can only be driven by animus toward gay persons. The primary basis for its decision, however, is its conclusion that that the intent of the marriage laws is "to treat [a] politically unpopular [and] historically disfavored [minority] differently" for "illegitimate reasons . . . ." Part I of the majority opinion. The majority also suggests that all state and federal legislation that classifies on the basis of an individual's sexual conduct or orientation is driven by discriminatory animus toward gay persons and is designed to "undermine the legitimacy of homosexual relationships, to perpetuate feelings of personal inferiority and inadequacy among gay persons, and to diminish the effect of the laws barring discrimination against gay persons." Part V D 2 of the majority opinion. Finally, the majority suggests that naked legislative preference for opposite sex couples, moral disapproval of same sex couples and private biases against homosexuality are the primary justifications for limiting marriage to one man and one woman. If, contrary to the import of these statements, the majority believes that persons of good will sincerely can believe that there are legitimate reasons for limiting marriage to one man and one woman, it should identify those reasons and take them into account in its analysis.

[13] There are a few exceptional examples of same sex marriage in ancient times. See K. Young & P. Nathanson, "Marriage á la mode: Answering the Advocates of Gay Marriage" (2003) ("[a]s for Nero and Elgabalus, Roman

generally M. Nussbaum, "Platonic Love and Colorado Law: The Relevance of Ancient Greek Norms to Modern Sexual Controversies," 80 Va. L. Rev. 1515 (1994). The absence of any evidence of intentional discrimination, in and of itself, is fatal to the plaintiffs' equal protection claim. See, e.g., *Harris* v. *McRae*, supra, 324 n.26.

Having concluded without any basis that the marriage laws classify on the basis of sexual orientation, the majority then concludes that same sex couples are similarly situated to opposite sex couples with respect to the marriage laws because gay persons "share the same interest in a committed and loving relationship as heterosexual persons who wish to marry." The majority, however, makes no attempt to explain why the state ever would have had an interest in promoting or regulating committed and loving relationships that have no potential to result in the birth of a child. It simply assumes that loving commitment between two adults is the essence of marriage, even though the essence of marriage is the very question at the heart of this case.[14]

emperors, they married men but in a context—Rome's degenerate aristocracy in which murder was rampant and even a horse could be made a senator—that few people today, gay or straight, would find edifying"), available at http://www.marriageinstitute.ca/images/mmode.pdf.

[14] The majority also ignores the fact that, if consensual, loving commitment among adults is the essence of marriage, then the state has no basis for prohibiting polygamous marriage. The duality of traditional marriage derives from the duality of the sexes. If marriage is genderless, then there is no reason—other than the pure "tradition" argument that the majority already has rejected—why any combination of loving, committed, adult men and women should not be allowed to get married.

The plaintiffs contend that this argument is baseless because, unlike the redefinition of marriage to include same sex couples, allowing more than two persons to marry "would require a complete restructuring of the laws of civil marriage. The state would not be able to determine under existing laws which spouse would make decisions in the event of incapacity, who would inherit in the event of intestacy, and how custody, visitation, child support, and tax matters would be handled." If marriage is a fundamental right, however, and the essence of marriage is a loving, committed relationship among adults, then an adult has a fundamental right to enter into a loving, committed relationship with other adults. The objections that the plaintiffs raise to polygamous marriage could readily be addressed by

The majority then compounds this question begging methodology by suggesting that "preserving the institution of marriage as a union between a man and a woman is the overriding reason why same sex couples have been barred from marrying in this state."[15] In other

agreement among the parties to a polygamous marriage, by litigation or by minor changes to our statutes, similar to those required to accommodate same sex marriage. Surely, the need for such minor changes would not constitute a sufficiently compelling reason to defeat a fundamental right.

[15] The majority states that "[t]his conclusion is amply supported by the legislative history of the civil union law" and cites the remarks of Representative Robert M. Ward during debate on that legislation. Footnote 80 of the majority opinion, citing 48 H.R. Proc., Pt. 7, 2005 Sess., p. 2002. Contrary to the majority's suggestion, however, Representative Ward did not indicate that there were no good *reasons* for preserving traditional marriage. Rather, he indicated that the civil union law extended rights to same sex couples in a way that was consistent with his constituents' views "of what marriage is"; 48 H.R. Proc., supra, p. 2002, remarks of Representative Ward; i.e., an institution designed to privilege and regulate the type of sexual conduct that can result in the birth of a child. In any event, the institution of traditional marriage long predates the civil union law. Even if the majority's interpretation of Representative Ward's remarks were correct, I do not believe that the statements of a single state legislator in 2005 should provide the sole basis for determining the fundamental purpose of a basic civil institution that has existed in innumerable societies over millennia.

The majority also states that "the defendants expressly have disavowed any claim that the legislative decision to create a separate legal framework for committed same sex couples was motivated by the belief that the preservation of marriage as a heterosexual institution is in the best interests of children, or that prohibiting same sex couples from marrying promotes responsible heterosexual procreation . . . ." Part VII of the majority opinion. Accordingly, the majority concludes that it need not address the *only* argument that other courts have found to be persuasive in determining that limiting marriage to one man and one woman is not unconstitutional. As the majority is aware, however, several amici, including the Family Institute of Connecticut (institute), have raised this argument, and there is nothing to prevent this court from considering it. See *Lewis* v. *Harris*, supra, 378 N.J. Super. 185 n.2 (when attorney general disclaimed reliance on promotion of procreation and creating optimal environment for raising children as justifications for limiting marriage to opposite sex couples, court was entitled to consider those arguments when raised by amici, and found them to be dispositive); see also id. ("amicus is not at liberty to inject new issues in a proceeding . . . [but] is not confined solely to arguing the parties' theories in support of a particular issue" [internal quotation marks omitted]). As the majority also is aware, at oral argument before this court on the institute's appeal from the trial court's denial of its motion to intervene in this case; see generally *Kerrigan* v. *Commissioner of Public Health*, 279 Conn. 447,

words, the majority purports to believe that the primary justification for limiting marriage to one man and one woman is that "marriage is heterosexual because it just is . . . ." (Internal quotation marks omitted.) *Conaway* v. *Deane*, supra, 401 Md. 427 (Bell, C. J., dissenting). Thus, the majority simply assumes at the outset of its analysis the answer to the central question in the case and then declines even to address the *only* argument— that marriage was intended to privilege and regulate sexual conduct that may result in the birth of a child— that any court ever has found to be persuasive in determining that that answer is incorrect. For the reasons that I have stated, I cannot agree.

## III

Because I would conclude that the plaintiffs cannot prevail on their equal protection claim, I must address their substantive due process claim under article first,

904 A.2d 137 (2006); the institute argued vigorously that intervention was necessary because the attorney general had indicated that he would not defend the institution of traditional marriage on the ground that it advanced the state's compelling interest in promoting responsible procreation and child rearing. See id., 451–52. The institute also noted that, if it was not allowed to raise this argument as a party, this court could deem the argument waived in any appeal from the trial court's decision on the merits. In response to this argument, members of this court indicated that, if the attorney general failed to argue that there was a rational basis for traditional marriage, he would not be adequately representing the state's interests, and expressed some skepticism that that would be the case. This court also questioned the institute about the substance of the arguments that it had made in the amicus brief that it had submitted to the trial court and expressed reservations as to whether the institute's intervention as a party was required when the institute was participating in the case as an amicus curiae. This court subsequently affirmed the trial court's denial of the institute's motion to intervene because "the trial court reasonably could have determined that the institute's interest in defending the constitutionality of the [civil union law] would be adequately represented by the attorney general, whose defense of state statutes is 'presumed' to be adequate"; id., 462; and because "the record demonstrate[d] that the institute ha[d] filed an extensive amicus brief that contain[ed] ample references to . . . scientific studies [concerning children raised without both a mother and a father]." Id., 464. In light of this history, I believe that it is unseemly, to say the least, for the majority to decline even to address the arguments raised by the amici.

§§ 8 and 10, of the Connecticut constitution.[16] The plaintiffs contend that two consenting, unrelated adults have a fundamental right to marry regardless of their respective sexes. I disagree. I further conclude that there is a rational basis for limiting marriage to one man and one woman.

## A

I first address the plaintiffs' claim that any two consenting, unrelated adults have a fundamental right to marry regardless of their respective sexes. "Our substantive due process case law under the state constitution . . . clearly establishes that certain fundamental rights are protected." *Ramos* v. *Vernon*, 254 Conn. 799, 835 n.31, 761 A.2d 705 (2000). Under the federal constitution, "the due process clause protects those fundamental rights and liberties which are, objectively, deeply rooted in this [n]ation's history and tradition . . . and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed . . . . Our [n]ation's history, legal traditions, and practices thus provide the crucial guideposts for responsible decisionmaking . . . that direct and restrain our exposition of the [d]ue [p]rocess [c]lause." (Internal quotation marks omitted.) *Hammond* v. *Commissioner of Correction*, 259 Conn. 855, 888–89, 792 A.2d 774 (2002). The plaintiffs do not claim that a different test should apply under the state constitution. When state action affects a fundamental right, it is subject to strict scrutiny. E.g., *Rayhall* v. *Akim Co.*, 263 Conn. 328, 342, 819 A.2d 803 (2003).

As I have indicated, the right of one man and one woman to marry has been recognized as a fundamental right under the federal constitution. See *Zablocki* v. *Redhail*, supra, 434 U.S. 384; *Loving* v. *Virginia*, supra,

---

[16] See footnotes 3 and 4 of the majority opinion for the relevant text of these provisions.

388 U.S. 12; *Skinner* v. *Oklahoma ex rel. Williamson,* supra, 316 U.S. 541. As I also have indicated, the link between marriage and procreation forms the basis of that fundamental right. For this reason, and for the reasons cogently set forth in Justice Borden's dissenting opinion, it is clear to me that the fundamental right to marry is limited to couples comprised of one man and one woman.[17] There simply is no deeply rooted history, tradition or practice of same sex marriage, or of marriage defined as a loving, committed relationship, in this nation or in this state.

Indeed, to the contrary, the relationship between men and women and the procreative potential of that relationship were the defining concerns of marriage long before the social compact that is our state constitution came into existence. The preamble to our state constitution provides in relevant part: "The People of Connecticut . . . do, *in order more effectually to define, secure, and perpetuate the liberties, rights and privileges which they have derived from their ancestors*; hereby, after a careful consideration and revision, ordain and establish the . . . constitution and form of civil government."[18] (Emphasis added.) Thus, the express and

---

[17] The majority purports *not to reach the plaintiffs' claim that they have* a fundamental right to marry. It is difficult, however, to see how that could be the case. The majority concludes that the plaintiffs are entitled to enter into *precisely the same* institution of marriage as that entered into by opposite sex couples. Marriage either is a fundamental civil right or it is not; it cannot have both characteristics at the same time. Because marriage indisputably is a fundamental civil right for opposite sex couples, the majority must believe that it is a fundamental civil right for same sex couples. Any such right can only be based on a loving, committed relationship between consenting adults. It is uncontroverted, however, that, up to now, marriage has been a fundamental right under the constitution because of its link to procreation. See *Zablocki* v. *Redhail,* supra, 434 U.S. 386; *Skinner* v. *Oklahoma ex rel. Williamson,* supra, 316 U.S. 541. Thus, the majority must believe that there are *two* fundamental rights to marriage. If that is the case, however, then the participants in the two different fundamental rights are not similarly situated.

[18] See *State* v. *Ross,* 230 Conn. 183, 289, 646 A.2d 1318 (1994) (*Berdon, J.,* dissenting in part) ("[t]he preamble of the constitution makes clear that

fundamental purpose of this social compact is to guarantee the right of the people to preserve their basic institutions, traditions and beliefs, assuming, of course, that they do not intrude on other constitutionally protected rights in doing so. As I have indicated, I am quite certain that preserving the institution of traditional marriage between one man and one woman does no such thing. Accordingly, although the deeply rooted and rationally based cultural preference for traditional marriage, and the institution's attendant liberties, rights and privileges, may be subject to change in light of new information and experiences, any such change is emphatically not for this court but is quintessentially a matter to be decided by the people through the democratic process.[19] "The virtue of a democratic system . . . is that it readily enables the people, over time, to be persuaded that what they took for granted is not so,

---

*it reserves to the people* 'the liberties, rights and privileges which they have derived from their ancestors' " [emphasis added; internal quotation marks omitted]), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995); see also Conn. Const., art. I, preface (declaration of rights is made so "[t]hat the great and essential principles of . . . *free government* may be recognized and established" [emphasis added]); Conn. Const., art. I, § 2 ("[a]ll political power is inherent in the people, and all free governments are founded on their authority, and instituted for their benefit").

[19] It is arguable that the preamble to the state constitution protects the institution of marriage in the form that it existed at the time that the constitution was adopted, i.e., an institution designed to privilege and regulate procreation, and that the legislature would be barred from redefining it in such a way that it would no longer serve that basic and compelling public interest. Cf. *Evans* v. *General Motors Corp.*, 277 Conn. 496, 509, 893 A.2d 371 (2006) (article first, § 19, of state constitution consistently has been construed to mean that if there was right to trial by jury at time of adoption of provision, then that right remains intact); *Gentile* v. *Altermatt*, 169 Conn. 267, 286–87, 363 A.2d 1 (1975) (article first, § 10, of state constitution deprives legislature of authority to abolish legal right existing at common law prior to 1818 unless legislature simultaneously establishes reasonable alternative to enforcement of that right), appeal dismissed, 423 U.S. 1041, 96 S. Ct. 763, 46 L. Ed. 2d 631 (1976); see also J. Root, supra, 1 Root (Conn.) xxvii (under Connecticut law at time that state constitution was adopted, marriage constituted joining of one man and one woman for purpose of propagating, and preserving and educating offspring). It is beyond dispute, however, that this court is barred from doing so.

and to change their laws accordingly. That system is destroyed if the smug assurances of each age are removed from the democratic process and written into the [c]onstitution." *United States* v. *Virginia,* 518 U.S. 515, 567, 116 S. Ct. 2264, 135 L. Ed. 2d 735 (1996) (Scalia, J., dissenting).

## B

Having concluded that there is no fundamental right to same sex marriage, I next must determine whether there is a rational basis for the laws limiting marriage to one man and one woman. See, e.g., *Ramos* v. *Vernon,* supra, 254 Conn. 840–41 (rational basis review applies to substantive due process claims that do not implicate fundamental rights). "In determining whether the challenged classification is rationally related to a legitimate public interest . . . [t]he test . . . is whether this court can conceive of a rational basis for sustaining the legislation; we need not have evidence that the legislature actually acted [on] that basis. . . . Further, the [e]qual [p]rotection [c]lause does not demand for purposes of rational-basis review that a legislature or governing decisionmaker actually articulate at any time the purpose or rationale supporting its classification. . . . Rational basis review is satisfied [as] long as there is a plausible policy reason for the classification . . . . [I]t is irrelevant whether the conceivable basis for the challenged distinction actually motivated the legislature. . . . To succeed, the party challenging the legislation must negative every conceivable basis which might support it . . . ." (Citation omitted; internal quotation marks omitted.) *Contractor's Supply of Waterbury, LLC* v. *Commissioner of Environmental Protection,* 283 Conn. 86, 93, 925 A.2d 1071 (2007).

In my view, the state's interests in promoting and regulating procreative conduct are legitimate. Indeed, they are compelling. I further believe that limiting marriage to one man and one woman is rationally related

to the advancement of those interests. First, the state rationally could conclude that "[t]he power of biological ties means that heterosexual families are most likely to achieve stability and successfully perform the child-rearing function." A. Wax, "The Conservative's Dilemma: Traditional Institutions, Social Change, and Same-Sex Marriage," 42 San Diego L. Rev. 1059, 1077 (2005). Second, and relatedly, the state rationally could conclude that children do best when they are raised by a mother and a father, a belief that finds great support in life experience and common sense.[20] See K. Young & P. Nathanson, "Marriage á la mode: Answering the Advocates of Gay Marriage" (2003), available at http://www.marriageinstitute.ca/images/mmode.pdf.[21]     This

[20] There is strong evidence that the state increasingly has recognized the harm caused by the breakdown of the traditional family and a child's need for both a mother and a father. In 1999, the state enacted the " 'Fatherhood Initiative' " to "promote the positive involvement and interaction of fathers with their children . . . ." Public Acts 1999, No. 99-193, § 1. The objectives of the initiative are to: "(1) [p]romote public education concerning the financial and emotional responsibilities of fatherhood; (2) assist men in preparation for the legal, financial and emotional responsibilities of fatherhood; (3) promote the establishment of paternity at childbirth; (4) encourage fathers, regardless of marital status, to foster their emotional connection to and financial support of their children; (5) establish support mechanisms for fathers in their relationship with their children, regardless of their marital and financial status; and (6) integrate state and local services available for families." Id. In June, 2008, James Amann, the speaker of the Connecticut House of Representatives, announced that he had formed a twelve member task force to study the growing problem of children growing up without fathers. See C. Stuart, "Lawmakers to Study Fatherlessness" (June 26, 2008), available at http://www.ctnewsjunkie.com/state_capitol/lawmakers_to_study_fatherlessn.php. As the result of recent research, "[t]he vital influence of a loving father on a child and family is increasingly undeniable." R. Rohner, Editorial, "What Fathers Mean for Kids," Hartford Courant, August 4, 2008, p. A13.

[21] "One thing that [children] surely require is at least one parent of each sex. . . . [This] is because the sexes are not quite interchangeable. Though much more similar than dissimilar, both sexes are distinctive. Boys cannot learn how to become healthy men from even the most loving mother (or pair of mothers) alone. And girls cannot learn how to become healthy women from even the most loving father (or pair of fathers) alone." K. Young & P. Nathanson, supra.

belief does not denigrate the parenting abilities of same sex couples but merely recognizes that a high level of individual parenting ability is no substitute for having *both* a mother and a father. Third, the benefits and social status associated with traditional marriage encourage men and women to enter into a state, namely, long-term, mutually supported cohabitation, that is conducive both to procreation and responsible child rearing on the part of the biological parents.[22] I acknowledge that these rationales, although supported by experience and common sense, are fact based and are open to debate. The burden is on the plaintiffs, however, to establish why none of these reasons provides a conceivable basis for the deeply rooted societal preference for families with a mother and a father.

The plaintiffs rely on several sociological studies that have concluded that "children of same sex parents are

---

[22] "Because heterosexuality is directly related to both reproduction and survival [of the species], and because it involves much more than copulation, every human society has had to promote it actively (although some have also allowed homosexuality in specific circumstances). And marriage is the major way of doing so. It has always required a massive cultural effort involving myths or theologies, rituals, rewards, privileges, and so on. Heterosexuality is always fostered as a cultural norm, in other words, not merely allowed as one 'lifestyle choice' among many. Some norms vary greatly from one society to another, to be sure, but others—along with the very existence of norms—are universal. So deeply embedded in consciousness are these that few people are actually aware of them. The result, in any case, is a 'privileged' status for heterosexuality. Postmodernists are not wrong in identifying it as such, but they are wrong in assuming that any society can do without it. . . .

"Its universal features include the fact that marriage . . . encourages procreation under specific conditions . . . recognizes the interdependence of men and women . . . and . . . provides mutual support not only between men and women but also between them and children. Its nearly universal features [include] . . . an emphasis on durable relationships between biological parents . . . . These features assume the distinctive contributions of both sexes, transmit knowledge from one generation to another, and create not only 'vertical' links between the generations but also 'horizontal' ones between allied families or communities." (Internal quotation marks omitted.) K. Young & P. Nathanson, *supra*.

as healthy, happy and well adjusted, and fare as well on all measures of development, as their peers." These studies, however, are far from conclusive.[23] Moreover, "[t]he story of the controversy surrounding out-of-wedlock childbearing . . . illustrates the point that knowledge often comes too late. There is a necessary lag between the instigation of a social change and the generation of persuasive evidence on its ultimate effects." A. Wax, supra, 42 San Diego L. Rev. 1087. Thus, it is entirely reasonable for the state to be cautious about implementing genderless marriage, the long-term effects of which cannot be known beforehand with any degree of certainty.

The plaintiffs also contend that procreation has "[n]ever" been the purpose of marriage. (Emphasis added.) In support of this startling claim, the plaintiffs note that opposite sex couples who choose not to procreate or who are incapable of procreating are not and never have been prohibited from marrying. Even if the institution of marriage is overinclusive, however, "[a] [s]tate does not violate the [e]qual [p]rotection [c]lause merely because the classifications made by its laws are imperfect. If the classification has some reasonable basis, it does not offend the [c]onstitution simply because the classification is not made with mathematical nicety or because in practice it results in some inequality. . . . The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, [though] it may be, and unscientific." (Citation omitted; internal quotation

---

[23] For example, in one of the studies on which the plaintiffs rely, the authors stated that "[t]he small and nonrepresentative samples studied and the relatively young age of most of the children suggest some reserve" and that "[r]esearch exploring the diversity of parental relationships among gay and lesbian parents is just beginning." E. Perrin & Committee on Psychosocial Aspects of Child and Family Health, "Technical Report: Coparent or Second-Parent Adoption by Same-Sex Parents," 109 Pediatrics 341, 343 (2002).

marks omitted.) *Dallas* v. *Stanglin*, 490 U.S. 19, 26–27, 109 S. Ct. 1591, 104 L. Ed. 2d 18 (1989); see also *Vance* v. *Bradley*, 440 U.S. 93, 108, 99 S. Ct. 939, 59 L. Ed. 2d 171 (1979) ("[e]ven if the classification involved . . . is to some extent . . . overinclusive, and hence the line drawn by [the legislature] imperfect, it is nevertheless the rule that . . . perfection is by no means required" [internal quotation marks omitted]).

I also would note that married couples who choose not to procreate can change their minds. In addition, until very recently, the nature and causes of infertility were not well understood and it was impossible to predict with certainty whether a marriage that appeared to be barren ultimately would prove to be so. Under such circumstances, the requirement that a married couple consist of one man and one woman *was* the requirement that the couple be able to procreate.[24] In any event, requiring proof of intent and ability to procreate prior to—and, presumably, during the course of—marriage would entangle the state in procedures that are grossly intrusive, ever-changing and counterproductive. "Marriage's social role does not rest on any ironclad, exceptionless demand that all couples actually achieve the optimum arrangement. Nor does the channeling function require the elimination of all relationships that fall short of the ideal [of procreative marriage]. After all, adhering to an airtight rule [that a

---

[24] In this regard, I would point out that couples never have been required to prove that they are in a loving relationship before being allowed to marry. Moreover, commitment is increasingly considered optional. That has not stopped the plaintiffs from claiming, and the majority from concluding, that loving commitment is the essence of marriage.

I recognize that, at least in more modern times, society has considered love between a man and a woman to be a sufficient justification for marriage. This does not mean, however, that the *state* has any particular interest in promoting romantic love, in and of itself. Rather, if the state has any interest in promoting love, it is only because love is instrumental to the sexual conduct and long-term commitment that are required to propagate and raise children.

couple must be willing and able to procreate in order to marry] would itself entail costs and intrusions. Such adherence would fail to accommodate the untidy, unpredictable nature of male-female relationships and the imperfect state of knowledge that prevents infallible prediction about biological functioning." A. Wax, supra, 42 San Diego L. Rev. 1078–79.

The plaintiffs further claim that a state policy based on a belief that marriage between one man and one woman promotes responsible procreation is precluded both by the civil union law, General Statutes § 46b-38aa et seq., and by General Statutes § 45a-727a (3), which provides that, for purposes of adoption, "[t]he best interests of a child are promoted when the child is part of a loving, supportive and stable family, whether that family is a nuclear, extended, split, blended, single parent, adoptive or foster family . . . ." Specifically, the plaintiffs contend that, because "the civil union law provides the same state based legal protections and obligations with respect to children for same sex couples as for married couples," and because § 45a-727a (3) evinces "a legislative policy that family configuration is not a relevant factor in determining the best interests of children . . . any proffered issue related to the welfare of children must be legally irrelevant as a reason that the state denies marriage to same sex couples." I am not persuaded. I see no reason why the state rationally could not continue to promote the *public's* vital interest in responsible procreation by limiting marriage to opposite sex couples while enacting a civil union law in recognition of the legitimate interests *of same sex couples.*[25] In other words, the state reasonably could

[25] The United States Supreme Court has recognized that the "distinctive elements [of marriage] . . . rob it of most of its characteristics as a contract, and leave it simply as a *status* or institution. As such, it is not so much the result of private agreement, as of public ordination. In every enlightened government, it is preeminently the basis of civil institutions, and thus an object of the deepest public concern. In this light, marriage is more than a contract. It is not a mere matter of pecuniary consideration. It is a great

believe that limiting marriage to a man and a woman accomplishes vital social goods, while the institution of civil union promotes the legitimate interests of those who enter into it. Recognition of the latter private interests does not necessarily entail abandonment of the former public interests.

With respect to the adoption laws, the legislative history of § 45a-727a (3) indicates that the statute was intended to address the situation in which "a person already sharing parental responsibility for a child [is prevented] from adopting a child even when absolutely everyone involved agrees that such an adoption would be in the best interest of the child." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 9, 2000 Sess., p. 2773, testimony of Reverend Mark Santucci; see also id., p. 2864, testimony of Representative Patrick Flaherty ("[t]he bill makes it possible for a child who has one parent to be adopted by a second person who shares parental responsibilities for that child").[26] The state reasonably could recognize that "[t]he best interests of a child are promoted when the child is part of a loving, supportive and stable family"; General Statutes § 45a-727a (3); regardless of the sex of the child's statutory and adoptive parents, while rationally concluding that the *ideal* family consists of both a mother and a father. In other words, if the choice is between one parent and two parents, there is no reason for the state ever to prefer one parent. If the choice is between two same

public institution, giving character to our whole civil polity." (Emphasis in original; internal quotation marks omitted.) *Maynard* v. *Hill*, 125 U.S. 190, 213, 8 S. Ct. 723, 31 L. Ed. 654 (1888). Thus, the institution of marriage is primarily concerned with preserving the existing civil polity, not with bestowing individual rights.

[26] We long have recognized that testimony from legislative committee hearings may be relevant to a statutory analysis because it tends to shed light on the problems that the legislature was attempting to resolve in enacting the legislation. E.g., *Burke* v. *Fleet National Bank*, 252 Conn. 1, 17, 742 A.2d 293 (1999).

sex parents and two opposite sex parents, however, there are reasons for the state to promote the latter. Indeed, General Statutes § 45a-727a (4) expressly provides that "the current public policy of the state of Connecticut is now limited to a marriage between a man and a woman." The inclusion of this provision, which defines the state's policy regarding the best interests of a child, in the adoption statutes clearly indicates that the legislature believes that limiting marriage to one man and one woman is in the best interests of children as a class.[27] This conclusion is further supported by General Statutes § 45a-727b, which expressly provides that "[n]othing in . . . section . . . 45a-727a . . . shall be construed to establish or constitute an endorsement of any public policy with respect to marriage, civil union or any other form of relation between unmarried persons . . . ." In addition, General Statutes § 45a-726a provides in relevant part that "[n]othing in th[at] section shall be deemed to require the Commissioner of Children and Families or a child-placing agency to place a child for adoption or in foster care with a prospective adoptive or foster parent or parents who are homosexual or bisexual."

The plaintiffs also contend that the state could not rationally conclude that extending marriage to same sex couples would *prevent* procreation and child rearing by opposite sex couples. I agree with the plaintiffs that it is doubtful whether any state policy could entirely

---

[27] The majority conspicuously omits any discussion of this statutory provision in its opinion, although it relies on § 45a-727a (3) in support of its conclusion that "it is the public policy of this state that sexual orientation bears no relation to an individual's ability to raise children . . . ." Part V B of the majority opinion. Of course, no one in this case is challenging the parenting ability of gay individuals. I find it troubling that the majority is willing to consider the plaintiffs' arguments in support of their claim that same sex marriage will have no deleterious effect on the welfare of children while expressly declining to address the arguments to the contrary. See footnote 12 of this opinion.

prevent men and women from procreating. As I have indicated, however, the state could rationally conclude that honoring and privileging marriage between one man and one woman as the ideal setting for procreation is conducive both to procreation and to responsible child rearing, and that redefining marriage to be a loving, committed relationship between two adults could have a significant effect on the number of opposite sex couples who choose to procreate and raise children together. See footnote 15 of this opinion.

Finally, I address the plaintiffs' claim that, even if there once was a link between procreation and marriage, such a link was based on sexual stereotypes and other outdated notions about the nature of family life, and such notions are no longer viable in light of the "steady legal, sociological and economic developments since the late nineteenth century . . . ." They contend that "[m]arriage is now an institution of legal equality between . . . two parties whose respective rights and responsibilities are equal, mutual and reciprocal. The state's astonishing insistence on resurrecting legal restrictions that pigeonhole individuals . . . on [the basis of] broad generalizations about sex roles flies in the face of rudimentary sex discrimination law." It is undisputed that the role of women in public and economic life has increased dramatically in the last century and that women have achieved an unprecedented degree of equality with men in our nation. That does not mean, however, that the procreative roles of men and women have changed or that there is no distinction between the parenting roles of men and women.[28]

---

[28] I agree with Justice Borden's response to the plaintiffs' argument that any link between marriage and procreation was severed by the decisions of the United States Supreme Court in *Griswold* v. *Connecticut*, 381 U.S. 479, 85 S. Ct. 1678, 14 L. Ed. 2d 510 (1965), *Turner* v. *Safley*, 482 U.S. 78, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987), and *Lawrence* v. *Texas*, supra, 539 U.S. 558. See part IV of Justice Borden's dissenting opinion.

In any event, even if the plaintiffs were correct that procreation is no longer at the center of the institution of marriage, that would not help them. As I have indicated, the reason that marriage between one man and one woman historically has had a privileged social status and has been considered a constitutionally protected fundamental right has been society's special concern with procreative conduct. If the link between marriage and procreation were destroyed, then the elevated social and constitutional status of marriage in our society also would be destroyed, and marriage would be nothing but a set of statutory rights and obligations, which is exactly what civil union is. In that case, the trial court would have been correct to conclude that the difference between the two institutions was merely a matter of nomenclature.

Accordingly, I reject the plaintiffs' claim, and the majority's conclusion, that redefining marriage to include same sex couples takes nothing away from the institution. See part VI E of the majority opinion (redefining marriage "would *expand* the right to marry without any adverse effect on those already free to exercise the right" [emphasis in original]). The redefinition of marriage takes away society's special concern with the institution as one involving the great societal risks and benefits of procreative conduct. The majority's reliance on *Loving* v. *Virginia*, supra, 388 U.S. 1, in support of its conclusion to the contrary is entirely misplaced. See part VI E of the majority opinion (recognizing right to same sex marriage "[will] not disturb the fundamental value of marriage in our society and . . . will not diminish the validity or dignity of opposite-sex marriage . . . any more than recognizing the right of an individual to marry a person of a different race devalues the marriage of a person who marries someone of [his or] her own race" [internal quotation marks omitted]), quoting *Goodridge* v. *Dept. of Public Health*, supra,

440 Mass. 337. The laws criminalizing miscegenation intruded on the fundamental right to procreate, and the constitutional prohibition against this intrusion recognizes and *enhances* the special status of procreative conduct. Redefining marriage to include same sex couples has no such purpose or effect.

IV

Although there is no need for me to reach many of the other issues that the majority addresses, I am compelled to state that I am extremely troubled by several aspects of its analysis. First, as Justice Vertefeuille notes in her dissenting opinion, those who challenge the constitutionality of legislation "must sustain the heavy burden of proving its unconstitutionality *beyond a reasonable doubt.*" (Emphasis added; internal quotation marks omitted.) *State* v. *McKenzie-Adams*, 281 Conn. 486, 500, 915 A.2d 822, cert. denied, 552 U.S. 888, 128 S. Ct. 248, 169 L. Ed. 2d 148 (2007). Instead of requiring the plaintiffs to meet this heavy burden, the majority bases its opinion on entirely unfounded assumptions about the subject and purpose of our marriage laws, the classification created by them and their discriminatory intent. Not only have the plaintiffs failed to establish these matters beyond a reasonable doubt, they have failed to present *any* evidence to support the majority's conclusions.

Second, the majority states that "[t]his court also has determined that, for purposes of the state constitution, [the] two-tier analysis of the law of equal protection . . . that distinguishes only between legislation requiring strict scrutiny, which typically fails to pass constitutional muster, and legislation requiring a rational basis, which typically does pass, is not sufficiently precise to resolve all cases. Legislation that involves rights that may be significant, though not fundamental, or classifications that are sensitive, though not suspect, may

demand some form of intermediate review." (Internal quotation marks omitted.) Part III of the majority opinion, quoting *Eielson* v. *Parker*, supra, 179 Conn. 564. Contrary to this statement, we never have made any such determination. Our statements in *Eielson*, in *Daly* v. *DelPonte*, 225 Conn. 499, 513, 624 A.2d 876 (1993), and in *Keogh* v. *Bridgeport*, 187 Conn. 53, 67, 444 A.2d 225 (1982), that the state constitution might recognize intermediate scrutiny were dicta and were unsupported by any analysis of the text of the equal protection provisions of the Connecticut constitution. In *Carofano* v. *Bridgeport*, 196 Conn. 623, 495 A.2d 1011 (1985), we assumed without deciding that laws affecting "the liberty of a person to live where he chooses while maintaining employment with a municipality" were subject to intermediate scrutiny. Id., 642. In light of the significant differences between the equal protection provisions of the state and federal constitutions, I have serious doubts as to whether intermediate scrutiny ever is appropriate under the state constitution.

Third, I am troubled by the majority's analysis under *State* v. *Geisler*, 222 Conn. 672, 685, 610 A.2d 1225 (1992). Historically, this court has used the *Geisler* analysis to determine the scope of a right under the state constitution. I am not aware of, and the majority has not cited, any cases in which we have used *Geisler* to determine whether the Connecticut constitution recognizes a suspect class that has not been recognized under the federal constitution. Indeed, *Geisler* was not mentioned in any of the cases to which the majority cites in support of its conclusion that intermediate scrutiny has been applied under the state constitution.

Moreover, none of the six *Geisler* factors supports a conclusion that sexual orientation is a quasi-suspect class in this state. With respect to the first *Geisler* factor, the text of the state constitutional provisions, I am not persuaded by the majority's analysis for the reasons

that I already have stated. The cases that the majority relies on for the proposition that the state constitution contemplates quasi-suspect classifications do not support such a conclusion, and the majority has not squarely addressed the textual differences between the state and federal constitutions.

Because the majority's analysis under *Geisler*'s second factor, decisions of this court and the Appellate Court, and the third factor, decisions of the federal courts, are closely intertwined, I address them together. The majority acknowledges that the Appellate Court and virtually all federal courts have concluded that sexual orientation is not a suspect classification but rejects the reasoning of these courts because they "relied on the holding of *Bowers* v. *Hardwick*, [478 U.S. 186, 106 S. Ct. 2841, 92 L. Ed. 2d 140 (1986), overruled by *Lawrence* v. *Texas*, supra, 539 U.S. 558], in which the United States Supreme Court upheld the constitutionality of a Georgia statute that criminalized homosexual sodomy." These courts have concluded that, because it is constitutionally permissible to criminalize homosexual conduct, a group that is defined by that conduct cannot be a quasi-suspect class. See, e.g., *Ben-Shalom* v. *Marsh*, 881 F.2d 454, 464–65 (7th Cir. 1989), cert. denied sub nom. *Ben-Shalom* v. *Stone*, 494 U.S. 1004, 110 S. Ct. 1296, 108 L. Ed. 2d 473 (1990); cf. *State* v. *John M.*, 94 Conn. App. 667, 678–84, 894 A.2d 376 (2006), rev'd on other grounds sub nom. *State* v. *John F.M.*, 285 Conn. 528, 940 A.2d 755 (2008). The majority notes that *Bowers* was overruled by *Lawrence* v. *Texas*, supra, 558, and concludes that, "after *Lawrence*, the social and moral disapprobation that gay persons historically have faced supports their claim that they are entitled to heightened protection under the state constitution." Part VI C of the majority opinion.

The majority may be correct on this point, which it already has made in the first part of its analysis applying

the federal test for determining suspect classifications, *but it is not the point that is under consideration.* Under these two prongs of *Geisler*, the question is whether the courts of this state or federal courts ever have concluded that sexual orientation is a quasi-suspect classification. If the answer to that question is no, but the reasoning of cases in which that classification has been rejected is not persuasive, then it may be that these cases do not weigh *against* this court's determination that sexual orientation is a quasi-suspect classification. It cannot be said, however, that the cases *support* such a determination. Thus, at best, the second and third *Geisler* factors are neutral.

Similarly, with respect to the fourth prong of *Geisler*, the decisions of our sister states, if the majority is not persuaded by the reasoning of the majority of state courts that have concluded that sexual orientation is not a suspect class, then the factor is neutral, at best. The fact that only a small minority of states agree with the majority's independent analysis under the federal test cannot be considered as favoring the plaintiffs' claim.

The majority declines to address the fifth prong of *Geisler*, the history of our state's equal protection provisions, because, according to the majority, "[n]either the plaintiffs nor the defendants contend that the history of this state's equal protection provisions . . . bears materially on the determination of whether [sexual orientation is] a quasi-suspect class[ification]." Footnote 73 of the majority opinion. To the contrary, however, the defendants expressly contend that "nothing in Connecticut's 'unique historical record' supports the conclusion that [the equal protection] provisions of the state constitution . . . were intended to protect sexual orientation as a suspect classification" and that "it is not possible to conclude that the framers intended [these provisions] to protect sexual orientation as a suspect

classification . . . ."[29] The plaintiffs do not rebut this contention and point to nothing in the history of our constitution that would support a conclusion that the framers or the people of the state believed that gay persons would receive special protection under the equal protection provisions. Accordingly, I would conclude that this factor weighs in favor of the defendants.

With respect to the sixth *Geisler* factor, economic and sociological considerations, the majority focuses on the effect that denying marriage to same sex couples purportedly has on same sex couples and their children. The question under review, however, is whether the state constitution requires this court to treat sexual orientation as a suspect classification, not the constitutionality of excluding same sex couples from marriage. In my view, this *Geisler* factor requires this court to examine existing cultural and economic conditions in the state in order to determine whether Connecticut citizenry have expectations that are not adequately protected by the federal constitution. Cf. *State* v. *Bernier*,

---

[29] To the extent that the majority contends that these statements were inadequately supported by citations to the historical record, the burden is not on the defendants to prove a negative. Nevertheless, I note that the amicus brief filed by the Knights of Columbus notes that, at the time that article first, § 20, of the state constitution was amended in 1974 to prohibit discrimination on the basis of sex, some citizens were concerned that the amendment could be interpreted as requiring the recognition of same sex marriage. The Hartford Courant published an editorial stating that any such claim was "nonsense," and the Danbury News-Times characterized the claims as "scare tactics." Gloria Schaffer, then the secretary of the state, and Kay Bergin, the executive director of the permanent commission on the status of women, gave a joint public statement that such claims were "unfounded" and were "misleading and inflammatory, calculated to frighten and to distort the true meaning of the proposed amendment." There is no evidence that the drafters or the supporters of the amendment ever disputed these characterizations or believed that the critics of the amendment were correct. In light of this history, it is difficult for me to believe that the drafters of the equal protection provisions of our constitution, or those who voted for them, believed that sexual orientation should be treated as a quasi-suspect classification.

246 Conn. 63, 72, 717 A.2d 652 (1998) ("[t]he analysis focuses on whether Connecticut citizenry [are] prepared, because of [their] code of values and [their] notions of custom and civility to [recognize heightened protection under the state constitution]" [internal quotation marks omitted]). The majority has pointed to no specific "values [or] . . . notions of custom and civility"; id.; in this state that would lead to the conclusion that Connecticut citizenry have expectations about laws classifying on the basis of sexual orientation that differ from those shared by the rest of the country, thereby requiring this court to subject the laws to heightened scrutiny. Instead, the majority apparently concludes that it must determine whether barring same sex marriage would have a disparate impact on gay persons because, if so, then sexual orientation must be a suspect classification; otherwise, the state would not be required to provide strong justification for that disparate impact.[30] The majority ultimately concludes that, because barring same sex couples from marriage could lead some gay persons to feel like second-class citizens, this prong "militates strongly in favor of the [plaintiffs' claim]."[31] Part VI E of the majority opinion. The majority has cited no authority, however, for the novel proposition that the potential negative impact of legislation on a particular group is a factor in determining whether

[30] The majority states that, "[a]t a minimum . . . recognizing gay persons as a quasi-suspect class would substantially increase the likelihood of a determination that same sex couples are entitled to marry in view of the fact that the state would be required to provide strong justification for denying them that right. Accordingly, we consider the public policy ramifications of invalidating the statutory scheme barring same sex marriage." Part VI E of the majority opinion.

[31] The defendants have stipulated that several of the plaintiffs *feel* that the marriage laws treat them as second-class citizens, and I have no reason to doubt that that is the case or to suggest that such feelings are unreasonable. The defendants have expressly denied, however, that "[b]eing 'placed into a separate category, such as civil unions, brands [the plaintiffs'] relationship[s] as second class . . . .'"

the group constitutes a suspect class.[32] Moreover, its reasoning is entirely circular, and, like the reasoning throughout the majority opinion, omits any reference to the actual interest of the citizenry in preserving the institution of traditional marriage despite any disparate impact that it may have on gay persons. Finally, as I have indicated, in the absence of intentional discrimination, a law's disparate impact on a particular group does not implicate equal protection principles. Accordingly, I am distinctly unpersuaded by the majority's *Geisler* analysis. Indeed, it is apparent to me that these factors weigh in the defendants' favor.

## V

Contrary to the majority's purported belief that society's sole justification for preserving traditional marriage between one man and one woman is the tautological claim that "marriage is heterosexual because it just is"; (internal quotation marks omitted) *Conaway* v. *Deane,* supra, 401 Md. 427 (Bell, C. J., dissenting); there are powerful reasons for preserving the institution. In concluding otherwise, the majority deliberately has closed its eyes to those reasons, has failed to engage in a proper analysis under the equal protection provisions of our state constitution and has distorted our state constitutional jurisprudence as set forth in *Geisler.* Indeed, in my view, the sole basis for the majority's conclusion that traditional marriage is no longer constitutional is the majority's a priori, unsubstantiated belief that "it just isn't." "Thus, the majority has [abused] this court's power to interpret the constitution in order to mandate a vast and unprecedented social experiment"; *Sheff* v. *O'Neill,* 238 Conn. 1, 61, 678 A.2d 1267 (1996) (*Borden, J.,* dissenting); the results

[32] Of course, if the legislation negatively impacts a fundamental right, then it is subject to heightened scrutiny under substantive due process principles. I have concluded that there is no fundamental right to same sex marriage.

of which will be beyond the power of both this court and the people of this state to correct.

Accordingly, I reject the majority's conclusion that limiting marriage to one man and one woman is unconstitutional. If the state's interests in promoting and regulating procreation are no longer sufficient to warrant the continuation of traditional marriage, then the decision to terminate that ancient institution is appropriate for the democratically elected legislature. To end an institution that the plaintiffs contend is time honored and special by judicial fiat is a usurpation of the legislative prerogative and a violation of the fundamental right of the people, on which the very existence of our constitution is premised, "to define, secure and perpetuate the liberties, rights and privileges which they have derived from their ancestors . . . ." Conn. Const., preamble.